## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY J. STANCEU, SENIOR JUDGE

| | | |
|---|---|---|
| YAMA RIBBONS AND BOWS CO., LTD. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 21-00402 |
| | ) | |
| UNITED STATES, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | Contains confidential information on |
| BERWICK OFFRAY, LLC, | ) | pages 10, 11, 14, 41 |
| | ) | |
| Defendant-Intervenor. | ) | |
| _____ ___ | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF YAMA RIBBONS AND BOWS CO., LTD'S 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

John J. Kenkel
Alexandra H. Salzman
Judith L. Holdsworth
J. Kevin Horgan
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.
Tel:   (202) 783-6900
Fax:   (202) 783-6909
Email: jkenkel@dhlaw.com
Counsel for Plaintiff *Yama Ribbons & Bows Co., Ltd.*

Dated: February 4, 2022

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   STATEMENT PURSUANT TO RULE 56.2(c) ...........................................1

      **A.** The Administrative Determination under Review .............................................1

      **B.** Issues of Law Presented ..............................................................................2

      **C.** Summary of Arguments ..............................................................................3

III.  STATEMENT OF FACTS RELEVANT TO THE ISSUES ...................................5

IV.   STANDARD OF REVIEW ...............................................................................17

V.    ARGUMENT .......................................................................................................22

      A.  SUBSTANTIAL EVIDENCE ON THE RECORD DEMONSTRATES
          THAT THE GOC AND YAMA GAVE FULL, VERIFIABLE ANSWERS
          REGARDING USAGE OF THE EXPORT BUYERS CREDIT (EBC)
          PROGRAM……………………………………………………………… 22

          1.  Introduction .................................................................................22

          2.  The instructions in the questionnaires were clear regarding the
              information required for non-used subsidy programs .........................25

              a.  Original Questionnaire and Supplemental Questionnaires ...........25

          3.  Commerce's Final Decision Memorandum conflates the real issue:
              was an EBC subsidy obtained by Yama's U.S. customers? .............25

                  a.  Commerce found 17+ other programs to not be used with
                      zero explanation on the record by either Yama or the GOC
                      concerning how they operated……...…………….…….. 26

          4.  The Statute Is Clear.  AFA Was Not Warranted For The EBC
              program……………………………………………………………27

                  a.  The Statute is unambiguous  ……………………………27

                  b.  Commerce's decision is due no deference under Chevron
                      since Congress has spoken to the issue whether there is

missing information.………………………………………..28

   i.   The first prong of the *Chevron* test has been met. ...........28

c.  AFA can only be used to be in gaps in the record. .................30

d.  Since the facts clearly demonstrate no gaps in the record,
    AFA cannot be used.................................................................30

e.  The information supplied by the GOC and Yama was
    verifiable…..…………………………………………………32

f.  The courts have held that foreign governments are not required
    to  give confidential information to Commerce......................33

5.  The Department's selection of the rate to apply to the alleged
    benefit received from the EBC program was unreasonable and
    unsupported by substantial evidence. ................................................33

    a.  The rate selected as AFA does not comply with either
        Commerce's stated policy or the statute .................................34

    b.  The current rate is punitive ......................................................36

6.  Recently, the courts have consistently ruled against Commerce
    regarding the EBC program ...............................................................37

**B.  COMMERCE ERRED IN FINDING THAT PROVISION OF SYNTHETIC
YARN AND CAUSTIC SODA FOR LESS THAN ADEQUATE
REMUNERATION WAS COUNTERVAILABLE**………………………38

1.      The Department Should Not Have Applied AFA With Respect to the
        Synthetic Yarn and Caustic Soda LTAR Programs. ...........................38

2.   The synthetic yarn and caustic soda market are not distorted;  Yama's
     suppliers are not "authorities," and the specificity requirement is moot
     …………………………………………………………….40

     a.  Substantial evidence confirms that the synthetic yarn and caustic soda
         markets are not distorted by the GOC……………………………...40

     b.  Yama's synthetic yarn and caustic soda suppliers are private
         companies with no ties to the CCP.  They are not government
         "authorities."……………………………………………. ………...44

3.    The Provision of Synthetic Yarn and Caustic Soda Is Not
      Specific………………………………………………………………46

        a.   The GOC Acted to the Best of Its Ability in Providing Verifiable
             Answer Regarding the Specificity Element…..………………..46

        b.   Any LTAR subsidies are not limited to a single industry…...…..47

        c.   Most important, contrary to Commerce's claim, the Statute does
             require that a specific "program" exist. ……...…………………48

**VI.    CONCLUSION** .............................................................................................49

# TABLE OF AUTHORITIES

## CASES

*Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1562 (Fed. Cir. 1984) ........................18, 19

*Borden, Inc. v. United States*, 4 F. Supp. 2d 1221, 1246 ...............................................................28

*Changzhou Trina Solar Energy Co., Ltd. v. United States, Ct. No. I7 -00246, Slip Op. 18-167 (Ct. Int'l Trade Nov. 30, 2018)* ...........................................................................................37

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984) ..............16, 17

*Clearon Corp. v. United States, Consol. Ct. No. 17-00171, Slip Op. 19-13 (Ct. Itn'l Trade, Jan.25, 2019)* ...............................................................................................................................37

*Consolidated Edison Corp. v. Labor Board,* 305 U.S. 197, 229 (1938) ...............................19, 31

*Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983) ...................................19, 31

*Dorbest Ltd v. United States,* 462 F. Supp. 2d 1262, 1302 (Ct. Int'l Trade 2006) ......................19

*Elkem Metals Co. v. United States,* 468 F. 3. 795, 800 (Fed. Cir. 2006)......................................34

*Essar Steel Ltd. v. United States,* 721, F. Supp. 2d 1285, 1297......................................................32

*F. Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United Sttes*, 216 F.3d 1027, 2013 (Fed. Cir. 2000). ......................................................................................................................36

*Ferro Union, Inc. v. United States,* 23 CIT 178, 44 F. supp. 2d 1310, 1328 (1999) ...................27

*Fine Furniture (Shanghai) Ltd. v. United States,* 748 F.3d 1365, 1372 (Fed. Cir. 2014) ...........35

*Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1038 (Fed. Cir. 1996) .....................................17

*Gallant Ocean (Thai-land) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010) ............36

*Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) ............................18, 31

*Gerber Food (Yunnan) Co. v. United States,* 387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005) .........20

*Guizhou Tyre Co., Ltd. v. United States, Ct: No. 18-00100, Slip Op. 19-59 (Ct. Int'l Trade May 15,2019)* ..............................................................................................................................37

*Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183, 1192 (Ct. Int'l Trade 2009) ..............19

*KYD, Inc. v. United States,* 607 F.3d 760, 767-68 (Fed. Cir. 2010) .............................................36

iv

*Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009) .........................22, 42

*Maverick Tube Corp. v. United States*, 857 F.3d 1353, (Fed. Cir. 2017) ...............................21, 36

*Mueller Comercial de Mex., S. de R.L. de C.V.  v. United States,* 753 F.3d 1227.......................21

*National Cable & Telecommunications Ass'n v. BrandXInternet Services,* 545 U.S. 967, 982-983 (2005) ...............................................................................................................................17

*Novosteel SA v. United States, 284 F.3d 1261, 1276 (Fed. Cir. 2002)* ................................22

*PesqueraMares Australes Ltda. v. United States,* 266 F.3d 1372, 1379 (Fed. Cir.2001)..............17

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) ....................................................................................................................19

*Shandong Huarong Machinery v. United States,* 435 F. Supp. 2d 1261, 1289, (Ct. Int'l Trade 2006) ...................................................................................................................................20

*SKF USA Inc. v. United States,* 675 F. Supp. 2d 1264, 1274-1275 (Ct. Int'l Trade 2009) ..........34

*Skidmore v. Swift & Co.,* 323 U.S. 134 (144) ......................................................................17, 18

*Taian Ziyang Food Co. v. United States,* 637 F. Supp. 2d 1093. 1102 (Ct. Int'l Trade June 29, 2009) ...................................................................................................................................34

*Timex V.I., Inc. v. United States,* 157 F.3d 879, 882 (Fed. Cir. 1998) ..........................................17

*Tung Mung Dev. Co., v. United States,* 354 F.3d 1371, 1378 (Fed. Cir. 2004) ...........................22

*United States v. Mead Corp.,* 533 U.S. 218, 228 (2001) ..............................................................10

*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951) ...............................................19, 31

*USX Corp. v. United States,* 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987) ...............................19

*Wheatland Tube Co. v. U.S.,* 495 F.3d 1355, 1361 (Fed. Cir. 2007) ......................................19, 31

*Yama Ribbons and Bows Co. v. United States, Ct. No. 18-54, Slip Op. l9-I73 (Ct. Int'l Trade Dec. 30, 2019)* ...................................................................................................................37

*Yama Ribbons and Bows Co. v. United States, Ct. No. 19-47; Slip Op. 21-50 (Ct. Int'l Trade, April 30, 2021),* ...................................................................................................................38

*Zhejiang Dunan Hetian Metal Co. v. United States,* 652 F.3d 1333, 1346 (Fed. Cir. 2011) .20, 29

**STATUTES**

19 CFR 351.514 .................................................................................................37

19 U.S.C. §1516a(a)(2)(B)(iii). ..........................................................................1

19 U.S.C. §1516a(b). .........................................................................................16

19 U.S.C. § 1671-1671(f) ...................................................................................16

19 U.S.C. § 1677e(a) ..................................................................................... 27, 29

19 U.S.C. § 1677e(a)(2)(A) .................................................................................40

19 U.S.C. § 1677(e)(b). ...............................................................20, 27, 29, 30

19 U.S.C. § 1677m(d) .........................................................................................29

19 U.S.C. § 1677m(e) .........................................................................................29

19 U.S.C. §1677(5) .............................................................................................40

**ADMINISTRATIVE DECISIONS**

*Chlorinated Isocyanurates From the People's Republic of China: Final Affirmative Countervailing Duty Determination: 2012, 79 Fed. Reg. 56,560 (Sept. 22, 2014) and accompanying IDM at 15* ..........................................................................32

*Boltless Steel Shelving Units Prepackaged for Sale Final Affirmative Countervailing Duty Determination, 80 Fed. Reg. 51,775 (August 26, 2015) and accompanying IDM* .......................32

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Notice of Correction for Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 75 Fed. Reg. 75,663 (Dec. 6, 2010) and accompanying Issues & Decision Memorandum (Sept. 20, 2010) ("Coated Paper IDM") and Dep't Memorandum re: Ministerial Errors for Final Determination (Nov. 12, 2010) ("Coated Paper MEM")* ......................................34, 35

*Final Determination in the Countervailing Duty Investigation of Truck and Bus Tires from the People's Republic of China; and Final Affirmative Determination of Critical Circumstances, in Part, 82 Fed. Reg. 8,606 (Dep't Commerce Jan. 27, 2017) and accompanying IDM at Comment 6* ..............................................................37

*Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Final Results of Countervailing Duty Administrative Review: 2015, 83 Fed. Reg., 11,117, (March 14, 2018) and accompanying Decision Memorandum ("DM") (March 8, 2018) ("Final*

*Results")* .................................................................................................................25

*Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review: 2018, 86 Fed. Reg., 7264, (January 27, 2021)("Preliminary Results")* ........................................................2

*Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Final Results of Countervailing Duty Administrative Review: 2018, 86 Fed. Reg., 40462, (July 28 2021) ("Final Results")* ...................................................................................................1

## I.    <u>INTRODUCTION</u>

The U.S. Department of Commerce failed to calculate a separate rate for Plaintiff Yama

6Ribbons and Bows Co., Ltd. ("Yama") in its administrative review of Narrow Woven Ribbons

With Woven Selvedge from the People's Republic of China regarding the Export Buyer's Credit

(EBC") Program and provision of certain raw materials at less than adequate remuneration

("LTAR").      The Department's conduct of the review and use adverse facts available against

the Government of China ("GOC"), with direct application to Yama, was not reasonable,

arbitrary and capricious, an abuse of discretion, not supported by substantial evidence on the

record, and was otherwise not in accordance with law.


## II.    <u>STATEMENT PURSUANT TO RULE 56.2(c)</u>

### A.  The Administrative Determination under Review

This action is brought pursuant to 19 U.S.C. § 1516a (a)(2)(B)(iii) to contest the

Commerce Department's ("Commerce," or "the Department," or "DOC") *Final Results* of its

2018 administrative review of the countervailing duty ("CVD") order, issued  July 23 2021 and

published July 28 2021.   *Narrow Woven Ribbons With Woven Selvedge From the People's*

*Republic of China: Final Results of Countervailing Duty Administrative Review: 2018*, 86 Fed.

Reg., 40462, (July 28 2021) P.R. 176 and accompanying Decision Memorandum ("DM") (July

23 2021) ("*Final Results*") P.R. 174 (unpublished); ("P.R. refers to the Department's public

record; "C.R." refers to the confidential record),  and accompanying Memorandum

(Memorandum to: Christian Marsh, Acting Assistant Secretary for Enforcement and

Compliance; From: James Maeder, Deputy Assistant Secretary for Antidumping and

2

Countervailing Duty Operations;  Subject: Decision Memorandum for the Final Results of 2018
Countervailing Duty Administrative Review: Narrow Woven Ribbons with Woven Selvedge
from the People's Republic of China. (July 22 2021) ("DM"), P. R. 174.  Commerce determined
a rate of 42.20 percent.

This decision was based entirely on the Department's *Preliminary Results* and its
preliminary decision memorandum.  *Narrow Woven Ribbons With Woven Selvedge From the
People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review:
2018*, 86 Fed. Reg., 7264, (January 27, 2021); P.R. 165; ("*Preliminary Results*");  and
accompanying Memorandum (Memorandum to: Jeffrey I. Kessler, Assistant Secretary for
Enforcement and Compliance; From: James Maeder, Deputy Assistant Secretary for
Antidumping and Countervailing Duty Operations;  Subject: Decision Memorandum for the
Preliminary  Results of 2018 Countervailing Duty Administrative Review: Narrow Woven
Ribbons with Woven Selvedge from the People's Republic of China. (January 21, 2021))
("PDM"), P. R. 162.

### B.  Issues of Law Presented

There are four issues presented.  First, whether the Department's use of adverse facts
available ("AFA") against the Government of China ("GOC") regarding the provision of export
buyer credits ("EBCs") because it withheld information and did not act to the best of its ability,
was reasonable, based on substantial evidence on the record, and otherwise in accordance with
law, or arbitrary and capricious and an abuse of discretion.

Second, whether the countervailing duty determined for Yama due to the use of AFA
against the GOC for the EBC program was reasonable, based on substantial evidence on the
record, and otherwise in accordance with law, or arbitrary and capricious and an abuse of

3

discretion.

Moreover, if AFA for EBCs is warranted, whether the 10.54 percent used as AFA for the EBC Program was based on substantial evidence and in accordance with law.  Or, whether Commerce failed to follow its policy and the statute in implementing the hierarchy that it must follow.

Third, whether the use of AFA against the GOC for perceived failures to provide information regarding alleged benefits accruing to Yama due to provision of synthetic yarn and caustic soda at less than adequate remuneration ("LTAR") was based on substantial evidence on the record and in accordance with law.

Finally, whether the use of AFA against Yama, based on AFA applied to the GOC, for provision at less than adequate remuneration ("LTAR") for synthetic yarn and caustic soda, was based on substantial evidence on the record and otherwise in accordance with law.  And, given that only "programs," as defined in the Statute, may be countervailed, whether such a "program" existed in the POR.

### C.  Summary of Arguments

First, the GOC stated it did not grant any subsidies regarding the export buyer's credits in the POR to any of Yama's U.S. customers.  Yama's verifiable responses confirmed this fact. Commerce asked further questions of the GOC with the sole intent to determine the specifics of this program, not whether it was used.  Commerce determined that the GOC did not answer these ancillary questions to its satisfaction.  The GOC provided fully verifiable evidence that the EBC program was not used in the POR.

Further, Commerce stated in its IDM that it is impossible to verify the use of any program unless it has a full working knowledge of that program, even if it is not used.  Yet,

4

Commerce did not require any details of 17+ other programs which it found to not be used by Yama in the POR.   Commerce asked not a single question about how these non-used programs operated.

Accordingly, Commerce used AFA to determine that this program was used and was countervailable.  This decision did not comply with the first prong of the *Chevron* test.  Congress has spoken and the statute states that if no information is missing from the record, Commerce cannot use either facts available or adverse facts available.  All relevant information was supplied by the GOC.  Further, it was arbitrary and capricious and an abuse of discretion for Commerce to require such details for this program when it did not require such details for 17a+ other unused programs.  Moreover, this request for details regarding how the program operated was in direct conflict with the numerous instructions in the questionnaire specifically not requiring such detail for unused programs.

Second, Commerce erred by applying the AFA rate given to the GOC to the facts supplied by Yama.  This decision was not based on substantial evidence on the record and not in accordance with law.  In fact, this decision was made despite substantial evidence on the record and case law.   Commerce is restricted to applying AFA to facts missing from the record.  No facts were missing from the record to determine whether EBCs were granted.  Thus, the decision also was arbitrary and capricious and an abuse of discretion.  Commerce did not simply fill in missing gaps in the record.   Rather, it ignored the essential facts on the record.

Over the last several years, this Court has consistently ruled that EBCs were not used by the mandatory respondent based on virtually the identical fact pattern.

Moreover, assuming, *arguendo*, that Commerce made the right decision to apply AFA to Yama regarding the EBC program, it applied the wrong CVD margin for this program.

5

Commerce did not follow the hierarchy contained in its stated policy or the statute.

Third, regarding alleged provision of synthetic yarn and caustic soda for less than adequate remuneration ("LTAR"), the GOC gave complete answers necessary to resolve this issue. Those answers included verifiable evidence that the GOC did not influence these markets. When GOC did not give answers satisfactory to Commerce, it was either because the information was not available or could not be released by the GOC under its confidentiality laws.

Indeed, the information provided by the GOC confirms that it does not control any significant portion of the synthetic yarn and caustic soda industries in China or dictate production or prices or to whom the producers may sell or from whom the buyers may purchase these raw materials.

Most importantly, the Statute requires that a foreign country (1) have a specific "program" in place that is specific to the alleged LTAR in question, (2) that this program be administered by some "authority," and (3) that it be in existence for a definable amount of time. There is not even a scintilla of evidence on the record that any of these requirements existed in the POR.

Finally, substantial evidence on the record demonstrates that none of Yama's synthetic yarn or caustic soda suppliers were anything other than privately owned, with no ownership by the GOC and none of the suppliers' managers were members of the Chinese Communist Party ("CCP"). Thus, these suppliers did not meet the test to be "authorities" under the statute.

### III.       STATEMENT OF FACTS RELEVANT TO THE ISSUES

The Department published the initiation notice on November 11, 2019, 84 Fed. Reg. 61011 (November 12, 2019).   P.R. 2.

Commerce issued the original questionnaire to the GOC, which then forwarded Section

6

III to Yama, November 20, 2019.  P.R. 5.  Commerce asked the GOC to report data on sales of synthetic yarn and caustic soda, government plans regarding the industry, any government control of these producers, etc. See Q're, pp. II 5-12.  In Section III of the questionnaire, Commerce asked Yama specific questions about its purchases, rather than broader questions about the LTAR program.  For example, report input purchases of synthetic yarn and caustic soda, freight costs, and trade publications.  See Q're, pp. III 10-12.

The original questionnaire also asked questions about exports buyer's credits ("EBCs"). The questions to the GOC are contained on pp. II 12-14.  In part, those questions included: "you do not need to provide a response to the **Standard Questions Appendix** if there were no changes to the program." *Id.* at II-12 (emphasis in original).  The questions also were limited to those customers of Yama who received any benefits in the POR.  "However, you must answer the below listed questions regarding Export Guyer's Credits **provided to all** U.S. customers of the mandatory company respondents (including all responding cross-owned affiliated companies) during the POR."  *Id.* (emphasis in original).  Thus, if no benefits were "provided" no answers were required.

For Yama, the original questionnaire asked only three questions regarding the EBC program.  See Q're, p. III-13. First, list all customers with their addresses.  Second, discuss the role of Yama in customers obtaining EBCs, including all documents submitted to the GOC in this regard.  Third, if no customers were provided these benefits, explain how you determined this fact.

In addition to the above recitations of lack of interest on the part of Commerce where no benefits were provided, throughout the original questionnaire, Commerce made it abundantly clear, time after time, that it was not interested in details for alleged subsidies not provided in the

POR.  First, broadly, Commerce cited a broad disinterest in any unused program.

> For each subsidy program, if a company subject to this review did not
> apply for, use, or benefit from that program during the POR, your
> government must so state and provide a **brief** explanation of the
> program and a detailed description of the records kept on that
> program.  Otherwise, please answer all questions listed completely,
> except as directed below.

*Id.* at II-2 (emphasis added).  The remainder of the original questionnaire, multiple times, states that no even these "detailed descriptions" were required, as noted below.

Second, the original questionnaire listed 17+ alleged subsidies which were either not used by Yama or provided no measurable benefits.  *Id*. at II-14 and elsewhere.  "If no respondent company used a program during the stated time period, please so state; you need **not** provide a response to the appendices for the program." *Id.*  (*emphasis added*).  The Appendices are contained in Section V of the original questionnaire.  See Q're, pp. II-16-30.  Thus, not only for these 17+ programs, but for the unused synthetic yarn and caustic soda, as well as the EBC program, the GOC and Yama **were not required to answer**, *inter alia*, the following questions contained in the appendices:

**Standard Questions Appendix**

1. Provide a description of the program including the purpose of the program and the
   date it was established.  *Id*. at. II-16.

2. Provide the name and address of each government agency responsible for
   administering the program. *Id*.

3. Indicate which companies applied for these benefits.  *Id.*  "if none of these companies
   applied for, received, claimed, accrued or used assistance under this program during
   the period designated, **you need not reply to all of the remaining questions** in this

8

Appendix." *Id*. (Question C.) (emphasis added).

4.   Provide translated copies of laws and regulations or internal reports.

5.   Identify and explain the types of records by various government agencies.

6.   Describe the application process. *Id*. at II-18.

7.   Describe the criteria governing eligibility for and actual use of the assistance under this program.  *Id.*  Also see, p. II-19, Questions e. and f.

8.   Is the industry or sector in which the applicant or recipient operates taken into account?  *Id*. at II-19.

9.   List the names of companies and industries and amount of assistance obtained by each in which any mandatory respondent resided.  *Id.* at II-19-20.

**Usage Appendix:**

Commerce repeats its directive that these questions **only apply if** benefits were received for any given program.  "**If** any of the companies under review applied for, received, or accrued assistance under the program, please respond to the following questions." *Id.,* p. II-21. (*emphasis added*).

*1.*   Indicate which companies applied for, received, or accrued assistance under this program. *Id.*

2.   Provide name and address of each government agency administering this program.  *Id.*

3.   Identify and explain the types of records maintained by the relevant government agency.

4.   Describe the application process. *Id*.

5.   Provide details of the assistance, disbursement, etc.  *Id*.

**Income Tax Appendix**

This appendix also needed to be answered only if a company received tax benefits under a program.  *Id.* at II-22.

1.  Indicate the companies receiving tax benefits.  *Id.*

2.  Provide the name and address of the government agency administering the program*.  Id*.

3.  Explain how the tax benefit works*.  Id.*

**Input Producer Appendix**

Here, Commerce breaks down questions between input producers who are majority-owned by the government and those which are not.  It asks for corporate details of each input producer, including ownership, management, how key decisions are made within each company, how each company relates to the Chinese Communist Party (CCP), e.g., does the CCP have any power to control the company, whether any restructuring of the companies has occurred, identification of senior managers, identify which owners/managers are members of the CCP

Again, none of these questions in any of these appendices need to be answered pursuant to the above-cited directions for programs which were not used by Yama.

While there also is an electricity appendix, it is not pertinent to this litigation.

Turning to Section III of the original questionnaire, questions specifically addressed to Yama, we see, repeatedly, the same tone evinced by Commerce.

"However, we must determine the extent to which your company used these programs." *Id*. at III-10 (under the LTAR section).

Thus, just within these appendices, there are 17+ specific instances where Commerce directed the government and Yama to ignore these questions if the program was not used.

Regarding EBCs, Commerce does not ask Yama a single question as to how this program works. *Id*., p. III-13.

Finally, regarding programs not used, *Id.,* at pp. III 13-14, for 17+ programs, Commerce reiterates what it told the GOC and what it stated in excruciating details in the Appendices.

> Therefore, **if** your company applied for or received benefits under any of the recurring subsidy programs identified below during the POR, please answer all questions in the **Standard Questions Appendix and nay other applicable appendices** of this section, separately for each program/company. **If** no respondent company used a program during the stated time period,   please so state; you need not provide a response to the appendices for the program.

*Id.* at p. III-14.  (Emphasis in original and added).  Thus, the additional Appendices in Section III (pp. III 15-20) were not applicable if a program were not used in the POR, just as they were not applicable in Section II of the questionnaire.

The GOC responded to the original questionnaire on January 10, 2020.  C.R. 4-26; P.R. 17-39.  Its submission consisted of 3,363 pages.

Regarding the provision of benefits for inputs of synthetic yarn and caustic soda under LTAR, the GOC provided an extensive response and associated exhibits.  In summary, the key information it provided included: (1) none of Yama's input suppliers was a state-owned enterprise ("SOE"); (2) the companies producing synthetic yarn in which the GOC has a majority ownership is [     ]%, and represents [     ]% of countrywide production; (3) none of the synthetic yarn producers used by Yama were either majority- or minority-owned by any entity of the GOC; (4) the GOC does not regulate pricing of synthetic yarn; rather the price is determined by market forces; (5) there are no export tariffs or quotas; (6) no export licensing requirements; (7) the GOC does not impose any limitations on the use of synthetic yarn and purchasers can source their product from any supplier, domestic or foreign; (8) the GOC provided SASAC

Decree No. 28, as requested, regarding SOE overseas investment, as well as Decree No. 35, which terminated Decree No. 28; (9) contrary to Commerce's belief, the GOC does not define certain terms requested by Commerce, e.g., "backbone," "pillar," 'key," etc.; (10) there is no five-year, or similar, plan for synthetic yarn regarding the producers of synthetic yarn used by Yama; (11) the GOC does not exert any control over mergers, restructurings, etc., of companies; and (12) such mergers, etc., are governed by market forces, not by SASAC or the GOC.  See GOC Resp. at 15-23.

Regarding caustic soda, the GOC explained: (1) the GOC has a majority share of [      ]% of caustic soda producers; (2) this majority ownership represents [      ]% of production two years prior to the POR;[1] data for the POR was not yet available at the time of the GOC response; (2) none of Yama's caustic soda suppliers are wholly or mainly owned by the GOC; later in its response (Resp. at 29), the GOC stated that Yama's supplier of caustic soda had zero ownership by any government entity.  For all remaining categories of questions, the GOC gave the same answers as it did for synthetic yarn, above.  See GOC Resp. at 23-31.

The GOC responded to questions regarding the EBC program.  See GOC Resp. at 31-36. In summary, the GOC stated: (1) Yama did not use this program in the POR; (2) there are no loans outstanding in POR; (3) there is no sample EBC application available, since none was submitted to the China Ex-Im Bank by Yama; (4) since no application was made in the POR, no interest rate was applicable; (5) regarding laws, etc., the GOC provided them in Exhibit D-2 and D-3; (6) no partner/correspondent banks were involved with Yama's customers in the POR, so there is no list of them; (6)  The GOC determined this program was not used in the POR, by

---

1 The initial data provided by the GOC in its original response was for 2016, prior to the POR since POR data was not yet available.  In a supplemental submission, the GOC updated its data for the POR.

12

asking the China Ex-Im Bank to search its records; the Ex-Im Bank found no EBC applications

or approvals; since the exporter is required also to be involved, to file the application on behalf

of its customer, the GOC asked Yama and it confirmed that none of its customers availed itself

of this program.  It is the exporter, Yama, which must make application to the Ex-Im Bank, not

the U.S. customer.  All of these facts are verifiable.

Yama submitted its response to Section III of the original questionnaire on January 10,

2020.  C.R. 27-36; P.R. 40.  Since neither facts available ("FA") nor adverse facts available

("AFA") were found to apply to Yama based on its responses, we do not address the details of its

responses at this time.  Suffice it to say that those responses were deemed to be fully complete by

Commerce.  *Infra*, we cite specific information provided by Yam.

Commerce placed on the record public memoranda, two of which are pertinent to the

instant litigation:

Commerce placed on the record a "Public Bodies Analysis Memo" on April 2, 2020.

P.R. 117-133.

Commerce also placed on the record on April 2, 2020, several documents relating to: (1)

129 Decisions, and (2) relevance of the Communist Party. P.R. 134-136.

 Commerce issued the first supplemental questionnaire to Yama on April 2, 2020.  C.R.

37; P.R. 137.Commerce issued its first supplemental questionnaire to the GOC on April 3, 2020.

C.R. 38; P.R. 138

Regarding the two issues at bar, Commerce asked Yama: (1) to reconcile purchases of

synthetic yarn and caustic soda to its cost of goods sold; (2) provide all purchases of synthetic

yarn not originally reported in kilograms, to kilograms.  There were no other questions regarding

either synthetic yarn or caustic soda.  There were zero questions regarding EBCs.  Thus, it is

13

clear that Commerce deemed all of Yama's original responses regarding these two programs to be complete.

Regarding these two programs, Commerce asked the GOC only three questions regarding synthetic yarn and caustic soda LTAR program: (1) update the 2016 data on government ownership or companies and production for the POR; (2) for two specifically-named companies, trace their ownership back to the ultimate owners; and (3) provide (a) list of industries purchasing these items; (b) amounts purchased by each industry; (c) identify those industries by a classification code, (d) provide the guidelines to classify industries in China, and (e) state which industry Yama is in.

For EBCs, Commerce also asked the GOC a mere three questions:  (1) explain how the Ex-Im Bank determined from its records that neither Yama nor its customers used the EBC program in the POR; and provide documentation to prove this; (2) provide the 2013 revisions to the Administrative Measures of Export Buyer's Credits of the Ex-Im Bank of China; and (3) provide a list of all partner/correspondent banks involved in the disbursement of funds in the EBC program.

All other answers provided by the GOC for these two programs should be deemed adequate, since Commerce did not issue any follow-up questions.

Yama submitted its first supplemental questionnaire response on April 16, 2020.  C.R. 39-40; P.R. 139.  It reconciled its purchases to the cost of goods sold and gave a unified measurement, in kilograms, for purchases.

The GOC submitted its first supplemental questionnaire response on April 17, 2020. C.R. 43; P.R. 140.  First, it provided the updated information on government-owned suppliers and quantity of total production for the POR.  It stated that it does not maintain statistics of value

of production.  In the POR [     ]% of synthetic yarn producers were majority owned by the

government.  [     ]% of production quantity was produced by these majority-owned companies.

For caustic soda, [     ]% of the producers were majority owned.  [     ]% of the quantity of

production originated from majority-owned producers.  Second, for the trace back of the

ownership of two companies, the GOC was unable to do so because these companies are not

Chinese companies. Since they are not Chinese companies, the GOC does not have any

information on them and they cannot be owned by the GOC.  Finally, regarding the request for

list of industries, purchases by the industry in which Yama operates, classifying all industries

using these inputs, the GOC stated it thought the question was not applicable since it does not

impose any limitations on any industry purchasing these inputs.    See GOC First Suppl. Resp. at

5-7.

 Thus, this last, single, question **is the only one the GOC did not answer** in the first

supplemental questionnaire response regarding synthetic yarn and caustic soda sold at LTAR.

 Regarding EBCs, the GOC reiterated that it determined that this program was not used by

contacting both (1) Yama, and (2) the Ex-Im Bank of China, which looked in their records.

(GOC First Suppl. Resp. at 17).  Regarding the 2013 revisions to the Administrative Measures of

Export Buyer's Credits of the Ex-Im Bank of China, the GOC said it does not maintain that

document.  Finally, regarding a list of participating banks, the GOC said that since this program

was not used in the POR by Yama, there is no list of banks.  Thus, the question is not applicable.

Only if the U.S. customer had applied for and been approved for this program, might it have

nominated a bank if it chose not to have the funds disbursed directly by the Ex-Im Bank to

Yama, in which case the correspondent bank would have disbursed the funds directly to Yama.

 Commerce issued a second supplemental questionnaire to the GOC on July 24, 2020.

15

C.R. 42; P.R.144.  Commerce asked only about the LTAR program for synthetic yarns and caustic soda.  There were no questions concerning the EBC program.  The first LTAR question concerned certain of Yama's suppliers.  Commerce asked about their ownership structure and basic registration information.  The second question asked the GOC to respond to the original questionnaire, in which it wanted to know (a) percentage of quantity and value of domestic production of these two inputs that is accounted for by companies in which the GOC has a majority ownership/control; it also asked for the names of these companies. If the quantity and/or value that is reported in the original questionnaire response included companies with less than 50 percent GOC ownership/control, then (i) submit the percentage of quantity and/or value of production of those companies in which the government ownership is less than a majority; (ii) a list of companies meeting the criterion in (i) above, and (iii) a detailed explanation of how the GOC determined it owned less than a majority in these companies.

There were no questions regarding the EBC program.

Commerce did not issue a second supplemental questionnaire to Yama.

The GOC submitted its response to the second supplemental questionnaire on August 14, 2020.  C.R. 43; P.R. 149.  First, regarding the LTAR program, the GOC provided Exhibit C-29 regarding the ownership structure of the requested suppliers. Second, regarding percentages of production with either a government majority or minority interest, the GOC responded by stating that it does not maintain this information.  Thus, the GOC gave a full answer, just not the answer Commerce wanted.

Commerce issued the Preliminary Results on January 21, 2021.  P.R. 161.  *Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Preliminary Results*

16

*of Countervailing Duty Administrative Review: 2018*, 86 Fed. Reg., 7264, (January 27, 2021);

P.R. 165; ("*Preliminary Results*")

      The Preliminary Decision Memorandum ("PDM") was issued on January 21, 2021.  P.

R. 162.   Memorandum to: Jeffrey I. Kessler, Assistant Secretary for Enforcement and

Compliance; From: James Maeder, Deputy Assistant Secretary for Antidumping and

Countervailing Duty Operations; Subject: Decision Memorandum for the Preliminary Results of

2018 Countervailing Duty Administrative Review: Narrow Woven Ribbons with Woven

Selvedge from the People's Republic of China. (January 21, 2021))  ("PDM"), P. R. 162.

      Commerce issued its Preliminary Sales Calculation Memorandum January 1, 2021.

C.R. 44; P.R. 163.

      The Preliminary Results were published in the Federal Register January 27, 2021.  P.R.

165. .  *Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China:*

*Preliminary Results of Countervailing Duty Administrative Review: 2018*, 86 Fed. Reg., 7264,

(January 27, 2021); P.R. 165; ("*Preliminary Results*")

      The GOC submitted its Case Brief on February 26, 2021.  P.R. 169.

      Yama submitted its Case Brief on February 26, 2021 C.R. 46; P.R. 168.

      Petitioner, Berwick Offrey, submitted its Rebuttal Brief March 5, 2021.  P.R. 170.

      Commerce did not give parties an opportunity to comment on the documents (P.R. 97

and 100) it placed on the record after the issuance of the Preliminary Results.

      Commerce issued the Final Results on July 23, 2021.  P.R. 173.

      Commerce issued the Final Decision Memorandum on July 23, 2021.  P.R. 174.

      Commerce published the Final Results in the Federal Register July on 28, 2021.  P.R.

176.

17

### IV.    STANDARD OF REVIEW.

The Court will hold unlawful Commerce determinations that are unsupported by substantial evidence on the record, or are not otherwise in accordance with law.  19 U.S.C. §1516a(b). To determine whether Commerce's interpretation and application of 19 U.S.C. § 1671-1671(f) is "in accordance with law," the courts review the statute to determine whether "Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984). "To ascertain whether Congress had an intention on the precise question at issue, {the Court} employ{s} the 'traditional tools of statutory construction.'" *Timex V.I., Inc. v. United States,* 157 F.3d 879, 882 (Fed. Cir. 1998) (citing *Chevron,* 467 U.S. at 843 n.9). In addition, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history." *Id.* Where a court has previously interpreted a statute and the court holds that its construction of the statute flows from the unambiguous terms of the statute and leaves no room for agency discretion, the court's interpretation is binding on the agency. *National Cable & Telecommunications Ass'n v. BrandXInternet Services,* 545 U.S. 967, 982-983 (2005).

If the court determines that the statute is silent or ambiguous with respect to the specific issue, the question then becomes what level of deference is owed Commerce's interpretation, the traditional second prong of the *Chevron* analysis, *Chevron,* 467 U.S. at 842-43, or the less deferential regime set forth in *Skidmore v. Swift & Co.,* 323 U.S. 134 (144). *See United States v. Mead Corp.,* 533 U.S. 218, 228 (2001). The Federal Circuit has held that *Chevron* deference is owed Commerce's statutory interpretations as to appropriate methodology. *PesqueraMares Australes Ltda. v. United States,* 266 F.3d 1372, 1379 (Fed. Cir.2001). That analysis entails

18

determining whether Commerce's construction of an ambiguous statute is "permissible." *See Chevron,* 467 U.S. at 843. A "permissible" construction under *Chevron* is understood in terms of reasonableness; only reasonable interpretations will be upheld by the Court. *See Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1038 (Fed. Cir. 1996) *('Chevron* requires us to defer to the agency's interpretation of its own statute as long as the interpretation is reasonable."). Not unlike the first prong of *Chevron,* to determine reasonableness, courts look to the express terms of the statute, the objectives of the statute, and the objectives of the statutory scheme as a whole. *Wheatland Tube Co. v. U.S.,* 495 F.3d 1355, 1361 (Fed. Cir. 2007).

Under the standard of review established in *Skidmore,* "{t}he weight {accorded to an administrative} judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, at 140.

The Court will uphold a final determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951), *quoting Consolidated Edison Corp. v. Labor Board,* 305 U.S. 197, 229 (1938). Furthermore, "substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quotations omitted). Thus, this Court has stated that "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when

19

viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [    ] view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983) *quoting Universal Camera*, 340 U.S. at 488.

Moreover, the Commerce determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987).  The substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

Commerce also must make its decisions based on a fair and balanced comparison of the data.  To do otherwise is arbitrary and capricious. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) at 1562 ("substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.")  *See also, Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183, 1192 (Ct. Int'l Trade 2009) (holding that Commerce failed "to make adequate findings, based on substantial evidence, to support its determination to disregard summarily the import and export data from the *Market Research Report*.  Nor did Commerce undertake a <u>qualitative</u> comparison of the NHRDF data with the import data or the export data in the *Market Research Report* to produce a finding or findings that the court could affirm." *Id.* (emphasis added).

Commerce is required to objectively evaluate all data on the record.  Thus, it must hold its preferences to the same test as it uses to evaluate respondent's proffered data.  This analysis must consider the strengths and weaknesses of all the data and then choose the best available

20

information.  *See, e.g., Dorbest Ltd v. United States*, 462 F. Supp. 2d 1262, 1302 (Ct. Int'l Trade 2006) (holding that Commerce must justify its decisions).

In addition, Congress intended that Commerce calculate dumping margins as accurately as possible and use the best available information.  *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

The use of adverse facts available ("AFA") is predicated on a two-part test.   Commerce must (1) find that not only that the provisions of 19 U.S.C. § 1677e(a) are met, i.e., that Commerce may use facts otherwise available when evidence on the record is lacking, and (2) use AFA only if it does so in compliance with 19 U.S.C. § 1677e(b).  *See Zhejiang Dunan Hetian Metal Co. v. United States,* 652 F.3d 1333, 1346 (Fed. Cir. 2011) citing *Shandong Huarong Machinery v. United States*, 435 F. Supp. 2d 1261, 1289, (Ct. Int'l Trade 2006) ("Absent a valid decision to use facts otherwise available, Commerce may not use an adverse inference.").

The use of facts otherwise available is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record. *Zhejiang Dunan, Id*., citing *Nippon Steel Corp. v. United States*, 37 F.3d 1373 (Fed. Cir. 2003) (noting that "[t]he mere failure of a respondent to furnish requested information – for any reason – requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination.")

"After Commerce has determined that the use of facts otherwise available is proper, it can "'use an inference that is adverse to the interests of [a respondent] in selecting from amount the facts otherwise available' only if Commerce makes the separate determination that the respondent 'has failed to cooperate by not acting to the best of its ability to comply.'" *Id*. (quoting 1677e(b)." *Id.*

21

Further, the courts have noted with approval that any adverse inference is limited to data on the record. *Zhejiang Dunan* cites with approval *Gerber Food (Yunnan) Co. v. United States*, 387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005) (holding "[b]ecause Commerce is empowered to use adverse inferences only in 'selecting from among the facts otherwise available,' it may not do so in disregard of information of record that is not missing or otherwise deficient." *Id*. at 1288 (emphasis added).  While this reasoning is not binding on this court, it is persuasive." *Id*. at 1348.

Moreover, Commerce "can only use facts otherwise available to fill a gap in the record." *Id*.  In addition, "the focus of subsection (b) {1677e(b)} is respondent's *failure to cooperate to the best of its ability, not its failure to provide requested information." Nippon Steel* at 1381 (emphasis in original).

The *Nippon Steel* court further decided that a respondent's action have to first be analyzed, noting that that the statute does not require perfection.  "Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information….While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Id*. at 1382.

Moreover, Commerce may not use AFA against a government when there is no evidence that it maintained the data it refused to give to the Department.  *Maverick Tube Corp. v. United States*, 857 F.3d 1353, (Fed. Cir. 2017) (sustaining, in a countervailing duty investigation, Commerce's decision not to apply AFA to the Government of Turkey, where "there was no evidence that [the Government of Turkey] had access to or maintained the . . . data that it claimed that it was unable to provide").

22

Even if the GOC were determined to be a non-cooperating party, Commerce must take into consideration whether the respondent has any control over the GOC and how an AFA decision against the GOC might be unfair to the respondent. *Mueller Comercial de Mex., S. de R.L. de C.V. v. United States*, 753 F.3d 1227 (holding in part, "if the cooperating entity has no control over the non-cooperating suppliers, a resulting adverse inference is potentially unfair to the cooperating party." *Id*. at 1235). Further, *Mueller* held that simply focusing on mere deterrence is insufficient. Commerce must also carry out a case-specific analysis of the applicability of deterrence and similar policies, as well as evaluate if there is a "direct adverse effect" on the non-cooperating party. *Mueller* at 1234, 1236.

Further, it is axiomatic that Commerce may not exert its authority in an arbitrary or capricious manner. *See, e.g., Tung Mung Dev. Co., v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004).

Moreover, when substantial evidence is not utilized, such action is tantamount to the use of speculation in making a determination. *See Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial evidence.'" (quoting *Novosteel SA v. United States,* 284 F.3d 1261, 1276 (Fed. Cir. 2002) (internal quotation marks omitted)).

## V.    ARGUMENT

### A. SUBSTANTIAL EVIDENCE ON THE RECORD DEMONSTRATES THAT THE GOC AND YAMA GAVE FULL, VERIFIABLE ANSWERS REGARDING USAGE OF THE EXPORT BUYERS CREDIT (EBC) PROGRAM.

#### 1. Introduction

There are three broad arguments contained herein. First, substantial evidence on the

23

administrative record clearly demonstrates that regarding the alleged <u>use</u> of export buyer credits ("EBCs"), both the GOC and Yama reported that this program was not used in the POR.  Yama argues that substantial evidence on the record neither supports a conclusion that the GOC did not act to the best of its ability in responding nor otherwise serve as a foundation for the Department using AFA.  Commerce's decision was based on AFA because the Department found that the GOC did not act to the best of its ability by not following Commerce's instructions in answering the questionnaire.  It is important to note that the alleged deficiencies perceived by Commerce did not go the key question of whether EBCs were granted by the Chinese Export-Import Bank, but solely concerned <u>how</u> the EBC program operated.  In its responses to the original questionnaire as well as to the first supplemental questionnaire, the GOC provided a detailed explanation how the EBC program worked.

In addition, the Department made no finding that Yama's responses were less than perfect.  Yama argues that substantial evidence on the record does not support a conclusion that AFA is warranted based on the GOC responses.  Rather, the GOC, and Yama, fully answered Commerce's questions regarding whether this program was used.  Just because the Department did not receive the answers it expected – limited to the operation of the EBC program - the GOC cannot be reasonably faulted for fully answering the relevant questions posed by Commerce.

Specifically, not once, but numerous times in the original questionnaire, as demonstrated in the "Statement of Facts," above, Commerce advised the GOC that if a program were not used, only basic information about that program was needed and the GOC did **<u>not</u>** have to fully answer the questionnaire, e.g., did not have to respond to the general questions in the Appendices, etc.

24

Subsequently, in the first supplemental questionnaire, Commerce reiterated numerous times that the GOC and Yama should answer the questions unless no subsidies were granted. "Please respond to the following questions. For more detailed instructions, refer to the guidelines and instructions included with the initial questionnaire issued on November 20, 2019." See. First Suppl. Q're at 3. A second time, further down the same page of the first supplemental questionnaire, regarding grants, Commerce reiterated the language from the original questionnaire. "**If** your company meets either of these two conditions, then you do not have to provide a response to any appendices for the relevant grant program." *Id.* (*Emphasis added*). A third time, Commerce reiterated its message that details were not needed for non-used programs. "**If** no respondent company used a program during the stated time period, lease so state; you need not provide a response to the appendices for the program." *Id*. at 4 (Emphasis added).

Finally, in the second supplemental questionnaire issued to the GOC, Commerce instructed as follows. "When responding to this supplemental questionnaire, please follow the filing requirements outlined in the initial questionnaire and submit the response electronically via ACCESS." See Cvr. Ltr, July 24, 2020.

Both parties completed complied. Both parties stated that these programs were not used in the POR. Thus, any failure regarding this issue rests solely with Commerce in not following its own instructions in the questionnaires.

In addition, because there is no missing information regarding the use of this program the first prong of the *Chevron* test is met and Commerce's interpretation of the statute is not due any deference by the courts.

Second, assuming, *arguendo*, that the GOC did not act the best of its ability, the

25

courts have ruled that such failure cannot be attributed to the mandatory respondent if it places the necessary information on the record, i.e., it is not found to be subject to adverse facts available.  Substantial evidence on the record supports a finding that Yama fully complied with the statute, that its information was verifiable, and it did not fail to answer any question and, therefore, there is no basis to apply AFA to it.

Third, assuming, *arguendo*, that the AFA rate applied to the GOC was also applicable to Yama, the rate itself is not taken from the underlying review.  Rather, it was taken from another review on a completely different product and that rate does not comply with Commerce's policy or the statutory requirements.

## 2.   The instructions in the questionnaires were clear regarding the information required for non-used subsidy programs.

### a.   Original Questionnaire and Supplemental Questionnaires.

As stated above, in the "Statement of Facts," Commerce made it abundantly clear that for programs not used, the GOC and Yama did not need any further information.  Each of those instances will not be repeated here

## 3.   Commerce's Final Decision Memorandum conflates the real issue: was an EBC subsidy obtained by Yama's U.S. customers?

Commerce makes clear that there is only one reason why it determined AFA for the GOC: the GOC did not fully respond to questions concerning <u>how</u> the EBC program worked.  This is the same rationale Commerce used in the three prior administrative reviews.  *See, e.g., Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Final Results of Countervailing Duty Administrative Review: 2015, 83 Fed. Reg., 11,117, (March 14, 2018) and accompanying Decision Memorandum ("DM") (March 8, 2018) ("Final Results").*  Without that knowledge,

26

Commerce determined that it could not accept the GOC's and Yama's clear responses that no EBC subsidy was granted in the POR because it would be impossible for Commerce to verify non-use of the EBC program.

> Given the complicated structure of loan disbursements which can involve various banks for this program, Commerce' complete understanding of how this program is administrated is necessary to verify claims of non-use.

IDM at 37.  This is not true.  Commerce is relying on the ignorance of the court as to how verifications are conducted, to convince the court of its arguments.  In reality, the non-use can be verified very simply.

In every verification, Commerce asks for a sample of U.S. invoices, typically 10 invoices.  Among the 50-60 documents that a normal exporter will have associated with each sale, is a single piece of paper: the wire transfer, showing payment from the U.S. customer's U.S. bank to the exporter's bank.  In the case at bar, if Commerce saw this wire transfer during verification it would know that the EBC program was not used.

However, if the "proof of payment" is a wire (or other) transfer from Ex-Im Bank of China, Commerce verifiers would immediately know that the payment did not come from the U.S. customer directly.   Record evidence indicates that the Ex-Im Bank disburses the funds to the exporter.  See GOC 1st Suppl. Resp at 19 (Ex-Im releases funds to exporter).  Then, Commerce verifiers could follow up to see why this aberration exists.  It is that simple.   It is really quite easy to verify the source of payment.

27

      a.      **Commerce found 17+ other programs to not be used with zero explanation on the record by either Yama or the GOC concerning how they operated.**

In the same Final DM, Commerce determined there were 12+ other programs not used by Yama in the POR.  Those programs are contained in the "Statement of Facts," *supra*.

There is zero evidence on the record of Commerce asking for any information on these programs, much less receiving any information concerning how they operated.

Thus, it is clear that for 17+ programs Commerce (1) did <u>not</u> need to understand at all – much less "fully understand" – how these programs operated; (2) did <u>not</u> need to know "the application process, internal guidelines and rules governing this program;" and (3)  <u>did</u> rely on a simple "no" for these 17+ programs, contrary to the EBC program.

Only for EBCs were copious amounts of information required.  This is not only arbitrary and capricious but an abuse of discretion. *See Tung Mung*.

Thus, it is clear that it is standard Commerce practice to not waste time with detailed answers that are meaningless, i.e., Commerce is not interested in a program if it were not used in the POR.  Thus, the questions posed by Commerce, for which it applied adverse facts available ("AFA"), must be viewed in light of Commerce's specific requirements in the questionnaires themselves regarding non-usage of programs.

      **4.  The Statute is clear.  AFA was not warranted for the EBC program.**

      **a.   The Statute is unambiguous.**

28

The statute is clear. Sections 1677e(a) and 1677e(b) require, before facts otherwise available are used, much less adverse facts available, that the terms of 1677e(a)(1) be met: information has to be missing that would allow Commerce to countervail a program.  Here, no information on the <u>usage</u> of the program was missing. Moreover, the GOC went into significant detail in describing how the program operates.

Commerce may not automatically resort to adverse inferences once it decides that a party has failed to comply with its request.  *Ferro Union, Inc. v. United States*, 23 CIT 178, 44 F. supp. 2d 1310, 1328 (1999) (*Ferro Union*), *citing Borden, Inc. v. United States*, 4 F. Supp. 2d 1221, 1246.  "The use of facts available is subject to the requirements of 19 U.S.C. § 1677m(d), that a party have a chance to remedy deficient submissions."  <u>Ferro</u> <u>Union</u> at 1328;

Subsection 1677m(d), "Deficient submissions," provides:

> If {Commerce} determines that a response to a request for information under this subtitle does not comply with the request, {Commerce} shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain    the deficiency in light of the time limits established for completion of investigations or reviews under this subtitle.

*Id*.

### b. Commerce's decision is due no deference under *Chevron* since Congress has spoken to the issue whether there is missing information.

### i.    The first prong of the *Chevron* test has been met.

*Chevron* entails a two-part analysis.  First, if the statute has spoken to an issue, that settles the matter and Commerce has no discretion to go beyond that.  If, however, the statute has not spoken to an issue, Commerce may use its discretion to make a decision but it has to be based on

he Case 1:21-cv-00402-TCS   Document 28-1   Filed 02/04/22   Page 37 of 57

substantial evidence on the record and be reasonable.

Here, the first prong of the *Chevron* test has been met.  The GOC gave a complete answer to the question whether Yama's U.S. customers had received any export buyer credits.  It answered "no."  Yama's response also was "no."  These answers satisfied 1677e(a)(1).

(a) In general, If—

(1) <u>necessary information is not available on the record,</u> or

(2) an interested party or any other person—

> (A)    withholds information that has been requested by the administering authority or the Commission under this subtitle,
>
> (B)    fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
>
> (C)    significantly impedes a proceeding under this subtitle, or
>
> (D)    provides such information but the information cannot be verified as provided in section 1677m(i) of this title, the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. § 1677(e)(a). (Emphasis added).  Here, "necessary information" was on the record.  Both the GOC and Yama stated that no export buyer credits were obtained by Yama's U.S. customer in the POR.

That settled the matter.  The statute is clear: Commerce cannot use either facts otherwise available or adverse facts available unless required information is missing from the administrative record.  Here, no information is missing.  Commerce can make a determination

whether export buyer credits were obtained from the record evidence.  Thus, Commerce cannot rely on 1677e(a) or (b) or 1677m(d) or (e) to support its decision to use either facts available or AFA. The "no" answer is complete and verifiable.

### c.  AFA can only be used to be in gaps in the record.

Regarding the use of AFA, Commerce may use it only when evidence on the record is lacking and if done in compliance with Section 1677e(b) of the statute.  *See Zhejiang Dunan.*  Moreover, use of AFA is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record.  *Id.  Also see Nippon Steel.*  In the case at Bar*,* there are no "facts" missing from the record regarding whether this program was used.

Moreover, AFA is limited to data on the record.  Commerce may not use AFA in disregard of information of record that is not missing or otherwise deficient.  *See Zhejiang Dunan*, citing *Gerber Food*.

Most importantly, "the focus of subsection (b) {1677e(b)} is respondent's *failure to cooperate to the best of its ability, not its failure to provide requested information*."  *See Nippon Steel Corp. at 1381.* (*emphasis* in original).  Indeed, Commerce may not use AFA against a government when there is no evidence that it maintained the data it refused to give the Department.  *See Maverick Tube.*  Here, there is no evidence on the record to contradict either GOC's claims regarding the usage of EBCs in this POR or its inability to provide certain information.

### d.      Since the facts clearly demonstrate no gaps in the record, AFA cannot be used.

There are no gaps in the record regarding whether any of Yama's U.S. customers availed themselves of the EBC program.

31

Further, the GOC also was clear in its response. The GOC fully answered Commerce's

question regarding usage of the EBC program.

> The GOC determined that none of the customers of Yama used this
> program through a process in which Yama provided its CU.S. customer list
> to the GOC.  The EX-IM Bank then searched its records to confirm that
> these customers did not receive credits under the Export Buyer's Credit
> program.  The GOC would also advise that whether a foreign buyer receives
> any loan pursuant to the Export Buyer's Credit program normally can be
> confirmed by the Chinese exporter.  Normally, if there is a loan under the
> Export Buyer's Credit program, the Chinese exporter should be aware of
> the buyer's receipt of loans and should be involved in the loan evaluation
> proceeding and in particular in the post-lending loan management.
> Therefore, the Chinese exporter is in a position to verify and confirm the
> existence, if any of sales contracts that were supported by the Export
> Buyer's Credit program.

GOC January 20, 2020 response at 34-35.

Moreover, there is no evidence regarding EBCs that would provide even a scintilla of

evidence to contradict the administrative record demonstrating that no EBCs were granted. *See*

*Universal Camera; also see Consolidated Edison.*

Commerce's determination cannot be based on "isolated tidbits of data which suggest a

result contrary to the clear weight of the evidence."  *See USX Corp.* Commerce seems to be

relying on speculation that answers to its irrelevant, general questions on how the EBC program

is run would somehow change the "no" answer given by the GOC.  Substantial evidence on the

record requires more than mere assertion of "evidence which in and of itself justified {the

determination} without taking into account contradictory evidence or evidence from which

conflicting inferences could be drawn."  *See Gerald Metals.*  When viewed in its entirety, the

record established by the GOC is clear and complete for Commerce to make a determination that

no benefit was conferred at LTAR.  *See Diversified Products.*  "No" means "no."  There is no

32

room for equivocation; and, no room for use of facts otherwise available, much less adverse facts available.

    **e.  The information supplied by the GOC and Yama was verifiable.**

The GOC's and Yama's "no" answer regarding usage of the EBC program was verifiable. *Chlorinated Isocyanurates Final Affirmative Countervailing Duty Determination; 2012*, 79 Fed. Reg. 56,560 (September 22, 2014) and accompanying IDM at 15 ("Regarding the export buyer's program, while the Department was <u>unable to conduct a complete verification of non-use</u> of this program at China ExIm, both Jiheng and Kangtai in their questionnaire responses provided statements from each of their U.S. customers in which each customer certified that they did not receive any financing from China ExIm. We conducted verification on May 22 and July 18, 2014 in the United States of the customers of Jiheng and Kangtai, and confirmed through an examination of each selected customers' accounting and financial records that no loans were received under this program."); (emphasis added); *see also Boltless Steel Shelving Units Prepackaged for Sale Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 51,775 (August 26, 2015) and accompanying IDM at Comment X ("We agree with the GOC. We verified non-use of these programs at both respondents.  As a result, we continue to find that these programs were not used during the POI.").

Indeed, there are many instances in Department practice where it verifies the negative. Indeed, in virtually every CVD verification, there is an outline section for alleged non-use of programs.

In addition, as explained, *supra*, it is quite easy for Commerce verifiers to inspect the wire transfers for payment of invoices to see if they originated in the U.S. or China.  This is not

33

rocket science.

Accordingly, the record evidence in this case only supports the conclusion that Yama did not benefit from the China Ex-Im Export Buyer's Credit program.  The U.S. Court of International Trade ("CIT") requires that the Department's determinations be supported by substantial evidence and be otherwise in accordance with law.  *See e.g., Taian Ziyang Food Co. v. United States*, 637 F. Supp. 2d 1093. 1102 (Ct. Int'l Trade June 29, 2009), *citing to Elkem Metals Co. v. United States*, 468 F. 3. 795, 800 (Fed. Cir. 2006).  Such substantial evidence is "more than a mere scintilla."

A finding that Yama benefitted and used the China Ex-Im Bank Buyers Credit Program would be an adverse inference against Yama in violation of statutory and case law precedents that prohibit the application of adverse inferences against a cooperating respondent.  *See SKF USA Inc. v. United States, 675 F. Supp. 2d 1264 (Ct. Int'l Trade 2009)*.

Accordingly, the Department must use Yama's own data in determining whether and in what amount Yama used and benefitted from the China Export Buyers Credit program.

> **f. The courts have held that foreign governments are not required to give confidential information to Commerce.**

The courts have noted that <u>a government will not be held liable</u> by the Department for not disclosing confidential information.  *Maverick Tube* at 1357, 1359 (Commerce did not use AFA against the government of Turkey for not submitting confidential documents).

> **5. The Department's selection of the rate to apply to the alleged benefit received from the EBC program was unreasonable and unsupported by substantial evidence.**

If the Court nonetheless decides to apply facts available to the GOC and Yama for the

34

EBCs, no adverse inference is warranted in terms of measuring the benefit conferred and the
Court should remand the case to the Department to select the most comparable program from
which to infer a rate.  The rate that the Department has selected is extremely adverse, punitive,
not related to exports, not related to this industry, and not connected to the EBC program.

> ### a.  The rate selected as AFA does not comply with either Commerce's stated policy or the statute.

The Department applied a 10.54-percent rate calculated in *Coated Paper from China* for
"Preferential Lending to the Coated Paper Industry" to the EBC program as supposedly "a rate
calculated for the same or similar program in another CVD proceeding involving imports from
China." See IDM at 42-44, *citing to Certain Coated Paper Suitable for High-Quality Print
Graphics Using Sheet-Fed Presses From the People's Republic of China: Notice of Correction
for Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty
Order*, 75 Fed. Reg. 75,663 (Dec. 6, 2010) and accompanying Issues & Decision Memorandum
(Sept. 20, 2010) ("*Coated Paper IDM*") and Dep't Memorandum re: Ministerial Errors for Final
Determination (Nov. 12, 2010) ("*Coated Paper MEM*").

The Department's description of the *Coated Paper* subsidy rate as an appropriate facts
available rate in this case is incorrect in several aspects because the program "Preferential
Lending to the Coated Paper Industry" is not the same or similar to any export buyer credit
program that Yama may have used.  The Department explains its AFA selection methodology
for cooperating respondents as follows:

> Consistent with section 776(d) of the Act and our established practice,
> we select the highest calculated rate or the same or similar program as
> AFA. When selecting rates in an administrative review, we first

35

> determine if there is an identical program from any segment of the
> proceeding and use the highest calculated rate for the identical program
> from any segment of the proceeding and use the highest calculated rate
> for the identical program (excluding *de minimis* rates).  If no such
> identical program exists, we then determine if there is a
> similar/comparable program (based on the treatment of the benefit)
> within the same proceeding and apply the highest calculated rate for the
> similar/comparable program, excluding *de minimis* rates.  Where there
> is no comparable program, we apply the highest calculated rate from
> any non-company specific program in any CVD case **involving the
> same country but we do not use a rate from a program if the
> industry in the proceeding cannot use that program.**

IDM at 42.   {footnote omitted.  Emphasis added.}

It is obvious that the woven ribbons industry cannot use the preferential loans for the

coated paper industry.  Furthermore, none of the loans used in the *Coated Paper* preferential

loans were export subsidies within the meaning of 19 C.F.R. 351.514.  *See Coated Paper IDM* at

12-13.  Thus, the *Coated Paper* subsidy rate is in no way similar or comparable.

The "Preferential Lending" program is also not a similar program based on treatment of

the benefit to the Export Buyers Credit program.  The Department stated that the "Preferential

Lending" program "provides assistance in the form of preferential interest rates on various types

of loans sourced from Chinese-owned financial institutions."  *Final Determination in the

Countervailing Duty Investigation of Truck and Bus Tires from the People's Republic of China;

and Final Affirmative Determination of Critical Circumstances, in Part,* 82 Fed. Reg. 8,606

(Dep't Commerce Jan. 27, 2017) and accompanying IDM at Comment 6.

Under the Export Buyer's Credit program, however, any benefit in the form of

preferential interest rates on various types of loans is provided to the U.S. customer/foreign

importer, not the mandatory respondents.  Thus, the "Preferential Lending" program is not a

36

similar program to the Export Buyer's Credit program based on treatment of benefit, because the benefit to the mandatory respondents, if any, is not in the form of preferential interest rates on various types of loans.

Instead, the Department should use a rate related to exports available to the woven ribbon industry.  Yama recommends using the International Market Development Fund Grants for Small and Medium Enterprises (IMDFG for SMEs).  The Department countervailed this program in the underlying review.  Thus, it is both export-related and timely, having been countervailed in the same period of review.  The Department determined a rate of 0.08 percent.  See Commerce Prelim. Calc. Memo. P.R. 163.   Given that under the EBC program, Yama does not receive any benefits even if the program had been used, use of the IMDFG for SMEs is appropriate if the court deems some rate to be appropriate.  This at least uses an export-oriented program that was countervailed in the woven ribbons industry in the same period of review.

### b.    The current rate is punitive.

An appropriate decision based on adverse facts is "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *F. Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United Sttes, 216 F.3d 1027, 2013 (Fed. Cir. 2000).*  A decision based on adverse facts is not punitive when determined in accordance with the statutory requirements. *KYD, Inc. v. United States, 607 F.3d 760, 767-68 (Fed. Cir. 2010).*  The imposition of adverse facts can be inappropriate if it is overly punitive. For example, in *Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1324 (Fed. Cir. 2010)*, Commerce imposed an unreasonably high anti-dumping margin, which was "more than

37

ten times higher than the average dumping margin for cooperating respondents." *Id. at 1324*.

That rate was "punitive, aberrational, or uncorroborated." *Id*.

So, too, in the underlying proceeding, using a high rate from a non-export program in an unrelated industry is punitive and does not comport with Commerce' stated prioritization of its criteria.

### 6.   Recently, the courts have consistently ruled against Commerce regarding the EBC program.

In the last several years, the Court of International Trade ("CIT") has ruled repeatedly that much of the information requested by the Department is not necessary or material to the question of non-usage. *See Guizhou Tyre Co., Ltd. v. United States*, Ct. No. 17-00101, Slip Op. 18-140 (Ct. Int'l Trade Oct. 17,2018) at 6-9 (holding that information regarding the operation of the Export Buyer's Credit program, including the 2013 revisions, are "entirely irrelevant to Guizhou's apparent non-use."); *Changzhou Trina Solar Energy Co., Ltd. v. United States,* Consol. Ct. No. 17-00198, Slip Op. 18-166 (Ct. Int'l Trade Nov. 30, 2018) (holding that Commerce failed to explain why the GOC's failure to explain the Export Buyer's Credit program fully was necessary to assess the claims of non-use and why other information accessible to respondents was insufficient to fill whatever gap was left by the GOC's refusal to provide internal bank records); *Changzhou Trina Solar Energy Co., Ltd. v. United States*, Ct. No. I7 - 00246, Slip Op. 18-167 (Ct. Int'l Trade Nov. 30, 2018) (same); *Clearon Corp. v. United States,* Consol. Ct. No. 17-00171, Slip Op. 19-13 (Ct. Itn'l Trade, Jan.25,2019)(same); *Guizhou Tyre Co., Ltd. v. United States,* Ct: No. 18-00100, Slip Op. 19-59 (Ct. Int'l Trade May 15,2019)(same).

Indeed, the CIT has recently affirmed this position, ruling that given the Department's

38

instructions, failure to respond to these questions is "not a failure to cooperate" if the respondent did not participate in this program during the POR. *Yama Ribbons and Bows Co. v. United States*, Ct. No. 18-54, Slip Op. l9-I73 (Ct. Int'l Trade Dec. 30, 2019) at 18-19. This decision stems from an appeal of the 2015 administrative review of this case and should be followed here.   This Court also ruled a second time in favor of Yama, in *Yama Ribbons and Bows Co. v. United States*, Ct. No. 19-47; Slip Op. 21-50 (Ct. Int'l Trade, April 30, 2021), at 19-22.  While the program has not changed from the 2015 administrative review, there has developed a clear and resounding consensus that responses to the unnecessary questions regarding how the program works are not required when the respondent has not participated in the Export Buyer's Credit program.

> **B.  COMMERCE ERRED IN FINDING THAT PROVISION OF SYNTHETIC YARN AND CAUSTIC SODA FOR LESS THAN ADEQUATE REMUNERATION WAS COUNTERVAILABLE.**
>
> **1.      The Department Should Not Have Applied AFA With Respect to the Synthetic Yarn and Caustic Soda LTAR Programs.**

Commerce based its decision regarding provision of synthetic yarn and caustic soda to Yama based on AFA applied to the GOC.  Commerce made no finding of AFA against Yama. Thus, any AFA found applicable to the GOC can only be applied to Yama in consideration of Yama's complete responses to the two questionnaires.  Commerce found no missing information regarding Yama's responses.  We know this because the only supplemental questionnaire issued to Yama was fully answered.  Commerce did not issue a second supplemental questionnaire to obtain further information.

Notwithstanding the above, Commerce erroneously applied AFA to the GOC.  In each instance where the GOC was unable to submit information, it explained that either (1) it did not

39

have such information to submit, or (2) the information would violate confidentiality provisions of Chinese law regarding private persons in China.  Thus, the GOC did participate in this administrative review to the best of its ability.  Accordingly, the GOC answered every question posed by Commerce.  Commerce simply did not like the answers it received.

Thus, Commerce, in determining AFA, failed to comply with 19 U.S.C. 1677e(a)(2)(A). Commerce (1) failed to establish what necessary information was missing, (2) that it specifically requested that information; once those criteria are established, then (3) the GOC had to fail to cooperate to the best of its ability to provide the missing **necessary** information.  The only reason certain information is not on the record is because the GOC informed the Department that it did not maintain or have access to such data.  The GOC cannot be forced to give that which it does not possess. *See Maverick Tube*.

Commerce, based on AFA, determined (1) the GOC distorted the synthetic yarn and caustic soda markets via (a) its majority ownership in a minority of companies producing a minority of production in those industries, as well as (b) the CCP dictated how state-owned and private companies operate in China for these two raw materials, and (2) as a result, Yama's privately-owned suppliers, with no ownership by the GOC or influence by CCP, were deemed to be "authorities" as defined by the statute.  This was based on Commerce's <u>assumption</u> that all producers in China are controlled either directly or indirectly by either the GOC or the CCP, despite evidence to the contrary, and (3) these LTAR subsidies were "specific" since they were limited to the textile industry.

According to the statute, 19 U.S.C. 1677(5), Commerce must find (1) distortion exists in the markets for these two raw materials, caused by the GOC; (2) Yama's suppliers of these raw materials are "authorities" under the statute, and (3) these LTAR programs are specific, i.e., are

40

not generally available to everyone and **are pursuant to a specific "program."**   Commerce

cannot find subsidies if even one of these criterion is not met.

We address each of these issues, below.

### 2.   The synthetic yarn and caustic soda markets are not distorted; Yama's suppliers are not "authorities," and the specificity requirement is moot.

#### a.   Substantial evidence confirms that the synthetic yarn and caustic soda markets are not distorted by either the GOC or the CCP.

Commerce determined that the market for these raw materials was not free of GOC

influence.  It drew this conclusion based on AFA rather than substantial evidence on the record.

It contends, first, that the GOC and its majority ownership in certain producers distorted the

market, such that it conferred a benefit on Yama that is countervailable.  This decision was not

based on the data presented by the GOC, but only due to AFA because Commerce said that the

GOC did not act to the best of its ability because it did not answer all questions posed by

Commerce.

Second, Commerce, based on AFA and its Public Bodies Memorandum, found that the

CCP was located in many companies and controlled those companies.  Commerce determined

that the Company Law of China and the CCP's own Constitution were not applicable and should

be ignored.   In essence, Commerce invalidates both the Company Law and the CCP without

proper legal foundation.  The facts show however, that the GOC did answer all questions based

on the data available to it.  The GOC cannot be held responsible for data it does not have.

Accordingly, the GOC acted to the best of its ability.

Thus, since the use of AFA was unwarranted, the GOC data should have been used.  The

GOC confirmed that the number of government majority-owned producers of both raw materials,

as well as the share of all production by those majority government-controlled producers do not

control pricing of these materials in China.  See GOC's arguments, as summarized in the IDM at

9-12.  Also see the GOC' Case Brief, at 10-26; IQR at Exhibit C-5, Pricing Law.

   The GOC's first supplemental questionnaire response, at 6, shows that for synthetic

yarn, only [     ] percent of producers have majority ownership by the GOC; and they produce

only [     ] percent of all synthetic yarn in China.   For caustic soda, the GOC also has a less than

majority ownership of the producers, [      ] percent; they account for only [      ] percent of

production.

   Commerce fails, for example, to explain how a reasonable mind can conclude, for

synthetic yarn, that only [     ] percent of the producers with majority government ownership,

and producing only [     ] percent of production are able to distort the market.  The same is true

for caustic soda.  Nor does Commerce provide any reasonable analysis based on any evidence,

much less substantial evidence on the record, to support a finding that [     ] percent of

production can dictate prices to the remaining [      ] percent of production.  Commerce was

required to do this simply because the statutory standards for using AFA were not met in the

underlying review.  The same is true for caustic soda.

   Moreover, the GOC stated that prices of these two raw materials are dictated by the

market, not the government.  There are no price controls.  Nor are there any export controls,

export licensing restrictions, or export tariffs.  Indeed, purchasers of these materials can buy

either from domestic companies or foreign exporters.  There are no government limitations on

the use of these two raw materials.  Producers are free to sell to any customer, domestic or

foreign.  See initial questionnaire response ("IQR") at 18-19.

    There is not even a scintilla of evidence, much less substantial evidence on the record,

to support a finding of distortion in these two markets.   Rather, Commerce has merely used

42

AFA to support its decision.  Once AFA is properly removed from the equation, we find that Commerce's only reliance is the use of speculation rather than substantial evidence, to makes its finding. *See Lucent Techs*.

The court, however, in determining whether distortion existed in the POR, should look at the synthetic yarn and caustic soda industries separately.  That is, a finding of distortion in the overall marketplace for one raw material does not automatically lead to distortion by the other raw material.

The second basis for distortion determined by Commerce is that the CCP's influence is pervasive in every company and the CCP has the power to dictate how each company is run.  Both the GOC and Yama stated that the Company Law and only that law, dictates how companies are managed.  See, e.g., IQR, Exh. C-3.   Indeed, even the CCP Constitution does not allow it to run companies, nor to have government employees in companies and running them.  See IQR, Exh. C-4.

Commerce chose to ignore this substantial evidence and basically find the opposite: companies do not have to comply with the Company Law of China and the CCP's Constitution is not dispositive.  This is absurd in the extreme.  Rather, Commerce relies on analysis by private parties, in its Public Bodies Memorandum P.R. 117-133).  That Memorandum mainly focuses on state-owned enterprises (SOEs) for its analysis.  Moreover, it is comprised only of opinions, not subject to verification.  The Company Law of China and the CCP's Constitution are subject to verification.

. The Company Law is the fundamental law regulating a company's organization structure and its conduct. Critical provisions include:

43

- Article 36: stipulates that the shareholders' meeting of a limited liability company is the authority of the company and shall exercise its powers according to this Law;

- Article 37: stipulates that the shareholders' meeting shall determine all the significant operational issues and plans for the company;

- Article 46: stipulates that the board of directors shall be responsible for the shareholders' meeting and shall implement the resolutions made at the shareholders' meetings, as well as manage daily business operations;

- Article 49: stipulates that the manager shall be responsible for the board of directors and oversee the daily management of the company;

- Article 137: stipulates that "The directors, supervisors and senior managers shall comply with the laws, administrative regulations, and bylaw. They shall bear the obligations of fidelity and diligence to the company."

*See* IQR, Exh. C-3.  These provisions mandate that a company's shareholders, directors, and managers are solely responsible for the company's internal operation and that it is unlawful for external organizations and authorities to interfere. For this reason, the CCP or primary party organization would be in violation of the law if it attempted to interfere in the control of the company.

Thus, there are no "facts otherwise available" on the record suggesting that CCP's involvement in a private company is sufficient to either (1) distort the market, or (2) transform the company into a government authority.  To the contrary, the facts on the record, as described

44

herein, make clear that the GOC is prohibited by law from interfering in the ordinary business operations and management of a company.

The GOC and Yama amply demonstrated that the presence of the CCP in any companies do not make those companies government "authorities."  The influence of the CCP is severely limited and does not rise to the level of control.  See GOC Case Br. at 14-19; also see IQR, Exh. C-4, CCP Constitution.  A careful reading of the Public Bodies Memorandum simply expresses uncertainty of how the CCP operates in a company.  "[T]he role of this party presence {in private companies] is unclear; it may exert varying degrees of control in different circumstances."  See Public Bodies Memo at 36.

**b.  Yama's synthetic yarn and caustic soda suppliers are private companies with no ties to the GOC or CCP.  They are not government "authorities."**

AFA should not be applied to the GOC.  Commerce should be directed to use substantial evidence on the record to determine whether the synthetic yarn and caustic soda markets are distorted.  Substantial evidence on the record proves they are not distorted.  Given this, it is moot whether Yama's suppliers are authorities.  Assuming, *arguendo*, that the Court finds there is distortion, Yama's complete responses clearly demonstrate they are not authorities as defined in the statute.

Even if this Court continues to find that AFA is warranted for GOC, it then has to determine whether that AFA should be applied to Yama.  It should not.  Yama fully explained that not only did it buy from private companies, with no government ownership (and this was confirmed in the GOC's responses) but that there also was no CCP influence in its suppliers.  See GOC 2nd Suppl. Resp. at 10 (none of the producers of synthetic yarn is wholly or majority owned/controlled by the government); Yama Resp. Jan. 10, 2020, at 12-13.

45

Commerce argues that not all of Yama's suppliers provided certification to prove they are not owned by the GOC or influenced by the CCP.  However, it is well-worn law that a mandatory respondent cannot be held responsible for the lack of participation by other companies in a Commerce inquiry if those companies are not subject to the AD or CVD order. *See* Luoyang Bearing Corp. et al v. U.S. US CIT Slip Op. 2005-03, January 21, 2005 (affirming Commerce's remand results; *see also,* Luoyang Bearing Corp. et al. v. U.S. (U.S. CIT May 18, 2004, Slip Op. 2004-53, 347 F. Supp. 2d 1326   Here, Yama did its best to obtain certifications from its suppliers that they were 100% private and their managers were not members of the CCP. The GOC confirmed that all of Yama's suppliers, not just the ones submitting certifications, were 100% private.  Thus, this information constitutes substantial evidence on the record and supersedes any speculation by Commerce to the contrary.  Commerce provided no evidence to refute Yama's statements.

Moreover, in numerous investigations/administrative reviews Commerce has validated the Company Law of China.  Commerce provides not even a scintilla of evidence to find that the Company Law is not dispositive of its absolute control over Chinese companies.

While a CCP organization within a private company is tasked with helping a company follow the law and perform certain public services (e.g., charity), private companies must follow Chinese law, including the Company Law.

Thus, there are no "facts otherwise available" on the record suggesting that CCP's involvement in a private company is sufficient to transform the company into a government authority. To the contrary, the facts on the record, as described above, make clear that the GOC and the CCP are prohibited by law from interfering in the ordinary business operations and management of a company.

46

Likewise, Commerce cannot accept the CCP Constitution in certain aspects, e.g., it can have party members in companies, such as SOEs, but then declare the CCP Constitution without effect when it prohibits its member or primary organization interference in those companies in other aspects, such as operations and control.  Commerce simply cannot have it both ways.

Thus, even if the Court finds that the GOC distorted the synthetic yarn and caustic soda markets, there is no evidence to support a reasonable conclusion that Yama's suppliers were "authorities" under the statute.

### 3.  The Provision of Synthetic Yarn and Caustic Soda Is Not Specific.

#### a.  The GOC Acted to the Best of Its Ability in Providing Verifiable Answers Regarding the Specificity Element.

Because substantial evidence on the record does not support a finding of either (1) distortion in the markets for synthetic yarn and caustic soda by either the GOC or the CCP, or (2) a reasonable indication that Yama's private synthetic yarn and caustic soda suppliers were government "authorities," it is a moot point whether any alleged LTAR subsidies were granted to Yama.

If, however, the Court finds that "specificity" needs to be addressed, we note as follows. The GOC stated that synthetic yarn and caustic soda producers can sell their products to anyone, including members of the ribbons industry.  "As a general matter, synthetic yarn and caustic soda have a wide range of uses, including, but not limited, use in the narrow woven ribbon industry." See GOC (1) IQR at 19, and (2) Second Suppl. Q're Resp. at 7.  There is no limit on the number or types of industries which can buy these raw materials.

#### b.  Any LTAR subsidies are not limited to a single industry.

47

Moreover, Commerce argues that only one industry uses these raw materials, the textile industry. See IDM at 2021 (only the textile industry uses these inputs). That is too broad a classification. The textile industry is comprised of dozens of important industries, e.g.,: the ribbons industry, the thread industry, the unfinished textile industry, finished textile industry, shirt industry, etc.

The statute, 19 U.S.C. 16777(A)(D), provides the basis for finding a domestic subsidy must meet certain criteria:

> (i) where the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry. The subsidy is specific as a matter of law,".
>
> …
>
> (iii) where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist:
>
>> (I) The actual recipients of the subsidy, whether considered on a enterprise or industry basis, are limited in number.

*Id.* There is no evidence on the record to even remotely suggest that any LTAR subsidy is specific either as a matter of law or of fact. Commerce did not place anything on the record to suggest otherwise. Thus, the GOC's statements in this regard constitute substantial evidence on the record.

Moreover, the GOC stated that many industries use synthetic yarn and caustic soda. IQR at 19 (synthetic yarn has a wide range of use, not just for ribbons).

> c. **Most importantly. contrary to Commerce's claim, the Statute <u>does</u> require that a specific "program" exist.**

48

Commerce spent an inordinate amount of time in its IDM stating that existence of a specific "program" is not necessary to finding provision of LTAR benefits.  IDM at 19-22.   Rather, Commerce states that the Statute does not require a "program" but merely a subsidy.   "Regarding the GOC's claim that these "programs" do not exist, we note that the applicable statutory provision does not refer to or other wise use the term "program."  See IDM at 21-22.  This is not accurate.  In fact, it is 180 degrees from accurate.

> In evaluating the factors set forth in subclauses (I), (II), (III), and (IV), the administering authority shall take into account the extent of diversification of economic activities within the **jurisdiction of the authority** providing the subsidy, and the **length of time** during which the subsidy **program** has been in operation.

19 U.S.C. 1677(5)(D)(iii).   (Emphasis added).  Thus, Commerce's determination regarding "programs" fails for multiple reasons: (1) AFA is not applicable to the GOC; (2) the alleged subsidy is not limited to any industry based on substantial evidence on the record, (3) there is no "authority" in China disbursing any benefits, (4) there is no "program," and (5) no "program" in existence for any "length of time."

   This Court's most recent decision regarding ribbons from China (for administrative review 2016), in which Yama was the exporter, ruled that there is no "program" in China regarding provision of the raw materials at LTAR.  *See Yama Ribbons and Bows Co., Ltd. v. United States*,  Ct. No. 19-00047, Slip Op. No. 21-50, (Ct. Int'l Trad, April 30, 2021) at 38.

Thus, Commerce's argument in its IDM regarding the "fact" that the statute does not require a "program" for it to be countervailable, is without merit.   Accordingly, contrary to Commerce's statements, "program" is a legal term since it is in the statute.

Since there is no program, the question whether AFA is applicable to the GOC is moot.

49

## VI.    CONCLUSION

For the reasons stated above, the court should rule in accordance with the argument

contained herein.  Thus, Yama respectfully requests this Court to remand this case to

Commerce with the appropriate instructions.

Respectfully submitted,

deKIEFFER & HORGAN


/s/ John J. Kenkel_____
John J. Kenkel
Alexandra H. Salzman
Gregory S. Menegaz
Judith L. Holdsworth
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
(202) 783-6900
*Counsel for Yama Ribbons and Bows Co., Ltd.*

February 4, 2022