**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY J. STANCEU, SENIOR JUDGE**

| | | |
|---|---|---|
| YAMA RIBBONS AND BOWS CO., LTD., | ) | |
| Plaintiff, | ) | |
| v. | ) | Court No. 21-00402 |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| BERWICK OFFRAY, LLC, | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**<u>RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 305-7571
Fax: (202) 514-8264
Email: kara.m.westercamp@usdoj.gov

OF COUNSEL
LESLIE M. LEWIS
Attorney
Office of the Chief Counsel
   For Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

April 22, 2022

*Attorneys for Defendant United States*

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT PURSUANT TO RULE 56.2 ....................................................2

    I.    Administrative Determination Under Review ........................................ 2

    II.    Issues Presented For Review ................................................ 2

STATEMENT OF FACTS ...............................................................3

    I.    Initiation Of Review And Preliminary Results ......................................3

    II.    Final Results .............................................................5

SUMMARY OF THE ARGUMENT ....................................................... 6

ARGUMENT ....................................................................... 7

    I.    Legal Standards ..........................................................7

        A.    Standard Of Review.................................................. 7

        B.    Application Of Facts Available With An Adverse Inference ...................9

    II.    Commerce's Determination That Yama Used The EBC Program And Its Selection Of An Adverse Rate For That Program Are Supported By Substantial Evidence And Lawful ........................................................11

        A.    Factual Background ................................................ 12

        B.    Commerce's Application Of An Adverse Inference In Determining That Yama Used The EBC Program Is Supported By Substantial Evidence And Otherwise In Accordance With Law ........................................17

        C.    Commerce's Selection Of The Adverse Rate Applied To The EBC Program Is Supported By Substantial Evidence And Otherwise In Accordance With Law ...........................................................27

            1.    Legal Framework For Selection Of An Adverse Rate .................27

            2.    Commerce Properly Selected The Adverse Rate Applied To The EBC Program 2 ...............................................9

i

III.    Substantial Evidence Supports Commerce's Application Of Facts Avaiaible With
        An Adverse Inference To The Provision Of Synthetic Yarn And Caustic Soda For
        Less-Than-Adequate-Remuneration Programs .....................................................32

        A.    Legal Framework  .....................................................................................32

        B.    Substantial Evidence Supports Commerce's Application Of Facts
              Available With An Adverse Inference In Determining That Synthetic Yarn
              And Caustic Soda Markets In China Are Significantly Distorted ...........34

        C.    Substantial Evidence Supports Commerce's Application Of Facts
              Available With An Adverse Inference In Determining That Yama's
              Synthetic Yarn And Caustic Soda Private Company Suppliers Are
              Government Authorities ...........................................................................37

        D.    Substantial Evidence Supports Commerce's Application Of Facts
              Available With An Adverse Inference To Its Determination That The
              Provision Of Synthetic Yarn And Caustic Soda For Less-Than-Adequate-
              Remuneration Is Specific ........................................................................43

IV.     The Court Should Grant Our Request For A Voluntary Remand Regarding
        Commerce's Determination That The Provision Of Synthetic Yarn And Caustic
        Soda For Less-Than-Adequate-Remuneration Is *De Facto* Specific  ..................45

CONCLUSION .............................................................................................................47

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States,*
    287 F. Supp. 3d 1361 (Ct. Int'l Trade 2018) ................................... 10

*Atl. Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984)........................................................ 8

*Bio-Lab, Inc. v. United States,*
    487 F. Supp. 3d 1291 (Ct. Int'l Trade 2020) ................................... 42

*Both-Well (Taizhou) Steel Fittings, Co. v. United States,*
    557 F. Supp. 3d 1327 (Ct. Int'l Trade 2022) ................................... 20

*Canadian Solar Inc., et al. v. United States,*
    537 F. Supp. 3d 1380 (Ct. Int'l Trade Sep. 3, 2021) ....................... 21

*Changzhou Trina Solar Energy Co., Ltd. v. United States,*
    195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) ................................... 18

*Changzhou Trina Solar Energy Co., Ltd. v United States,*
    352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ........................... passim

*Clearon Corp. v. United States,*
    359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) ................................... 20

*Clearon Corp. v. United States,*
    474 F. Supp. 3d 1339 (Ct. Int'l Trade 2020) ................................... 21

*Cleo Inc. v. United States,*
    501 F.3d 1291 (Fed. Cir. 2007)........................................................ 8

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966)......................................................................... 8

*Cooper Kunshan Tire Co. v. United States,*
    539 F. Supp. 3d 1316 (Ct. Int'l Trade Oct. 12, 2021)....................... 20

*Essar Steel Ltd. v. United States,*
    721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) ............................. 10, 42

*Essar Steel Ltd. v. United States,*
    678 F.3d 1268 (Fed. Cir. 2012)................................................ 10, 31, 33

iii

*Essar Steel Ltd. v. United States*,
    908 F. Supp. 2d 1306 (Ct. Int'l Trade 2013) ..................................................... 28

*Ethyl Corp. v. Browner*,
    989 F.2d 522 (D.C. Cir. 1993) ........................................................................... 46

*F.Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000) .......................................................................... 42

*Fengchi Imp. & Exp. Co. v. United States*,
    59 F. Supp. 3d 1386 (Ct. Int'l Trade 2015) ...................................................... 28

*Fine Furniture (Shanghai) Ltd. v. United States*,
    748 F.3d 1365 (Fed. Cir. 2014) ................................................................... passim

*Fujitsu Gen. Ltd. v. United States*,
    88 F. 3d 1034 (Fed. Cir. 1996) ............................................................................ 7

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ...................................................... 8

*Guizhou Tyre Co. v. United States*,
    389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019) .................................................... 21

*Guizhou Tyre Co. v. United States*,
    415 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) .................................................... 21

*Guizhou Tyre Co. v. United States*,
    447 F. Supp. 3d 1373 (Ct. Int'l Trade 2020) .................................................... 21

*Guizhou Tyre Co., Ltd. v. United States*,
    348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) .................................................... 21

*Guizhou Tyre Co., Ltd. v. United States,*
    399 F. Supp. 3d 1346 (Ct. Int'l Trade 2019) .................................................... 21

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992) ............................................................................................. 8

*Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*,
    405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019) ............................................... 18, 21

*KYD, Inc. v. United States*,
    607 F.3d 760 (Fed. Cir. 2010) ................................................................. 10, 25, 42

iv

*Mueller Comercial de Mexico v. United States,*
    753 F.3d 1227 (Fed. Cir. 2014).................................................................... 10

*Mukand, Ltd. v. United States,*
    767 F.3d 1300 (Fed. Cir. 2014).................................................................... 27

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003)................................................................ 9, 45

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006)..................................................................... 8

*PAM, S.p.A. v. United States,*
    582 F.3d 1336 (Fed. Cir. 2009)................................................................ 7, 31

*Papierfabrik August Koehler SE v. United States,*
    843 F.3d 1373 (Fed. Cir. 2016)..................................................................... 9

*RZBC Grp. Shareholding Co. v. United States,*
    No. 15-022, 2016 WL 3880773 (Ct. Int'l Trade June 30, 2016) ...................... 18

*Shangdong Rongxin Imp. & Exp. Co. v. United States,*
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ................................................. 8

*SKF USA Inc. v. United States,*
    254 F.3d 1022 (Fed. Cir. 2001).................................................................. 46

*SolarWorld Am., Inc. v. United States,*
    229 F. Supp. 3d 1362 (Ct. Int'l Trade 2017) ......................................... passim

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009)..................................................................................... 7

*Yama Ribbons & Bows Co. v. United States,*
    517 F. Supp. 3d 1325 (Ct. Int'l Trade 2021) ............................................... 20

*Yama Ribbons and Bows Co. v. United States,*
    419 F. Supp. 3d 1341 (Ct. Int'l Trade 2019) ......................................... 20, 25

## **STATUTE**

19 U.S.C. §1677..................................................................................... passim

## **REGULATIONS**

19 C.F.R. § 351.308(c)(1)(i)-(iii) ........................................................... 11, 28

19 C.F.R. § 351.511(a)(2) ................................................................................ 33

19 C.F.R. §§ 351.504-351.520 .................................................................. 29, 30

## **OTHER AUTHORITIES**

*Countervailing Duties,*
    63 Fed. Reg. 65,377 (Dep't of Commerce Nov. 25, 1988) ........................ 33, 34

*Certain Kitchen Appliance Shelving and Racks From the People's Republic of China,*
    77 Fed. Reg. 21,744 (Dep't of Commerce Apr. 11, 2012). .............................. 29

*Certain Frozen Warmwater Shrimp from China,*
    78 Fed. Reg. 50391 (Aug. 19, 2013) ............................................................... 31

*Aluminum Extrusions from the People's Republic of China,*
    79 Fed. Reg. 78,788 (Dep't of Commerce Dec. 31, 2014) ............................... 28

*Truck and Bus Tires from China,*
    82 Fed. Reg. 8606 (Jan. 27, 2017) .................................................................. 31

*Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China,*
    83 Fed. Reg. 11,177 (Dep't of Commerce Mar. 14, 2018) ......................... 36, 46

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    84 Fed. Reg. 61,011 (Dep't of Commerce Nov. 12, 2019) ............................... 3

*Certain Fabricated Structural Steel from China,*
    85 Fed. Reg. 5384 (Jan. 30, 2020) .................................................................. 30

*Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China,*
    86 Fed. Reg. 7,264 (Dep't of Commerce Jan. 27, 2021) .................................. 4

*Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China,*
    86 Fed. Reg. 40,462 (Dep't of Commerce July 28, 2021) ............................. 2, 5

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE**

| | |
|---|---|
| YAMA RIBBONS AND BOWS CO., LTD., | ) |
| Plaintiff, | ) |
| v. | ) Court No. 21-00402 |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| BERWICK OFFRAY, LLC, | ) |
| Defendant-Intervenor. | ) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully submits this response in opposition to the motion for judgment upon the agency record filed by plaintiff, Yama Ribbons and Bows Co., Ltd. (Yama). Yama Br., ECF No. 27. Yama challenges the final results issued by the United States Department of Commerce (Commerce) in the 2018 administrative review of the countervailing duty order covering narrow woven ribbons with woven selvedge from the People's Republic of China (China). As set forth below, we respectfully request a voluntary remand for Commerce to reconsider its *de facto* specificity determination for the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration. We further respectfully request that the Court sustain Commerce's final results in all other respects because they are supported by substantial evidence and in accordance with law.

<u>**STATEMENT PURSUANT TO RULE 56.2**</u>

**I.      <u>Administrative Determination Under Review</u>**

The administrative determination under review is Commerce's final results of the 2018 administrative review of the countervailing duty order covering narrow woven ribbons with woven selvedge from China.  *See Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*, 86 Fed. Reg. 40,462 (Dep't of Commerce July 28, 2021) (final results) (P.R. 176),[1] and accompanying Issues and Decision Memorandum (IDM) (P.R. 174), with Attachments (P.R. 175).  The period of review is January 1, 2018, through December 31, 2018.

**II.      <u>Issues Presented For Review</u>**

1.      Whether Commerce's determination to use an adverse inference when selecting from among the facts otherwise available on the record in determining that Yama used and benefited from the Export Buyer's Credit (EBC) program, based on the Chinese government's failure to cooperate, is supported by substantial evidence and otherwise in accordance with law.

2.      Whether the adverse rate that Commerce applied for the EBC program is supported by substantial evidence and otherwise in accordance with law.

3.      Whether Commerce's application of facts available with an adverse inference in determining that synthetic yarn and caustic soda markets in China are significantly distorted is supported by substantial evidence and in accordance with law.

4.      Whether Commerce's application of facts available with an adverse inference in determining that synthetic yarn and caustic soda private-company suppliers are "authorities"

---

[1] Citations to public and confidential documents from the administrative record are identified as "P.R. ___" and "C.R. ____," respectively.

under the statute is supported by substantial evidence and in accordance with law.

5.      Whether Commerce's application of facts available with an adverse inference in determining that the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration is specific is supported by substantial evidence and in accordance with law.

6.      Whether the Court should grant our request for a voluntary remand regarding Commerce's *de facto* specificity determination for the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration so that Commerce may add information to the record and allow the parties to comment on it.

## STATEMENT OF FACTS[2]

### I.    Initiation Of Review And Preliminary Results

In November 2019, Commerce initiated an administrative review of the countervailing duty order covering narrow woven ribbon with woven selvedge from China covering the period of January 1, 2018, through December 31, 2018. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 61,011, 61,016 (Dep't of Commerce Nov. 12, 2019) (initiation notice) (P.R. 2). Shortly after Commerce selected Yama as the mandatory respondent in this review, Commerce issued its initial questionnaire to the Chinese government, requesting information regarding the EBC program for the 2018 period and the provision of goods or services for less-than-adequate-remuneration for synthetic yarn and caustic soda, among other things. *See* Initial Questionnaire at I-2, III-1, III-2 (Dep't of Commerce Nov. 20, 2019) (P.R. 5), with Attachments (P.R. 6).

---

[2] To avoid repetition, the relevant facts pertaining to individual issues appear below in the argument section.

In April 2020, Commerce placed its public bodies analysis memorandum on the record and issued supplemental questionnaires to the Chinese government and Yama.  *See* Public Bodies Analysis Memo (Dep't of Commerce Apr. 2, 2020) (P.R. 134-136); Government of China (GOC) First Supplemental Questionnaire (Dep't of Commerce Apr. 3, 2020) (GOC First SQ) (P.R. 138); Yama First Supplemental Questionnaire (Dep't of Commerce Apr. 2, 2020) (Yama First SQ) (P.R. 137).  Both respondents timely responded.  *See* GOC First Supplemental Questionnaire Response (Apr. 17, 2020) (GOC First SQR) (P.R. 140; C.R. 41); Yama First Supplemental Questionnaire Response (Apr. 16, 2020) (P.R. 139; C.R. 39-40).  After analyzing the questionnaire responses, Commerce issued a second supplemental questionnaire to the Chinese government, to which it timely responded.  *See* GOC Second Supplemental Questionnaire (Dep't of Commerce July 24, 2020) (GOC Second SQ) (P.R. 144; C.R. 42); GOC Second Supplemental Questionnaire Response (Aug. 14, 2020) (GOC Second SQR) (P.R. 149; C.R. 43).

In January 2021, Commerce published its preliminary results.  *See Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*, 86 Fed. Reg. 7,264 (Dep't of Commerce Jan. 27, 2021) (preliminary results) (P.R. 165), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 162).  In them, Commerce preliminarily determined that Yama had received countervailable subsidies during the review period.  PDM at 1.  Commerce preliminarily determined that companies producing synthetic yarn and caustic soda for less-than-adequate-remuneration are "authorities" within the meaning of 19 U.S.C. § 1677(5)(B).  *Id.* at 6-9.  Commerce also preliminarily determined that Yama had benefitted from the EBC program administered by the Export-Import Bank of China (EX-IM Bank), which provided loans at preferential rates to customers for the purchase of exported goods from China.  *See id.* at 12-14.

As to both the EBC program and the provision of synthetic yarn and caustic soda, Commerce preliminarily determined that the Chinese government had failed to cooperate by not acting to the best of its ability in failing to fully respond to Commerce's questionnaires, and, as a result, Commerce applied facts available with an adverse inference.  *Id.* at 9, 14-15.

Commerce preliminarily determined that Yama had benefitted from the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration, and from use of the EBC program.  *See id.* at 28-32.  Commerce calculated preliminary subsidy rates of 27.74 percent and 0.27 percent *ad valorem* for the provision of synthetic yarn and caustic soda at less-than-adequate-remuneration, respectively, and assigned a 10.54 percent *ad valorem* subsidy rate for the EBC program, consistent with prior reviews.  *Id.* at 29, 31-32.  Commerce calculated a total subsidy rate of 42.20 percent *ad valorem* for Yama.  *Id.*

## II.   **Final Results**

On July 28, 2021, Commerce published the final results of the review.  *See* 86 Fed. Reg. at 40,462; IDM at 1.  In the final results, Commerce reexamined its determination that the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration is specific under 19 U.S.C. § 1677(5A)(D).  *Id.* at 14-22.  It explained its longstanding practice to not reexamine the specificity of a subsidy that it had previously found to be countervailable unless new evidence challenges such a finding, but, because it had found the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration programs to be countervailable based on facts available with an adverse inference, in this administrative review, Commerce requested the Chinese government to provide necessary information regarding these programs.  *Id.* at 19.  As Commerce explained in the final results, because the Chinese government had failed to provide the requested information about the *de facto* specificity of these programs, Commerce relied on

the information it had used to initiate an investigation of the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration as facts available with an adverse inference. *Id.* at 19-20.  Commerce also determined that the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration is *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(I).[3]  *Id.* at 21.

Commerce otherwise made no changes to the rates or methodology used to calculate the subsidy rates for the preliminary results, and continued to apply facts available with an adverse inference to both the EBC program and the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration.  *See id.* at 1, 3-4, 13-22, 26-44.

## SUMMARY OF THE ARGUMENT

First, Commerce appropriately determined Yama had benefitted under the EBC program by applying facts available with an adverse inference because the Chinese government had failed to cooperate to the best of its ability when it failed to respond fully to Commerce's questionnaires, which was necessary for Commerce to understand the operation of the program. Because Commerce could not understand how the program operates, Commerce was unable to rely on Yama's claims of non-use.  Contrary to Yama's argument that its assertions of non-use were sufficient for Commerce to find non-use, substantial evidence supports Commerce's explanation that a complete understanding of the functioning of the program was a prerequisite to Commerce's ability to verify non-use.  In addition, Commerce may apply facts available with an adverse inference based on a government's failure to cooperate even if it has a collateral effect on cooperating respondents, such as Yama.

---

[3] The information Commerce relied upon for its *de facto* specific determination is the narrow issue for which we seek a voluntary remand, as explained in more detail below.

Second, Commerce properly selected the 10.54 percent *ad valorem* rate to apply to the EBC program.  The 10.54 percent rate was a reasonable selection based upon Commerce's rate selection criteria for adverse rates.

Third, Commerce's reliance on facts available with an adverse inference in determining that: (1) the synthetic yarn and caustic soda markets in China are significantly distorted; and (2) the synthetic yarn and caustic soda private-company suppliers are government "authorities" is supported by substantial evidence and lawful.  Additionally, Commerce's determination to rely on facts available with an adverse inference in determining that the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration is specific is supported by substantial evidence and lawful because Commerce found that the Chinese government did not act to the best of its ability in complying with Commerce's requests for specificity information.

Finally, we respectfully request that the Court remand to Commerce its determination that the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration is *de facto* specific, so that Commerce may place the information on which it had relied for its finding on the record and to allow the parties to comment on it.

**ARGUMENT**

## I. Legal Standards

### A. Standard Of Review

The Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful.  *See Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."  *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  "Substantial evidence" amounts to "more than a mere scintilla" of "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). Substantial evidence is also "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shangdong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing tremendous deference to Commerce's factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment for Commerce's in choosing between two fairly conflicting views, even if it could justifiably have made a different choice had the matter been before it *de novo*. *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are reasonable and supported by the record as a whole, even if evidence detracts from them. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

**B.**     **Application Of Facts Available With An Adverse Inference**

Pursuant to 19 U.S.C. § 1677e(a), Commerce follows a two-step process to determine whether to use an adverse inference when selecting among the facts otherwise available. Commerce will use "facts otherwise available" to fill gaps in the record if:  (1) necessary information is not available, or (2) an interested party (a) withholds information requested by Commerce, (b) fails to provide the information in the form or in the manner requested, (c) significantly impedes the proceedings, or (d) provides information that cannot be verified.  In a countervailing duty proceeding, information submitted to Commerce during a review can be subject to verification by the agency.  *See* 19 U.S.C. § 1677m(i)(3).

Further, if Commerce finds that a respondent failed to cooperate by not acting "to the best of its ability to comply with a request for information," it may apply an adverse inference in its selection of facts otherwise available.  *Id.* § 1677e(b).  A respondent's failure to cooperate to the "best of its ability" is "determined by assessing whether {a} respondent has put forth its *maximum effort* to provide Commerce with full and complete answers to all inquiries."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (emphasis added).  The standard requires that respondents "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question."  *Papierfabrik August Koehler SE v. United States,* 843 F.3d 1373, 1379 (Fed. Cir. 2016).  Thus, the statutory trigger for an adverse inference "is simply a failure to cooperate to the best of respondent's ability, *regardless of motivation or intent*."  *Nippon Steel*, 337 F.3d at 1383 (emphasis added).  To then determine whether an adverse inference is warranted, Commerce examines a "respondent's actions and assesses the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information."  *Id.* at 1382.

In countervailing duty proceedings, Commerce requires information from both the foreign government in question and the foreign producers or exporters. "Typically, foreign governments are in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients." *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1297 (Ct. Int'l Trade 2010), *aff'd in part, rev'd in part on other grounds*, 678 F.3d 1268 (Fed. Cir. 2012). This means that Commerce seeks information pertaining to the "financial contribution" (including, when necessary, the status of an entity as an "authority") and "specificity" elements of a subsidy from the foreign government. *See id.* "The respondent companies, on the other hand, will have information pertaining to the existence and amount of the benefit conferred on them by the program." *Id.*

If the foreign government fails to cooperate or "fails to act to the best of its ability, Commerce will usually find the government has provided a financial contribution to a specific industry." *Id.* Commerce may then apply a remedy that collaterally impacts a cooperative respondent in certain circumstances. *See KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010); *see also An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 287 F. Supp. 3d 1361, 1373 (Ct. Int'l Trade 2018) ("Commerce may apply an adverse inference, notwithstanding the respondent's motivation or intent for noncompliance, and even if doing so may 'have collateral consequences for a cooperating party.'") (quoting *Mueller Comercial de Mexico v. United States*, 753 F.3d 1227, 1236 (Fed. Cir. 2014)). Thus, "{c}ooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions," but "this result is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014).

10

When applying an adverse inference, Commerce may rely on information derived from any stage of the proceeding, including the petition, a final determination in the investigation, any previous review, or any other information placed on the record.  *See* 19 U.S.C. §1677e(b)(2); 19 C.F.R. §351.308(c)(1)(i)-(iii).

## II.    Commerce's Determination That Yama Used The EBC Program And Its Selection Of An Adverse Rate For That Program Are Supported By Substantial Evidence And Lawful

Commerce's determination, based on the facts available using an adverse inference, that Yama used the EBC program, and its selection of an adverse rate for that program, are supported by substantial evidence and in accordance with law.  *See* IDM at 30-44; PDM at 12-15.  Yama makes numerous arguments challenging Commerce's determination.  Yama Br. 22-38.  First, Yama argues that use of facts available with an adverse inference is unwarranted because the Chinese government and Yama reported that the EBC program was not used during the review period and, thus, they both "fully answered" Commerce questionnaires.  *Id.* at 22-23.  Yama relatedly argues that Commerce's final results conflate the operation of the EBC program with whether Yama's U.S. customers obtained export buyer's program credits, and Commerce could have verified non-usage of the program.  *Id*. at 25-26, 32-33.  Third, Yama argues that because there are no gaps in the record, it was inappropriate for Commerce to apply facts available with an adverse inference.  *Id*. at 27-33.  Finally, Yama argues that Commerce's selection of the adverse rate of 10.54 percent *ad valorem* applied to the EBC program is unreasonable and unsupported by substantial evidence.  *Id*. at 33-38.

However, as demonstrated below, Yama's arguments are meritless.  Commerce's determination that Yama used the EBC program, and its selection of an adverse rate for that program, are supported by substantial evidence and otherwise in accordance with law.

A.    **Factual Background**

Commerce applied an adverse inference concerning Yama's use of the EBC program because the Chinese government had failed to comply with Commerce's requests for information, which would have enabled Commerce to fully understand the program and confirm whether Yama's customers had used the program.  *See* IDM at 39-42; PDM at 12-15.

In its initial questionnaire, Commerce stated that it did not intend to reevaluate the countervailability of the EBC program and requested that the Chinese government answer specific questions regarding the export buyer's credits provided to Yama's U.S. customers.  *See* Initial Questionnaire at II-12 – II-13; PDM at 12; IDM at 35.  Commerce also requested that the government provide the original and translated copies of any laws, regulations or other governing documents for the EBC program; a list of all partner/correspondent banks involved in the disbursement of program funds; and certain credit program information and documentation (*e.g.*, a sample buyer's credit application with the approval and credit agreement, *etc.*).  Initial Questionnaire at II-12 – II-13.

In the initial questionnaire, Commerce also clearly instructed, "{i}f you claim that no customer of the respondent compan{y} used buyer credits, please explain in *detail* the steps the government took to determine that no customer used the Export Buyer's Credits," and to also "identify the documents, databases, accounts, *etc*. that were examined to determine there was no use."  *Id*. at II-13 (emphasis added).  Commerce also asked Yama to "explain in detail the steps {it} took to determine that no customer used the {EBC} program."  *Id*. at III-13.

On January 10, 2020, the Chinese government responded that "to the best of its knowledge," neither Yama nor its customers received EBC program credits.  *See* GOC Initial Questionnaire Response at 33-34 (Jan. 10, 2020) (GOC IQR) (P.R. 17; C.R. 4).  On this basis,

the government argued that it was not required to respond to Commerce's requests for information regarding the export buyer's credits provided to Yama's customers.  *See id.* at 33. Accordingly, it stated that Commerce's request for a list of all partner/correspondent banks involved in the disbursement of program funds was not applicable.  *Id.*

Nonetheless, the Chinese government provided the 2000 administrative measures and implementing rules for the EBC program, claiming that the Chinese exporter can verify the use and benefit of the program.  *Id.* at 34 & Exhibits D-2 (containing the 2000 *Administrative Measures of the Export Buyer's Credit of the Export-Import Bank of China* (2000 administrative measures)), D-3 (containing the *Detailed Implementation Rules Governing Export Buyers' Credit of the Export-Import Bank of China* (implementing rules)).  The government elaborated that "normally" the Chinese exporter is able to verify and confirm the existence of sales contracts supported by export buyer's credits because the exporter "*should be aware* of the foreign buyer's receipt of loans and *should be involved* in the loan evaluation proceeding and in particular in the post-lending management."  *Id.* at 34-35 (emphasis added).  Additionally, the government stated that the Export-Import Bank of China (EX-IM Bank) searched its records and confirmed that none of Yama's customers received EBC program credits.  *Id.* at 32-33.

Yama responded to Commerce's initial questionnaire with a list of its U.S. customers for the review period.  *See* Yama Initial Questionnaire Response at 18 & Exhibit 13 (Yama IQR) (P.R. 40; C.R. 27).  Notwithstanding the Chinese government's claim that Yama itself can verify whether its customers had used the EBC program, Yama asserted that it had "taken all necessary steps to determine that no customer used the {EBC program} during the {period of review}" by attempting to obtain use information and non-use certifications from its U.S. customers.  *Id.* at 19.  Yama, however, failed to provide non-use certifications for all of its U.S. customers.  *Id.* at

19 & Exhibits 14-1 (containing non-use certifications from less than a majority of Yama's U.S. customers), 14-2 (containing Yama's email requests to its U.S. customers) (C.R. 30).

In a supplemental questionnaire, Commerce again requested that the Chinese government provide a list of all partner/correspondent banks involved in the disbursement of program funds and "explain in detail the steps the {government} took to determine that none of Yama's U.S. customers used {the EBC} program during the {period of review}" with supporting documentation. GOC First SQ at 7. Specifically, Commerce requested that the government "provide documentation from the EX-IM Bank of China to support the {government's} claims that it searched it{s} records and confirmed that Yama's customers did not receive credits under this program." *Id*. Although the government had provided the 2000 administrative measures in its initial questionnaire response, Commerce also requested a copy of the 2013 revisions to the program's administrative measures to understand amendments the Chinese government had made to the program and how program funds flow to and from foreign buyers and the EX-IM Bank in accordance with those amendments. *See id*.; *see also* IDM at 39.

In its supplemental response, the government again refused to provide the list of partner/correspondent banks, and also failed to explain with supporting documentation the steps it had taken to determine that none of Yama's U.S. customers had used the EBC program during the review period, which Commerce had specifically requested. *See* GOC First SQR at 17, 20. Instead, the government reiterated that the Chinese exporter can verify usage of the program and that it has "checked with the China EX-IM Bank and confirmed that none of the U.S. customers" used the program. *Id*. at 20. The Chinese government further claimed that it does not maintain the 2013 revisions to the administrative measures for the EBC program, as the program is "a commercial, financial product offered by the bank." *Id*.; *see also* IDM at 36.

In the final results, Commerce explained its understanding of the EBC program, and, more importantly, how it had come to understand that the Chinese government had failed to provide important information about the program.  *See* IDM at 30-35.  Commerce explained that its "understanding of the EBC program changed after {it} began questioning the {Chinese government's} earlier indication that loans provided pursuant to the EBC program were between the {government} and the borrower *only*, essentially a *direct* deposit from the China EX-IM Bank to the foreign buyer."  *Id.* at 36 (emphasis in original).

But then Commerce learned "that the loans associated with this program are *not* limited to direct disbursements through the China EX-IM Bank."  *Id.* at 37 (emphasis added).  Rather, "it appears that:  (1) customers can open loan accounts for disbursements through this program with other banks; (2) the loans are first sent from the China EX-IM Bank to the importer's account, which could be at the China EX-IM Bank or other banks; and (3) that these funds are then sent to the exporter's bank account."  *Id.*  And "{g}iven the complicated structure of loan disbursements which can involve various banks for this program, Commerce's complete understanding of how this program is administrated is necessary to verify claims of non-use."  *Id.*  "Thus, the {Chinese government's} refusal to provide the 2013 revisions, as well as other requested information, such as key information and documentation pertaining to the application and approval process, and partner/correspondent banks, impeded Commerce's ability to conduct its investigation of this program and to verify the claims of non-use by Yama's customers."  *Id.*

Moreover, Commerce explained that "{b}ecause the program changed in 2013 and the {Chinese government} has not provided details about these changes, Commerce has outstanding questions about how this program currently functions, *e.g.*, whether the China EX-IM Bank limits the provision of export buyer's credits to business contracts exceeding $2 million, and

whether it uses third-party banks to disburse/settle export buyer's credits." *Id.* at 39.  And without the requested information, Commerce explained that it "would amount to looking for a needle in a haystack with the added uncertainty that Commerce might not even be able to identify the needle when it was found." *Id.*

Because the Chinese government had failed to provide the requested information necessary to Commerce's understanding of the program and for any determination of whether the "manufacture, production, or export" of Yama's merchandise has been subsidized, Commerce found there was an informational gap in the record.  *See id.* at 37, 40-41; *id.* at 40 (explaining "the originating bank, the China EX-IM bank, {} is a government-controlled bank"). Further, the gap in the record impeded Commerce's ability to investigate the program and to verify the non-use certifications from less than a majority of Yama's U.S. customers.  *Id.* at 40-41; Yama IQR at Exhibit 13.

Accordingly, Commerce resorted to facts available pursuant to 19 U.S.C. § 1677e(a)(2)(D).  IDM at 40-42.  "Specifically, necessary information is not on the record because the {Chinese government} withheld information that {Commerce} requested that was reasonably available to it, which significantly impeded the proceeding," and, thus, Commerce determined that an adverse inference was warranted.  *Id.* at 42 (citing 19 U.S.C. § 1677e(b)).

When selecting the rate, Commerce explained that, consistent with its established practice, it selected the highest calculated rate for the same or similar program as facts available with an adverse inference.  *Id.* at 42-44.  It determined the highest calculated rate for a comparable lending program to be a 10.54 percent rate calculated for the preferential policy lending program in *Coated Paper from China*.  *Id.* at 43.  Commerce rejected Yama's argument that it was not a comparable lending program because it is allegedly limited to the coated paper

industry, because the program is not limited to that industry, and "Commerce has found this program to be similar to the EBC program and used this same rate in several other reviews or investigations that do not involve the coated paper industry."  *Id.*

> **B.      Commerce's Application Of An Adverse Inference In Determining That Yama Used The EBC Program Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

Commerce's use of an adverse inference in selecting from among the facts available to find that Yama had used the EBC program, after the Chinese government had failed to provide answers about its 2013 amendments to the program, is supported by substantial evidence and otherwise in accordance with law.  Commerce reasonably determined that it needed an explanation of the 2013 amendments to fully understand the EBC program, and a full understanding was a pre-requisite to verifying use or non-use of the program.  Accordingly, without an understanding of the 2013 amendments, including correspondent banks, Commerce determined that it was unable to rely on Yama's and the Chinese government's statements of non-use of the program.

Yama argues that no information on the usage of the EBC program was missing, and therefore, Commerce was prohibited from applying facts available, much less an adverse inference.  *See* Yama Br. at 22-32.  Yama further argues that the Chinese government and Yama reported that the EBC program was not used and thus they both "fully answered Commerce's questions," with that information being verifiable.  *Id.* at 23, 32.  Contrary to Yama's various arguments, Commerce appropriately applied an adverse inference based on the Chinese government's failure to provide the required information.

In the context of the EBC program, the Court has held that, "to apply an adverse inference that a cooperating party benefited from the {program} based on the {government of

China's} failure to cooperate, Commerce must: (1) define the gap in the record by explaining exactly what information is missing from the record necessary to verify non-use; (2) establish how the withheld information creates this gap by explaining why the information the {government of China} refused to give was necessary to verify claims of non-use;" and finally, "(3) show that only the withheld information can fill the gap by explaining why other information, on the record or accessible by respondents, is insufficient or impossible to verify." *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 405 F. Supp. 3d 1317, 1333 (Ct. Int'l Trade 2019) (citing *Changzhou Trina Solar Energy Co., Ltd. v United States*, 352 F. Supp. 3d 1316, 1326-27 (Ct. Int'l Trade 2018)).

With respect to the EBC program, this Court has held that "only the government of China, and in particular the {} Ex-Im {Bank of China}, could provide and verify the information needed to determine whether a benefit was conferred to Respondents during the {review period} from the {EBC} Program." *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 195 F. Supp. 3d 1334, 1355 (Ct. Int'l Trade 2016) (*Trina Solar*). The Court also explained that "{b}ecause the {Chinese government}—the sole party with access to the necessary information—submitted information that could not be verified, and failed to act to the best of its ability by preventing Commerce from verifying this information, Commerce reasonably applied 19 U.S.C. §§ 1677e(a)(2)(D) and 1677e(b)." *Id*. at 1355. In addressing verification of non-use of the EBC program in another review after the 2013 revisions to the program's administrative measures, this Court held that Commerce's finding of non-use based on the failure of the Chinese government to respond to requests for access to information about the program at verification was supported by record evidence. *See RZBC Grp. Shareholding Co. v. United States*, No. 15-022, 2016 WL 3880773 (Ct. Int'l Trade June 30, 2016).

18

Yama claims that Commerce's questionnaire provided that "the {Chinese government} did not have to fully answer the questionnaire" if a program, like the EBC program, was not used. Yama Br. at 23. However, Commerce specifically requested certain information from the Chinese government precisely to determine *whether* the EBC program was used. *See* IDM at 35-36; PDM at 12; Initial Questionnaire at II-12 – II-13. For example, Commerce requested that the government provide copies of any laws, regulations or other governing documents for the EBC program including the 2013 program revisions; a list of partner/correspondent banks involved in the disbursement of program funds; certain credit information and documents (*e.g.*, a sample buyer's credit application with the approval and credit agreement, *etc.*); and a detailed description of "steps the government took to determine that no customer used the Export Buyer's Credits" and "the documents, databases, accounts, *etc.*" examined if the Chinese government claimed non-use. Initial Questionnaire at II-12 – II-13. Thus, the Chinese government's response that Yama did not use the EBC program, without more, did not somehow exempt the government from providing the requested information, as Yama claims.

Moreover, in response to Commerce's questionnaires, the Chinese government directed Commerce to reevaluate the information required to determine use and asserted that it was not required to respond to Commerce's request for information regarding the export buyer's credits provided to Yama's U.S. customers. *See* GOC IQR at 33. Although the government claimed that "to the best of its knowledge" neither Yama nor its customers received EBC program credits and that it checked with the EX-IM Bank, it failed to explain the steps either it or the EX-IM Bank took to identify the databases, documents, accounts, *etc.*, examined to establish non-use, despite Commerce's specific instruction that it do so. Initial Questionnaire at II-13. And while the Chinese government provided the 2000 administrative measures and implementing rules for

the program, the government failed to provide the 2013 actual revisions or even a description of those revisions.  *See* IDM at 39-40.

We acknowledge that the Court has repeatedly set aside Commerce's determination to apply facts available with an adverse inference regarding the EBC program as being unsupported by substantial evidence, including in the 2015 and 2016 reviews of this proceeding.[4]  *See, e.g.*, *Yama Ribbons & Bows Co. v. United States*, 517 F. Supp. 3d 1325, 1330-35 (Ct. Int'l Trade 2021) (remanding Commerce's determination in the 2016 countervailing duty administrative review covering woven ribbons from China for further consideration as to whether Yama used or benefitted from the EBC program); *Yama Ribbons and Bows Co. v. United States*, 419 F. Supp. 3d 1341, 1345-56 (Ct. Int'l Trade 2019) (finding a lack of evidence in the record sufficient to support a determination of use or benefit of the EBC program in the 2015 countervailing duty administrative review covering woven ribbons from China); *see also, e.g.*, *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1355-60 (Ct. Int'l Trade 2019) (remanding the determination, through the application of facts available with an adverse inference, that respondents used the program); *Both-Well (Taizhou) Steel Fittings, Co. v. United States*, 557 F. Supp. 3d 1327 (Ct. Int'l Trade 2022) (same); *Cooper Kunshan Tire Co. v. United States*, 539 F. Supp. 3d 1316 (Ct. Int'l Trade 2021) (same); *Canadian Solar Inc., et al. v. United States*, 537 F.

---

[4]  The Court has not issued its opinion in the challenge to the final results of the 2017 administrative review with respect to Commerce's application of facts available with an adverse inference regarding Yama's use of the EBC program.  *See Yama Ribbons and Bows Co., Ltd. v. United States*, No. 20-00059 (Ct. Int'l Trade).   Also, although the Court has not issued an opinion with respect to the remand redetermination in the 2016 administrative review, Commerce, under respectful protest, determined that Yama did not use the EBC program based on record information and statements by Yama and the government of China that none of Yama's customers used the program during the period of review.  *See* Final Results of Redetermination Pursuant to Court Remand, *Yama Ribbons and Bows Co., Ltd. v. United States*, No. 20-00059 (Ct. Int'l Trade Aug. 13, 2021), ECF No. 47.

Supp. 3d 1380 (Ct. Int'l Trade 2021) (same); *Clearon Corp. v. United States*, 474 F. Supp. 3d 1339 (Ct. Int'l Trade 2020) (same); *Guizhou Tyre Co. v. United States*, 447 F. Supp. 3d 1373 (Ct. Int'l Trade 2020) (same); *Jiangsu Zhongji Lamination Materials Co. v. United States*, Ct. No. 18-00089, Slip Op. 20-39 (Ct. Int'l Trade Mar. 24, 2020) (same); *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335, 1340-44 (Ct. Int'l Trade 2019) (same); *Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315, 1319-22 (Ct. Int'l Trade 2019) (same); *Guizhou Tyre Co., Ltd. v. United States,* 399 F. Supp. 3d 1346, 1349-53 (Ct. Int'l Trade 2019) (same); *Changzhou Trina Solar Energy Co. v. United States*, Consol. Ct. No. 17-00246, Slip Op. 19-143 (Ct. Int'l Trade Nov. 18, 2019) (same); *Changzhou Trina Solar Energy Co. v. United States*, Consol. Ct. No. 17-00198, Slip Op. 19-137 (Ct. Int'l Trade Nov. 8, 2019) (same); *Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) (same); *Changzhou Trina Solar Energy Co.*, 352 F. Supp. 3d at 1326-27 (Ct. Int'l Trade 2018) (same); *Changzhou Trina Solar Energy Co. v. United States*, Consol. Ct. No. 17-00246, Slip Op. 18-167 (Ct. Int'l Trade Nov. 30, 2018) (same). However, there is no binding precedent from the Court of Appeals for the Federal Circuit on this issue.

Nevertheless, here, we respectfully assert that Commerce has:  (1) defined the gap in the record by explaining exactly what information is missing from the record necessary to verify non-use; (2) established how the withheld information created this gap by explaining why the information the Chinese government refused to provide was necessary to verify claims of non-use; and (3) showed that only the withheld information can fill the gap by explaining why other information, on the record or accessible by respondents, is insufficient or impossible to verify. *See Jiangsu Zhongji*, 405 F. Supp. 3d at 1333; *see also* IDM at 31-42.

For example, in the final results, Commerce explained that the Chinese government either failed or simply refused to provide the following:  a list of partner/correspondent banks involved in the disbursement of program funds; program information and documents (*e.g.*, application materials and approval letters, *etc.*) from the EX-IM Bank of China; an explanation of the steps the government took to determine non-use with identification of documents, databases and accounts, *etc.* that were examined; and revisions to the program's administrative measures made in 2013.  *See* IDM at 35-36; PDM at 12-13.  The government's refusal to provide the requested information impeded Commerce's ability to conduct the investigation of the program and to verify Yama's customers' non-use claims, including certifications of non-use from a subset of Yama's customers.  *See* IDM at 37.  Commerce identified the missing information as particularly important because record evidence indicates that program credits are *not* direct transactions from the EX-IM Bank to the respondent's U.S. customers; rather, intermediary banks may be involved and the government refused to provide a list of such banks.  *Id.*

As Commerce explained in the final results, rather than a direct deposit from the EX-IM Bank to the U.S. customer, "Commerce identified that the rules implementing the EBC program appeared to indicate that the China EX-IM Bank's payment was instead disbursed to U.S. customers *via an intermediary Chinese bank*, thereby contradicting the {Chinese government's} responses otherwise." *Id.* at 36 (emphasis added).  Based on this record information, Commerce determined that verification by examining the financial statements and books and records of Yama's U.S. customers for evidence of loans from the Ex-IM Bank was no longer possible.  For example, "performing the verification steps to make a determination of whether the 'manufacture, production, or export' of the company respondents' merchandise has been subsidized would . . . require knowing the names of the intermediary banks; it would be their

names, not the name 'China EX-IM Bank,' that would appear in the subledgers of the U.S. customers if they received credits." *Id.* at 37.  Thus, having a list of the correspondent banks was critical for Commerce to perform verification with the U.S. customers. *Id.* at 38.  But the Chinese government refused to provide such information and, thus, the names of the intermediary banks remain unknown. *Id*.

Moreover, verifying non-use of the program without knowledge of the correspondent banks would have required Commerce to review the underlying documentation for *all* entries from the subledger to attempt to confirm the origin of each loan (*i.e.*, whether the loan was provided from the EX-IM Bank via an intermediary bank). *Id.*  But the Chinese government also refused to provide such requested information and documentation (*e.g.*, sample application and approval letter, *etc.* constituting a "paper trail") which rendered "Commerce's typical non-use verification procedures of selecting specific entries from the subledger and requesting to see underlying documentation, such as applications and loan agreements) . . . of no value." *Id.*; *id.* (explaining that "Commerce would simply not know what to look for behind each loan in attempting to identify a loan provided by the China EX-IM Bank via a correspondent bank.").

Given the complicated structure of the loan disbursements involving various unidentified correspondent banks, even if the Chinese government had provided Commerce with the names of the correspondent banks and underlying documentation, which it did not, Commerce explained that it was still unable to verify without an understanding of how the program worked. *Id.* at 37, 39.  For example, Commerce explained that even if it had the names of correspondent banks, it would still "need to know how to differentiate ordinary HSBC loans from loans originating from, facilitated by, or guaranteed by the China EX-IM Bank." *Id.*  But to do this, "Commerce would need to know what underlying documentation to look for in order to determine whether

particular subledger entries for HSBC might actually be China EX-IM Bank financing:  specific applications, correspondence, abbreviations, account numbers, or other indicia of China EX-IM Bank involvement." *Id.* at 38-39.  Thus, "companies could provide Commerce with incomplete loan documentation without Commerce understanding that the loan documentation was incomplete." *Id.* at 39.

Accordingly, Commerce required the 2013 program revisions and other information regarding the program's operations to verify usage, which the Chinese government refused to provide. *Id*. at 39.  Commerce explained why that information was necessary because "{a} complete understanding of the program provides a 'roadmap' for the verifiers by which they can conduct an effective verification of usage." *Id.*  Without that information, "Commerce could not *accurately* and *effectively* verify usage at the company respondent's customers, even were it to attempt the unreasonably onerous examination of each of the customers' loans." *Id.* (emphasis in original).  On this basis, Commerce reasonably determined it was unable to verify claims of non-use of the export buyer's credits by Yama's U.S. customers. *Id.*

Yama argues that Commerce could have "very simply" verified non-use by confirming that the exporter's records show payment from the U.S. customer's U.S. bank to the exporter's bank, as opposed to a wire (or other) transfer from the EX-IM Bank to the exporter's bank. Yama Br. at 26.  According to Yama, Commerce inappropriately conflates *how* the EBC program works with whether Yama's customers used the program. *Id.* at 25.

However, record evidence indicates that:  (1) customers can open loan accounts for export credit disbursements through the EBC program with other banks; (2) the funds are first sent from the Ex-Im Bank to the importer's account, which could be with the Ex-Im Bank *or other banks*; and (3) that these funds are then sent to the exporter's bank account.  IDM at 37.

Again, the Chinese government refused to provide Commerce with a list of banks involved in the disbursement of program funds.  Therefore, that the exporter's records show only wire transfers from the U.S. customer's U.S. bank to the exporter's bank demonstrates nothing more than proof of payment.  *Id.* at 26.

Yama also claims that because Commerce found non-use of other subsidy programs without "copious amounts of information," Commerce's application of facts available with an adverse inference to the EBC program is "not only arbitrary and capricious but an abuse of discretion."  Yama Br. at 27.  But this assertion ignores the fact that the EBC program involves a complicated loan disbursement structure, the parameters of which the Chinese government has yet to identify, despite repeated requests, and Commerce required certain information from the government to understand the program so that it could verify the accuracy of non-use claims. IDM at 37-41.

At bottom, Commerce may apply an adverse inference based upon the Chinese government's failure to provide requested information in a countervailing duty proceeding even when a respondent like Yama cooperates.  *See, e.g.*, *KYD, Inc.*, 607 F.3d at 768 (holding that a collateral impact on a cooperating party does not render the application of adverse inferences in a countervailing duty investigation improper); *Fine Furniture*, 748 F.3d at 1371-73 (affirming Commerce's application of adverse inferences when the government of China did not provide requested information despite the respondents' cooperation).  While Commerce should "seek to avoid such {adverse} impact if relevant information exists elsewhere on the record," *Yama Ribbons*, 419 F. Supp. 3d at 1347 (citing *Changzhou Trina Solar Energy Co.*, 352 F. Supp. 3d at 1325), the adverse impact here is unavoidable, because although relevant information exists elsewhere on the record in the form of a limited number of non-use certifications from Yama's

U.S. customers, these certifications are not sufficient for Commerce to accept because of the unique nature of this program that permits third-party correspondent banks to issue loans. *See* IDM at 37-40. As Commerce explained, "{a} careful verification of {Yama's} customers' non-use of this program without understanding the identity of these correspondent banks would be extremely difficult, if not impossible" because "without knowledge of the correspondent banks," Commerce would be required "to view the underlying documentation for *all* entries from the subledger to *attempt* to confirm the origin of each loan—*i.e.*, whether the loan was provided from the China EX-IM Bank via an intermediary bank." *Id.* at 38 (emphasis in original). In such circumstances, verification "would be an extremely onerous undertaking for any company that received more than a small number of loans." *Id.*

Moreover, we agree with Yama that 19 U.S.C. § 1677e(a) is clear that necessary information must be missing from the record before Commerce can apply facts available. *See* Yama Br. at 28-30. As Commerce explained in the final results, it resorted to selecting from among the facts otherwise available not only because there was a gap of information in the record, but also because the Chinese government withheld information that Commerce had requested, significantly impeded the proceeding, and provided information that could not be verified. *See* IDM at 37-42. Although both the Chinese government and Yama stated that Yama did not benefit from the EBC program, the government's failure to provide requested information prevented Commerce from confirming the accuracy and completeness of such claims. *Id.* at 41.

Therefore, Commerce's application of an adverse inference in selecting from among the facts otherwise available is reasonable because it reasonably determined that the Chinese government had failed to cooperate by declining to answer Commerce's questions about the

EBC program, despite being the sole party in possession of such information.  *See id.* at 37-42;

*Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306-07 (Fed. Cir. 2014) (affirming an adverse

inference is warranted when "Commerce reasonably concluded that Mukand failed to cooperate

to the best of its ability when responding to Commerce's requests for information").  Substantial

evidence supports Commerce's determination that the Chinese government withheld necessary

information that Commerce had requested "that was reasonably available to it which

significantly impeded the proceeding."  IDM at 42.  For these reasons, Commerce's application

of facts available with an adverse inference to the EBC program, based on the Chinese

government's withholding of requested information and failure to cooperate to the best of its

ability, is supported by substantial evidence and otherwise in accordance with law.

> **C.    Commerce's Selection Of The Adverse Rate Applied To The EBC Program Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

Yama also argues that Commerce's selection of the adverse rate for the EBC program is

unreasonable and unsupported by substantial evidence.  Yama Br. at 33-37.  However,

Commerce selected the 10.54 percent rate in accordance with its hierarchy for the selection of

adverse rates in countervailing duty administrative reviews, which has been codified by statute,

and therefore, is supported by substantial evidence and in accordance with law.

> **1.    Legal Framework For Selection Of An Adverse Rate**

In a countervailing duty proceeding, Commerce may select a rate with which to

countervail a subsidy program by applying an adverse inference from among the facts otherwise

available where it "finds that an interested party has failed to cooperate by not acting to the best

of its ability to comply with {its} request for information."  19 U.S.C. § 1677e(b)(1); *see also*

*SolarWorld Am., Inc. v. United States*, 229 F. Supp. 3d 1362, 1366-67 (Ct. Int'l Trade 2017).

When applying an adverse inference, Commerce may rely on information derived from any stage of the proceeding, including the petition, a final determination in the investigation, any previous review, or any other information placed on the record.  *See* 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c)(1)(i)–(iii).

Commerce has an established practice for selecting an adverse rate based on facts available in countervailing duty proceedings, with different hierarchical methodologies for investigations versus administrative reviews.  *SolarWorld*, 229 F. Supp. 3d at 1366-67.  This Court and the Federal Circuit have repeatedly upheld these hierarchical methodologies for countervailing duty proceedings.  *See Essar Steel Ltd. v. United States*, 908 F. Supp. 2d 1306 (Ct. Int'l Trade 2013) (affirming Commerce's hierarchy for administrative reviews), *aff'd*, 753 F.3d 1368 (Fed. Cir. 2014); *Fengchi Imp. & Exp. Co. v. United States*, 59 F. Supp. 3d 1386, 1396 (Ct. Int'l Trade 2015) (explaining Commerce's hierarchy system for administrative reviews). Congress codified these hierarchical methodologies in a 2016 amendment to the statute, which permits Commerce to use as facts available with an adverse inference in a countervailing duty proceeding "a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country; or if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use."  19 U.S.C. § 1677e(d)(1)(A).

For administrative reviews, Commerce's practice is to use, as adverse rates, "program-specific rates calculated for the cooperating respondents in the instant review or in prior segments of the instant proceeding, or calculated in prior {countervailing duty} cases involving the country under review{,} {China.}"  *Aluminum Extrusions from the People's Republic of China*, 79 Fed. Reg. 78,788 (Dep't of Commerce Dec. 31, 2014) (final results), and

28

accompanying IDM at 15; *see also Certain Kitchen Appliance Shelving and Racks From the People's Republic of China*, 77 Fed. Reg. 21,744 (Dep't of Commerce Apr. 11, 2012) (final results), and accompanying IDM at 3.  Commerce seeks both program relevancy (*i.e.*, a rate reflective of a company using the identical program) and industry relevancy (*i.e.*, a rate reflective of a company in the same industry), which both inform an accurate rate.  *SolarWorld*, 229 F. Supp. 3d at 1367.  Commerce then employs the following hierarchy:  (1) Commerce looks for the highest above *de minimis* calculated rate for a cooperating respondent for the identical program in any segment of the same proceeding, *i.e.*, this administrative review, any previous administrative reviews of the countervailing duty order at issue, or the investigation; (2) if no other company used the identical program within any segment of the proceeding, Commerce uses the highest above *de minimis* calculated rate for a similar program (determined by the type of benefit) from any segment of the same proceeding; (3) if no same or similar programs have been calculated for any segment of the proceeding, Commerce selects the highest above *de minimis* rate calculated for the identical program – or, barring that, a similar program – in another countervailing duty proceeding involving China; and (4) if Commerce has never calculated a rate for the same or similar program in any countervailing duty proceeding involving China, Commerce uses the highest above *de minimis* rate for any program in any proceeding involving China, as long as the non-cooperating companies could have used the program for which the rate was calculated.  *See* 19 C.F.R. §§ 351.504-351.520; *SolarWorld*, 229 F. Supp. 3d at 1366-68.

### 2.    Commerce Properly Selected The Adverse Rate Applied To The EBC Program

After determining that Yama had used the EBC program in this review using an adverse inference in selecting from the facts otherwise available, Commerce applied its administrative

review hierarchy to select an adverse rate.  *See* IDM at 42-43; PDM at 14.  Commerce

determined that there was no calculated above *de minimis* rate for the EBC program in this

proceeding, and no similar/comparable program within this proceeding without a *de minimis*

rate.  *See* IDM at 43; PDM at 15.  Therefore, pursuant to its hierarchy, Commerce relied on the

rate determined for a comparable program in another countervailing duty proceeding involving

China, which was the revised rate for the Preferential Lending to the Coated Paper Industry

program.  *See* IDM at 43; PDM at 15.  Thus, Commerce properly applied the 10.54 percent rate

in this review as the adverse rate for the EBC program.

Yama argues that the Preferential Lending to the Coated Paper Industry program is not

the same or similar to any export buyer credit program Yama may have used.  Yama Br. at 34.

However, the difference Yama asserts exists between these two programs is irrelevant;

Commerce's selection of this rate is consistent with its practice and supported by substantial

evidence.  "{B}y 'similar program,' {Commerce} refers to a program with the same type of

benefit, as defined under 19 C.F.R. §§ 351.504 through 351.520.  Thus, a grant would be similar

to another grant; *a loan subsidy to another loan subsidy*; etc."  *SolarWorld*, 229 F. Supp. 3d at

1368 (emphasis added) (quotation omitted).  Under such criteria, contrary to Yama's argument

that the Preferential Lending to the Coated Paper Industry program is "in no way similar or

comparable" to the EBC program, the programs are similar because both provide access to loans.

*Id.*

Notwithstanding that Yama asserts that the preferential lending program is unavailable to

the woven ribbons industry and none of the loans were export subsidies, Yama Br. at 35,

Commerce has determined that the program is similar to the EBC program and used the same

10.54 percent rate in other reviews and investigations which do not involve the coated paper

industry.  *See, e.g.*, *Certain Fabricated Structural Steel from China*, 85 Fed. Reg. 5,384 (Jan. 30, 2020) (final affirm. CVD deter.); and *Truck and Bus Tires from China*, 82 Fed. Reg. 8606 (Jan. 27, 2017) (final affirm. CVD deter.).  As Commerce explained in the final results, "a lending program is similar to the {EBC program} based on the treatment of the benefit because the credits function as short-term or medium-term loans," with the type of benefit being a loan or loan support.  IDM at 43; *see also Certain Frozen Warmwater Shrimp from China*, 78 Fed. Reg. 50391 (Aug. 19, 2013) (final affirm. CVD deter.), and accompanying IDM at 14.

Regardless, Yama's similarity arguments are without merit because the Coated Paper Preferential Lending program is sufficiently similar to the EBC program based on the treatment of benefit.  In other words, the statute does not require that Commerce select the *most* similar program when selecting rates based on facts available with an adverse inference. *See Changzhou Trina Solar Energy*, 352 F. Supp. 3d at 1328-29 (sustaining Commerce's selection of an adverse rate from a sufficiently similar program).  Rather, the plain statutory text merely requires Commerce to select a *similar* program.  *Id.*  Commerce has broad discretion, as recognized by the Court, in determining and applying an adverse rate, if it "reasonably balance{s} the objectives of inducing compliance and determining an accurate rate."  *Id.* (citing *SolarWorld*, 229 F. Supp. 3d at 1366).

Further, despite Yama's argument that the 10.54 percent rate is unduly punitive because it is a "high rate from a non-export program in an unrelated industry," Yama Br. at 37, Commerce's rate is reasonable.  Indeed, the Federal Circuit has recognized that Commerce possesses considerable discretion when selecting an appropriate source for the facts available with an adverse inference rate, *see PAM, S.p.A.*, 582 F.3d at 1340, and "{a} decision based on adverse facts is not punitive when determined in accordance with the statutory requirements."

*Essar Steel Ltd. v. United States*, 678 F. 3d 1268, 1276 (Fed. Cir. 2012).  Because Commerce's determination based on adverse facts was in accordance with the statutory requirements, it is not punitive.  *See* IDM at 42-43.

In conclusion, Commerce's application of its methodology to select the adverse rate of 10.54 percent *ad valorem* for the EBC program is supported by substantial evidence and otherwise in accordance with law.

### III.    Substantial Evidence Supports Commerce's Application Of Facts Available With An Adverse Inference To The Provision Of Synthetic Yarn And Caustic Soda For Less-Than-Adequate-Remuneration Programs

Yama argues that Commerce's determination of the countervailability of the provision of synthetic yarn and caustic soda at less-than-adequate-remuneration is unlawful because the application of facts available with an adverse inference is not warranted, the input markets are not distorted, Yama's suppliers are not "authorities," and the input provisions at less-than-adequate-remuneration are not specific.  Yama Br. at 38-48.  However, Commerce properly applied facts available with an adverse inference in determining that the synthetic yarn and caustic soda markets in China are significantly distorted and that Yama's private-company suppliers are "authorities" based on the Chinese government's non-cooperation in providing necessary information.  Additionally, Commerce reasonably concluded that the application of facts available with an adverse inference was also warranted with regard to whether the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration is specific.  Accordingly, the Court should sustain these determinations.

### A.    Legal Framework

A subsidy is countervailable when an authority has provided a financial contribution to a person, a benefit is thereby conferred, and the subsidy is specific.  19 U.S.C.

§ 1677(5)(A)-(B).  When considering whether a good or service has been provided "for less than adequate remuneration," and, thus, whether a benefit has been conferred, Commerce examines the "prevailing market conditions for the good or service being provided," including "price, quality, availability, marketability, transportation, and other conditions of purchase or sale."  Commerce measures the adequacy of remuneration by comparing the respondent's actual price paid for an input to an adjusted benchmark figure that represents the market price for the good at issue.  19 C.F.R. § 351.511(a)(2).

Commerce's benchmarking regulations provide a three-tiered hierarchal framework for this analysis.  *See id.* § 351.511.  First Commerce looks for "an actual transaction price in the country in question, which may, in some cases, include sales by competitively-run government auctions."  *Essar Steel*, 678 F.3d at 1273 (citing § 351.511(a)(2)(i)).  If such a transaction does not exist, Commerce then looks for "a world market price for the goods in question."  *Id.* (citing § 351.511(a)(2)(ii)).  Finally, if neither is available, Commerce then "measures the adequacy of the remuneration by assessing whether the price is consistent with market principles."  *Id.*  (citing § 351.511(a)(2)(iii)).

As reflected by this hierarchy, Commerce prefers to derive a benchmark to measure the adequacy of remuneration for an input from market-determined prices in the country in question.  19 C.F.R. § 351.511(a)(2)(i).  However, when "actual transaction prices are significantly distorted as a result of {a} government's involvement in the market{,}" Commerce's practice is to "resort to the next alternative in the hierarchy" (*i.e.,* a world market or tier-two price).  *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Dep't of Commerce Nov. 25, 1988) (final rule).  Commerce resorts to a tier-two benchmark, that is, a world

market price for the input in question, if "it is reasonable to conclude that such price would be available to purchasers in the country in question."  19 C.F.R. § 351.511(a)(2)(ii).

> **B.      Substantial Evidence Supports Commerce's Application Of Facts Available With An Adverse Inference In Determining That Synthetic Yarn And Caustic Soda Markets In China Are Significantly Distorted**

Commerce resorted to using the facts otherwise available to fill in the informational gap on the record because the Chinese government withheld information about, and failed to provide government ownership information for, companies comprising the synthetic yarn and caustic soda industries.  *See* IDM at 14-15; PDM at 7-8.  Commerce also applied an adverse inference based on its conclusion that the Chinese government failed to act to the best of its ability to comply with Commerce's informational requests and elected not to assist Commerce in obtaining the necessary information available to it.  *See* IDM at 15; PDM at 7-8.  Commerce therefore applied facts available with an adverse inference to determine that, in the synthetic yarn and caustic soda markets, Chinese prices from transactions involving Chinese buyers and sellers are significantly distorted by the involvement of the Chinese government, and are not usable to derive a tier one benchmark.  *See* IDM at 14; PDM at 7, 28, 30; *see also Countervailing Duties*, 63 Fed. Reg. at 65,377.

As a result, Commerce used an external benchmark (tier two), world market prices available to purchasers in China, to calculate the benefit for the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration because actual transaction prices (tier one) were significantly distorted.  *See* PDM at 8, 28, 30.  Based on the world market price, Commerce determined that the provision of synthetic yarn and caustic soda was provided at less-than-adequate-remuneration, conferring a benefit within the meaning of 19 U.S.C. § 1677(5)(E)(iv).  *Id*. at 28, 30.

Yama's claim that the application of facts available with an adverse inference is unwarranted because the Chinese government "acted to the best of its ability," Yama Br. at 40, is clearly contradicted by record evidence.  In the final results, Commerce explained that it had requested that the Chinese government provide information regarding the synthetic yarn and caustic soda industries to determine whether the government is the predominant provider of these inputs and whether its significant presence in the market distorts all transaction prices for both inputs.  *See* IDM at 14; *see also* PDM at 7.  Specifically, Commerce asked the government to provide:

(a) the total number of producers;
(b) the total volume and value of Chinese domestic consumption of the input and the total volume and value of Chinese domestic production of the input;
(c) the percentage of domestic consumption accounted for by domestic production;
(d) the total volume and value of imports of the input;
(e) the percentage of total volume and (separately) value of domestic production that is accounted for by companies in which the Chinese government maintains an ownership or management interest, either directly or through other Chinese government entities, including a list of the companies that meet these criteria; and
(f) a discussion of what laws, plans or policies address the pricing of the input, the levels of production of the input, the importation or exportation of the input, or the development of the input capacity.

Initial Questionnaire at II-6 and II-9.  Because the government had failed to provide information responsive to Commerce's requests, Commerce issued a supplemental questionnaire, requesting that it provide a list of the producers in which it maintains an ownership or management interest. *See* IDM at 8, 14; *see also* GOC Second SQ.  The Chinese government responded that it does not maintain a list of companies in which it maintains a majority ownership or a controlling management interest, nor data regarding companies in which it maintains some, but not a majority, ownership interest.  *See* GOC Second SQR at 10-11; IDM at 14.  Accordingly, the Chinese government stated that it was not able to provide the percentages of total volume and

value of domestic production, as Commerce had requested.  *See* GOC SQR at 11; IDM at 14.

"Consequently, the {Chinese government} failed to identify, and provide {Chinese government} ownership information for, the companies comprising the synthetic yarn and caustic soda industries."  IDM at 15.

Yama argues that the Chinese government cannot be held responsible for data it does not have, claiming that "the facts show {…} that the {Chinese government} did answer all questions based on the data available to it."  Yama Br. at 40.  Yet, Yama fails to reference any record support for this statement, and nor could it.

As explained in the final results, Commerce had already confirmed at a previous on-site verification in a different proceeding that the Chinese government maintains two databases at the State Administration of Industry and Commerce:  the first, a business registration database which shows the most up-to-date company information; and the second, "ARCHIVE," which "houses electronic copies of documents such as business licenses, annual reports, capital verification reports, *etc*."  IDM at 15 (citing *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*, 83 Fed. Reg. 11,177 (Dep't of Commerce Mar. 14, 2018) (final CVD deter.), and accompanying IDM at 6-7).  Thus, Commerce reasoned that the Chinese government "has an electronic system available to it to gather the industry-specific information that Commerce {had} requested, including the {government's} minority ownership interests in companies producing synthetic yarn and caustic soda, but elected not to assist Commerce in obtaining necessary information for this proceeding."  *Id*.

Yama also asserts that the Chinese government "confirmed that the number of government majority-owned producers of both raw materials, as well as the share of all production by those majority government-controlled producers do not control pricing of these

materials in China."  Yama Br. at 40-41.  And that "Company Law" and the "CCP Constitution" prevent market distortion by the Chinese government, with no price controls or other restrictions on the inputs.  *Id.* at 41, 43-44.  But as Commerce explained in the final results, the Chinese government "did not provide information on the companies producing synthetic yarn and caustic soda in which the government maintains any ownership interest (majority or otherwise)."  IDM at 15.  While Chinese law may prohibit government interference in a company's internal operations, Commerce explained that even the "presence of {government}-owned companies in the market, information which the {government} did not provide {} would also indicate that the {Chinese government's} presence in the market is distortive."  *Id.*

Accordingly, Commerce reasonably resorted to facts available and applied an adverse inference because the Chinese government had failed to act to the best of its ability.  *Id.*  In drawing an adverse inference, Commerce reasonably found that "Chinese prices from transactions involving Chinese buyers and sellers are significantly distorted" by the Chinese government.  *Id.*

### C.    Substantial Evidence Supports Commerce's Application Of Facts Available With An Adverse Inference In Determining That Yama's Synthetic Yarn And Caustic Soda Private Company Suppliers Are Government Authorities

Commerce determined that, in the synthetic yarn and caustic soda markets, Yama's privately-owned input suppliers of synthetic yarn and caustic soda are "authorities" within the meaning of 19 U.S.C. § 1677(5)(B).  *See* IDM at 14, 16-19; PDM at 8-9.  Commerce made this determination based on facts available with an adverse inference because the Chinese government withheld necessary information requested of it and provided incomplete responses to Commerce's questionnaires.  IDM at 17.  The Court should reject Yama's arguments to the contrary.  *See* Yama Br. at 44-45.

As explained above, a subsidy is countervailable when a government or public authority has provided a financial contribution to a person, a benefit is thereby conferred, and the subsidy is specific.  *See* 19 U.S.C. §§ 1677(5)(A)-(B), (5A).  In determining the existence of a financial contribution by an "authority," Commerce sought information from the Chinese government regarding the specific companies that produced synthetic yarn and caustic soda inputs that Yama had purchased from during the review period, which would allow Commerce to determine whether such producers are "authorities" within the meaning of 19 U.S.C. § 1677(5)(B).  *See* PDM at 8; IDM at 16; Initial Questionnaire at II-6 – II-12; GOC First SQ at 4-5; GOC Second SQ at 7-8.  Specifically, Commerce requested information regarding "whether any individual owners, board members, or senior managers were government or {Chinse Communist Party (CCP)} officials and the role of any CCP primary organization within the companies.  IDM at 16.  To the extent that the "owners, managers, or directors of a producer are CCP officials or otherwise influenced by certain entities," Commerce requested information regarding how the Chinese government "may exercise control over company operations and other CCP-related information." *Id*.

However, the Chinese government failed to respond to Commerce's requests regarding the identity of owners, board members, or managers of input suppliers who were government or CCP officials during the review period, instead stating that there is "no central informational database to search for the requested information{.}"  GOC IQR at Exhibit C-1, 17.  At the same time, the Chinese government refused to provide the requested information based on Article 14 of the Regulation on Disclosure of Government Information (Decree 492 of the State Council 2007), which prevents disclosure of "government information . . . related to state secrets, business confidential {information}, or personal privacies" unless certain conditions are met,

adding that it did not believe such conditions were met.  *Id*. at Exhibit C-1, 17-18 (addition in original).  Lastly, the Chinese government stated that "{i}f {Commerce} insists on the necessity of this information, {Commerce} should collect this information through the respondent, via its suppliers directly."  *Id*. at Exhibit C-1, 18.

Contrary to this response, in a prior countervailing duty proceeding, Commerce explained in the final results that the Chinese government had been able to obtain the information independently from the companies involved in that review.  *See* PDM at 9; IDM at 16.  Commerce had also found that "statements from the companies, rather than from the {Chinese government} or CCP themselves," were insufficient in response to Commerce's request.  IDM at 16.  Further, despite the Chinese government's conflicting, alternative rationale for not disclosing government information for confidentiality reasons, as Commerce explained, "to the extent that Commerce is requesting business proprietary or personally identifiable information, such information can be submitted under administrative protective order (as the {Chinese government} is well aware), and it will be released only to authorized applicants and receive other protections."  *Id.* at 17.  Simply put, the Chinese government withheld the requested information and refused to assist Commerce in obtaining such information.  *Id.*

Because Commerce had identified record evidence suggesting that the CCP exerts significant control over economic activities in China, Commerce determined that the information requested of the Chinese government regarding the role of CCP officials in the management and operations of Yama's privately-owned input suppliers was necessary for its determination of whether such producers are "authorities."  *See* PDM at 9; Public Bodies Memorandum and attachment, the CCP Memorandum at 33 (stating that "available information and record evidence indicates that the CCP meets the definition of the term 'government' . . . for the limited purpose

of applying the U.S. {countervailing duty} law to China."); IDM at 16-17 (explaining that Commerce "regard{s} the CCP's involvement in China's economic and political structure to be relevant"). Therefore, Commerce determined that the Chinese government withheld necessary information requested of it and, thus, resorted to facts available in conducting its analysis of whether the producers which supplied Yama during the review period are "authorities." *See* PDM at 9; IDM at 17.

Further, Commerce determined that the government had failed to cooperate by not acting to the best of its ability to comply with Commerce's requests for information regarding Yama's privately-owned input suppliers as evidenced by the government's incomplete questionnaire responses and that an adverse inference was warranted pursuant to 19 U.S.C. § 1677e(b). *See* PDM at 9; IDM at 17. Commerce explained, "{i}n drawing an adverse inference, {it} find{s} that CCP officials are present in each of Yama's privately-owned input suppliers as individual owners, managers, and members of the boards of directors, and that this gives the CCP, as the government, meaningful control over the companies and their resources." PDM at 9. Further, "{a}s explained in the Public Body Memorandum, an entity with significant CCP presence on its board or in management or in party committees may be controlled, such that it possesses, exercises, or is vested with government authority." *Id.* Thus, Commerce determined that all producers who supplied Yama with synthetic yarn and caustic soda during the review period are "authorities" within the meaning of 19 U.S.C. § 1677(5)(B). *See* IDM at 17; PDM at 9.

Yama argues that it provided certifications that *senior managers* for *some* of its input suppliers were not Chinese government officials or CCP members, *see* Yama Br. at 45, but Yama did not provide these certifications for *all* of its input suppliers, nor did Yama provide such certifications for the individual owners or board members for any of the relevant

companies.  *See* IDM at 17-18.  This incomplete information is insufficient for Commerce to conclude that Yama's input suppliers are independent from government control.  *Id.* at 18.

And despite Yama's claim that there is "no government ownership" and "no CCP influence in its suppliers" because they are privately-owned companies, Yama Br. at 45, Commerce explained that "{t}he fact that Yama's input suppliers are privately-owned companies is not dispositive to {Commerce's} determination regarding whether they are 'authorities' because of the potential for the {Chinese government's} or CCP's involvement in these companies."  IDM at 17.  Indeed, the means of government control and influence as it relates to the standard of an "authority" in the context of a CVD proceeding may extend beyond ownership–and therefore may extend to private enterprises.  *Id.* at 18.

As explained in Commerce's public body memorandum, the government of China includes both the CCP and the state apparatus, and an entity with significant CCP presence on its board or in management or in party committees may be controlled such that it possesses, exercises, or is vested with governmental authority.  *See* Public Bodies Memorandum at 33-36, 38.  Based on this record information, Chinese law requires the establishment of CCP organizations, *i.e.*, primary organizations of party, in all companies and that such organizations may wield a controlling influence in the company's affairs.  *See* IDM at 18-19.  Accordingly, record evidence contradicts Yama's claim that there is no evidence to suggest Chinese government or CCP involvement in private Chinese companies.

Finally, Yama argues that facts available with an adverse inference should not be applied because Yama acted to the best of its ability to provide information from its privately-owned suppliers, and it should not "be held responsible for the lack of participation by other companies" or by the Chinese government's failure to cooperate.  Yama Br. at 44-45.  Importantly,

Commerce requested information about the suppliers from the Chinese government because foreign governments are in the best position to answer questions about individuals who hold public positions or who are affiliated with the government, and to provide information regarding the administration of their alleged subsidy programs, including eligible recipients.  *See* IDM at 18; *Essar Steel*, 721 F. Supp. 2d at 1297.  The lack of necessary information requested by Commerce from the Chinese government resulted in a gap in the record which rendered Commerce unable to determine that Yama's input suppliers are independent from government control.  IDM at 18.

Moreover, Congress authorized Commerce to apply facts available with an adverse inference as a means to incentivize respondents to cooperate in Commerce's proceedings.  *See F.Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).  A foreign government may be found to be an uncooperative party and as a result, Commerce may apply facts available with an adverse inference to an otherwise cooperative respondent to induce, or encourage, a foreign government's cooperation.  *See Fine Furniture*, 748 F.3d at 1371 ("{O}n its face, the statute authorizes Commerce to apply adverse inferences when an interested party, including a foreign government fails to provide requested information."); *KYD*, 607 F.3d at 768 (finding that a collateral impact on a cooperating party does not render the application of adverse inferences in a CVD investigation improper).  Thus, contrary to Yama's claim, as this Court has many times acknowledged, "where a foreign government is uncooperative, respondent companies from that country may face an {adverse } rate, even if they themselves are cooperative."  *Bio-Lab, Inc. v. United States*, 487 F. Supp. 3d 1291, 1300 (Ct. Int'l Trade 2020) (citing *Fine Furniture*, 748 F.3d at 1371).

Accordingly, because the Chinese government had failed to respond to Commerce's request for information, including the identity of owners, the members of the board of directors or managers of input suppliers who were Chinese government or CCP officials during the period of review, Commerce properly relied on the Public Body Memorandum in determining that, based on facts otherwise available with an adverse inference, Yama's synthetic yarn and caustic soda producers are "authorities" within the meaning of 19 U.S.C § 1677(5)(B). *See* IDM at 18-19.

### D.   Substantial Evidence Supports Commerce's Application Of Facts Available With An Adverse Inference To Its Determination That The Provision Of Synthetic Yarn And Caustic Soda For Less-Than-Adequate-Remuneration Is Specific

In the final results, Commerce determined that the application of facts available with an adverse inference was warranted with respect to Commerce's determination that the provision of synthetic yarn and caustic soda at less-than-adequate-remuneration is specific because the Chinese government failed to act to the best of its ability to respond to Commerce's questions. *See* IDM at 19-22.  Yama's arguments to the contrary are without merit.  Yama Br. at 46-48.

As a matter of long-standing practice, Commerce does not reexamine the specificity of a subsidy that it has previously found to be countervailable unless new evidence challenges such a finding.  *See* IDM at 19.  Commerce had previously found the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration programs to be countervailable, but because it had based these prior determinations on facts available with an adverse inference, Commerce explained in the final results that it had requested that the Chinese government provide information regarding the *de facto* specificity of the provision of synthetic yarn and caustic soda subsidies during the administrative review.  *Id.* at 19-20.  Specifically, Commerce requested that the Chinese government provide the following:  (1) a list of industries in China that purchase

synthetic yarn and caustic soda directly, using a consistent level of industrial classification; (2) the amounts (volume and value) purchased by the industry in which Yama operates, as well as the totals purchased by every other industry; (3) the classification scheme the government normally relies on to define industries and classify companies; (4) the relevant classification guidelines and ensure the list reflects consistent levels of industrial classification; and (5) clearly identify the industry in which Yama is classified.  *See id.* at 20; Initial Questionnaire at II-7-II-8, II-10-II-11.

Rather than provide the requested information, the Chinese government had responded that it "does not impose any limitations on the use of synthetic yarn and producers of synthetic yarn and producers of synthetic yarn are free to sell their product to any purchaser and at any price," noting that "purchasers of synthetic yarn are free to source their product from any producer, domestic or foreign."  GOC IQR at 19.  The government had also responded that, "{a}s a general matter, synthetic yarn has a wide range of uses, including but not limited to use in the narrow ribbon industry."  *Id.*  With respect to Commerce's questions for caustic soda, the government provided identical statements.  *See id.* at 27.

Commerce then issued a supplemental questionnaire to the government, seeking the same information again for both synthetic yarn and caustic soda.  *See* GOC First SQ at 5.  The government again provided the same statements in response.  *See* GOC First SQR at 7.

In the final results, Commerce explained that the Chinese government's response that "there are many uses for the synthetic yarn and caustic soda inputs" was the "only statement relevant to Commerce's specificity questions," but that was still "non-responsive to Commerce's question because the {Chinese government} provided no list of industries, as Commerce {had} requested."  IDM at 20.  Moreover, the government's response was tailored to the *de jure*

specificity of these subsidies, but was not responsive to Commerce's questions regarding *de facto* specificity. *Id.* And even the relevant response was "speculative" and "conclusory" and did not provide "any supporting information." *Id.*

Thus, Commerce determined that "because the {Chinese government}{had} failed to provide this necessary information to allow Commerce to fully analyze these subsidies, and as a result, the information is not available on the record of this review, Commerce {} relied on facts otherwise available{,}" and also found that it had "failed to cooperate by not acting to the best of its ability in providing requested information." *Id.*; *see also* 19 U.S.C. § 1677(5A).

However, Yama argues that the Chinese government had "acted to the best of its ability in providing verifiable answers regarding the specificity element." Yama Br. at 47. But merely providing verifiable responses to *some* of Commerce's questions does not demonstrate that the Chinese government had acted to the best of its ability when it ultimately failed to provide certain necessary information Commerce had requested. *See* IDM at 20.

Accordingly, substantial evidence supports Commerce's conclusion that the application of facts available with adverse inferences was warranted with regard to whether the provision of synthetic yarn and caustic soda for less-than-adequate-remuneration is specific. *See id.*; *Nippon Steel*, 337 F.3d at 1382.

**IV.    The Court Should Grant Our Request For A Voluntary Remand Regarding Commerce's Determination That The Provision Of Synthetic Yarn And Caustic Soda For Less-Than-Adequate-Remuneration Is *De Facto* Specific**

Yama asserts that "{t}here is no evidence on the record to even remotely suggest that any {less-than-adequate-remuneration} subsidy is *specific* either as a matter of law or of fact" and "Commerce did not place anything on the record to suggest otherwise." Yama Br. at 47

(emphasis added).  Yama is correct that Commerce did not place information on the record to support its *de facto* specificity finding.

In the final results, Commerce explained that because the Chinese government had failed to cooperate and did not provide the requested necessary information, it would rely on facts available with an adverse inference to make its specificity determination.  *See* IDM at 19-20. While substantial evidence supports Commerce's determination to apply facts available with an adverse inference regarding the synthetic yarn and caustic soda less-than-adequate-remuneration subsidy, in determining that the subsidy is *de facto* specific, Commerce relied on information from the petitioner's new subsidy allegation in the 2015 segment of this administrative review. *See id.* at 20-21; *see* New Subsidy Allegations (Feb. 7, 2017), and Attachment II: Decision Memorandum on New Subsidy Allegations (Dep't of Commerce Mar. 2, 2017) (2015 New Subsidy Allegation); *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China*, 83 Fed. Reg. 11,177 (Dep't of Commerce Mar. 14, 2018) (final CVD deter.), and accompanying IDM at Comment 1.

However, Commerce inadvertently did not place the 2015 New Subsidy Allegation information on the record of this review.  As a result, parties did not have an opportunity to comment on the information.  *See* 19 U.S.C. § 1677m(g) (affording Commerce the opportunity to weigh comments from interested parties on evidence obtained by the agency during the course of the proceeding "upon which the parties have not previously had an opportunity to comment.").

Therefore, without confessing error, we respectfully request that the Court remand this issue to Commerce so that Commerce may place the information on the record of the review and allow parties an opportunity to comment, and if necessary, reconsider its *de facto* specificity determination.  *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1027-31 (Fed. Cir. 2001)

(discussing various grounds for remand and explaining that agency may request remand, without confessing error, to reconsider its previous position); *see, e.g.*, *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993) ("We commonly grant such motions {for voluntary remand}, preferring to allow agencies to cure their own mistakes rather than wasting the court's and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete.").

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court grant our request for voluntary remand for the *de facto* specificity issue, deny plaintiff's motion in all other respects, and sustain Commerce's final results.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

<u>/s/ Patricia M. McCarthy</u>
PATRICIA M. McCARTHY
Director

<u>/s/ Kara M. Westercamp</u>
OF COUNSEL:                                          KARA M. WESTERCAMP
LESLIE M. LEWIS                                    Trial Attorney
Attorney                                                   Commercial Litigation Branch
Office of the Chief Counsel                     U.S. Department of Justice
  for Trade Enforcement and Compliance   Civil Division
U.S. Department of Commerce              P.O. Box 480
Washington, D.C.                                     Ben Franklin Station
                                                              Washington, D.C. 20044
                                                              Tel: (202) 305-7571
                                                              Email: kara.m.westercamp@usdoj.gov

April 22, 2022                                         *Attorneys for Defendant United States*

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| YAMA RIBBONS AND BOWS CO., LTD.,    ) | |
|              Plaintiff,   ) | |
|       v.   ) | Court No. 21-00402 |
| UNITED STATES,   ) | |
|              Defendant,   ) | |
|    and   ) | |
| BERWICK OFFRAY, LLC,   ) | |
|              Defendant-Intervenor.   ) | |

**ORDER**

Upon consideration of plaintiff's motion for judgment upon the agency record, defendant's response, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is denied; and, it is further

ORDERED that judgment is entered for the United States.

Dated:_____          _____

New York, New York                                                    Senior Judge

48

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that the public version of defendant's "Defendant's Response in Opposition to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record" in this matter complies with the Court's type-volume limitation rules.  According to the word-count calculated by the word processing system with which the brief was prepared, this brief contains a total of 13,927 words.

<u>/s/ Kara M. Westercamp</u>