Slip Op. 23-127

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| YAMA RIBBONS AND BOWS CO., LTD., | |
| Plaintiff, | |
| v. | Before:  Timothy C. Stanceu, Judge |
| UNITED STATES, | Court No. 21-00402 |
| Defendant. | |

### OPINION AND ORDER

[Ordering remand of an agency determination in a countervailing duty proceeding on certain woven ribbons from the People's Republic of China]

Dated: August 25, 2023

*John J. Kenkel*, deKieffer & Horgan, PLLC, of Washington, D.C., for plaintiff Yama Ribbons and Bows Co., Ltd.  With him on the briefs was *Judith L. Holdsworth*.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., for defendant United States. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Patricia M. McCarthy*, Director.  Of counsel on the brief is *Leslie M. Lewis*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Stanceu, Judge: Plaintiff Yama Ribbons and Bows Co., Ltd. ("Yama") contests an

administrative determination of the International Trade Administration, U.S.

Department of Commerce ("Commerce" or the "Department") concluding the eighth

periodic administrative review of a countervailing duty ("CVD") order on certain

woven ribbons from the People's Republic of China ("China" or the "PRC").  Finding

merit in one of the claims plaintiff raised in contesting the Final Results, the court

remands the Final Results to Commerce for reconsideration in accordance with this

Opinion and Order.  On other claims, the court allows supplementation of the

administrative record in response to a request of defendant.

## I. BACKGROUND

### A.  The Contested Determination

The contested determination (the "Final Results") was published as *Narrow*

*Woven Ribbons With Woven Selvedge From the People's Republic of China: Final Results of*

*Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 40,462 (Int'l Trade Admin.

July 28, 2021) ("*Final Results*").

### B.  Proceedings before Commerce

On September 1, 2010, Commerce issued a countervailing duty order (the

"Order") on narrow woven ribbons with woven selvedge from China (the "subject

merchandise").  *Narrow Woven Ribbons With Woven Selvedge From the People's Republic of*

*China: Countervailing Duty Order*, 75 Fed. Reg. 53,642 (Int'l Trade Admin.) ("*Order*").[1]

---

[1] The subject merchandise is defined generally in the countervailing duty order
as woven ribbons twelve centimeters or less in width, and of any length, that are
composed in whole or in part of man-made fibers and that have woven selvedge.  Some
exclusions apply.  *Narrow Woven Ribbons With Woven Selvedge From the People's Republic*
(continued. . . .)

In November 2019, Commerce published a notice of initiation of the eighth

administrative review of the Order ("eighth review"), which pertained to a period of

review ("POR") of January 1, 2018 to December 31, 2018.  *Initiation of Antidumping and*

*Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 61,011, 61,016 (Int'l Trade

Admin. Nov. 12, 2019).

　　　Commerce published the preliminary results of the eighth review ("Preliminary

Results") in early 2021, preliminarily determining for Yama, the sole reviewed

respondent, a total net CVD subsidy rate of 42.20%.  *Narrow Woven Ribbons With Woven*

*Selvedge From the People's Republic of China: Preliminary Results of Countervailing Duty*

*Administrative Review; 2018*, 86 Fed. Reg. 7,264, 7,265 (Int'l Trade Admin. Jan. 27, 2021)

("*Preliminary Results*").  Commerce incorporated an explanatory document.  *Decision*

*Memorandum for Preliminary Results of 2018 Countervailing Duty Administrative Review:*

*Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China* (Int'l Trade

Admin. Jan. 19, 2021), P.R. Doc. 162 ("*Prelim. Decision Mem.*").[2]

---

*of China: Countervailing Duty Order*, 75 Fed. Reg. 53,642, 53,642–43 (Int'l Trade Admin.
Sept. 1, 2010).  The term "selvedge" refers to "the edge on either side of a woven or
flat-knitted fabric so finished as to prevent raveling."  *Selvage or selvedge*, WEBSTER'S
THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (2002).

　　　[2] Documents in the Joint Appendix (June 17, 2022), ECF Nos. 42 (Conf.), 43
(Public) are cited herein as "P.R. Doc. __."  All citations to record documents are to the
public versions of those documents.

In the Final Results, Commerce determined a final total net CVD subsidy rate of

42.20% for Yama.  *Final Results*, 86 Fed. Reg. at 40,462.  Commerce incorporated by

reference an explanatory memorandum, the "Final Issues and Decision Memorandum."

*Issues and Decision Memorandum for the Final Results of 2018 Countervailing Duty*

*Administrative Review: Narrow Woven Ribbons with Woven Selvedge from the People's*

*Republic of China* (Int'l Trade Admin. July 22, 2021), P.R. Doc. 174 ("*Final I&D Mem.*").

Commerce calculated the 42.20% rate by adding individual "program rates" for what it

considered to be countervailable subsidies arising from 24 government programs.  *Id*.

at 3–5.

In this action, Yama contests the Department's inclusion of the following three

subsidy rates in the 42.20% total subsidy rate: a rate of 10.54% for the Export Buyer's

Credit Program ("EBC Program" or "EBCP"), which is an export-promoting loan

program administered by the Export Import Bank of China; a rate of 27.74% for the

provision of synthetic yarn for less than adequate remuneration ("LTAR"); and a rate of

0.27% for the provision of caustic soda for LTAR.

### C.  Proceedings in the Court of International Trade

Yama commenced this action in August 2021.  Summons (Aug. 12, 2021),

ECF No. 1; Compl. (Aug. 12, 2021), ECF No. 7.  Before the court is Yama's motion for

judgment on the agency record under USCIT Rule 56.2 and accompanying brief.

Pl. Yama Ribbons and Bows Co., Ltd.'s Rule 56.2 Mot. for J. Upon the Agency R. (Feb. 4,

2022), ECF Nos. 27 (Conf.), 28 (Public); Mem. of Law in Supp. of Pl. Yama Ribbons and

Bows Co., Ltd's 56.2 Mot. for J. Upon the Agency R. (Feb. 4, 2022), ECF No. 27-1 (Conf.),

28-1 (Public) ("Pl.'s Br.").

Defendant United States opposes Yama's motion for judgment on the agency

record.  Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. (Apr. 22, 2022),

ECF No. 37 ("Def.'s Br.").  Plaintiff replied to defendant's submission.  Pl. Yama

Ribbons and Bows Co., Ltd.'s Reply to Def.'s Opp'n to Pl.'s Rule 56.2 Mot. for J. Upon

the Agency R. (June 3, 2022), ECF No. 41 ("Pl.'s Reply").

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction over this action according to section 201 of the

Customs Courts Act of 1980, 28 U.S.C. § 1581(c), which grants this Court subject matter

jurisdiction of actions commenced under section 516A of the Tariff Act of 1930, *as

amended* (the "Tariff Act"), 19 U.S.C. § 1516a, including actions contesting a final

determination that Commerce issues to conclude an administrative review of a

countervailing duty order.  *Id*. § 1516a(a)(2)(B)(iii).[3]

In reviewing a final determination, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial

---

[3] All citations to the United States Code herein are to the 2018 edition.

evidence on the record, or otherwise not in accordance with law." *Id*. § 1516a(b)(1).

Substantial evidence refers to "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d

1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## B.  Countervailing Duties under the Tariff Act

When certain conditions are met, the Tariff Act provides for a "countervailing

duty" to be assessed on imported merchandise to redress the effect of a subsidy

provided by the government of the exporting country.  Section 701(a) of the Tariff Act,

19 U.S.C. § 1671(a), provides for imposition of a countervailing duty if: (1) Commerce

determines that an "authority," defined as either the government of a country or any

public entity within the territory of the country, *id*. § 1677(5)(B), "is providing, directly

or indirectly, a countervailable subsidy with respect to the manufacture, production, or

export of a class or kind of merchandise imported, or sold (or likely to be sold) for

importation, into the United States"; and (2) the U.S. International Trade Commission

determines that an industry in the United States is materially injured or threatened with

material injury by reason of the subsidized imports.

A "countervailable subsidy" exists, generally, where an authority provides a

financial contribution to a person and a benefit is thereby conferred, and the subsidy

meets the requirement of "specificity," as determined according to various rules set

forth in the statute.  *Id.* §§ 1677(5), (5A).  When subsidies consist of the provision of

goods or services rather than the provision of monies directly, a benefit is conferred if

those goods or services are provided for less than adequate remuneration.  *Id.*

§ 1677(5)(E)(iv).

### C.  Use of Facts Otherwise Available and Adverse Inferences when the Exporting Country Government Fails to Cooperate in a CVD Proceeding

In the Final Results, Commerce invoked its authority to use "the facts otherwise

available" under section 776(a) of the Tariff Act, 19 U.S.C. § 1677e(a), and "adverse

inferences" under section 776(b) of the Tariff Act, 19 U.S.C. § 1677e(b), with respect to

the EBCP and the provision of synthetic yarn and caustic soda.  When using both the

"facts otherwise available" and the "adverse inference" provisions, Commerce

describes its action by using the term "adverse facts available" ("AFA").

Commerce may resort to the use of the facts otherwise available when, for

example, "an interested party or any other person" withholds requested information,

19 U.S.C. § 1677e(a)(2)(A), or "significantly impedes a proceeding," *id.* § 1677e(a)(2)(C).

Commerce also may use the facts otherwise available if Commerce finds that an

interested party provides requested information "but the information cannot be verified

as provided in section 1677m(i) of this title [19 U.S.C. § 1677m(i)]."  *Id.* § 1677e(a)(2)(D).

If Commerce finds that "an interested party has failed to cooperate by not acting

to the best of its ability to comply" with a request for information, Commerce "may use

an inference that is adverse to the interests of that party in selecting from among the

facts otherwise available."  *Id.* § 1677e(b)(1)(A).

In some circumstances arising in a countervailing duty investigation or review, Commerce may use an inference adverse to the interests of a party in the proceeding in the event of non-cooperation by the government of the exporting country in responding to the Department's requests for information, even if the result is a collateral adverse effect upon a fully cooperative party. *See Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014); *see also Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, __, 352 F. Supp. 3d 1316, 1325 (2018) (quoting *Archer Daniels Midland Co. v. United States*, 37 CIT 760, 769, 917 F. Supp. 2d 1331, 1342 (2013)) ("Commerce may apply AFA even if the collateral effect is to 'adversely impact a cooperating party.'"). But in such circumstances, Commerce should "seek to avoid such impact if relevant information exists elsewhere on the record." *Changzhou Trina*, 42 CIT at __, 352 F. Supp. 3d at 1325 (citation omitted).

Commerce did not find that Yama withheld any information or failed to cooperate in responding to the Department's information requests. Commerce, instead, based its use of the facts otherwise available and adverse inferences entirely on its findings of non-responsiveness and non-cooperation on the part of the government of China (the "GOC").

### D.  The Export Buyer's Credit Program

Commerce found that the Export Buyer's Credit Program provides medium and long-term loans at preferential, low interest rates. *Final I&D Mem*. at 30.  The program

is administered by a government entity, the Export Import Bank of China (the "EX-IM

Bank").  *See id*. at 35.

Commerce did not find from record evidence that Yama participated in the

EBCP, and the only record evidence relevant to that issue supports a finding that Yama

did not do so.  Had one or more of Yama's customers received preferential loans under

the EBCP and used the proceeds to purchase Yama's subject merchandise during the

POR, a benefit indirectly would have been "conferred" upon Yama.  But in this case,

Commerce did not find as a fact that any Yama customer actually received a loan under

the program.  Here again, the record lacked evidence that such an event occurred

during the POR and contained record evidence that it did not.

Commerce began its analysis by stating a negative finding, as follows:

"Consistent with the *Preliminary Results* and Commerce's practice, we continue to find

that the record of the instant review does not support a finding of non-use regarding

the EBC program for Yama."  *Final I&D Mem*. at 30 (footnote omitted).  This is not an

affirmative finding under 19 U.S.C. § 1677(5) that Yama was conferred a "benefit" as a

result of participation in the EBCP by one or more of its customers.  Instead, it is a

"double negative," i.e., a conclusion that the record does *not* support a "finding" that

Yama did *not* benefit from the EBCP.

Nevertheless, defendant argues that "Commerce's determination that Yama used

the EBC program, and its selection of an adverse rate for that program, are supported

by substantial evidence and otherwise in accordance with law."  Def.'s Br. 11.  Because

Commerce did not actually "determine" from record evidence (substantial or

otherwise) that Yama used the EBC program, defendant's argument misstates what

Commerce actually decided.

Applying 19 U.S.C. § 1677e(a), Commerce found that "the GOC withheld

necessary information that was requested of it."  *Final I&D Mem*. at 42.  It concluded

from this finding that the withholding of information "resulted in necessary

information not being available on the record of this review" and that "the GOC

significantly impeded the proceeding."  *Id*.  Referring to record information submitted

by Yama and some of its customers to demonstrate that no customer of Yama used the

EBCP, Commerce found that information about the operation of the EBCP it considered

to be necessary but missing from the record "prevents complete and effective

verification of the customers' certifications of non-use."  *Id*. at 41.

Commerce concluded, further, that "an adverse inference is warranted in the

application of facts available, pursuant to section 776(b) of the Act [19 U.S.C. § 1677e(b)]

because the GOC did not act to the best of its ability in providing the necessary

information to Commerce."  *Id*. at 42.  As adverse inferences, Commerce asserted that

"we continue to find this program provides a financial contribution, is specific, and

provides a benefit to Yama within the meaning of sections 771(5)(D), 771(5A), and

771(5)(E) of the Act, respectively [19 U.S.C. §§ 1677(5)(D), (5A), and (5)(E),

respectively]." *Id*.

In some situations, the serious and pervasive nature of the non-cooperation of

the exporting government may prevent any meaningful inquiry by Commerce and

justifies an adverse inference against a cooperative party. For example, in *Yama Ribbons*

*& Bows Co., Ltd. v. United States*, 46 CIT __, 611 F. Supp. 3d 1394 (2022), this Court

sustained an adverse inference that Yama benefited upon the government of China's

inadequately responding to the Department's questionnaire by providing, essentially,

nothing beyond a copy of the GOC's questionnaire response for the previous review,

which was unresponsive to the Department's request.

This case presents a different situation. Here, the Chinese government provided

requested information that pertained specifically to the operation of the EBCP in the

eighth review and explained the basis for its response to Commerce that neither Yama

nor its customers were EBCP participants. Although Commerce permissibly found that

the GOC failed to provide certain requested information about the EBCP, the essential

finding Commerce drew from that failure, which was that the lack of the requested

information prevented it either from determining, or from verifying, that Yama did not

benefit from the EBCP, was unsupported by substantial evidence on the record.

As the court noted previously, Commerce in some circumstances may use an

inference adverse to a cooperative party when the exporting government fails to act to

the best of its ability to respond to information requests but should "seek to avoid such impact if relevant information exists elsewhere on the record." *Changzhou Trina*, 42 CIT at __, 352 F. Supp. 3d at 1325 (citation omitted).  Commerce did not adhere to this principle in inferring, adversely, that Yama benefited from the EBCP.

### 1.  Record Evidence that Yama Did Not Benefit from the EBCP

In response to a request in the Department's initial questionnaire, Yama provided Commerce, as Exhibit 13 to its response to the Department's initial questionnaire, a "list of U.S. customers to which Yama exported during the POR," along with their shipment addresses.  *Narrow Woven Ribbons With Woven Selvedge from People's Republic of China, Antidumping Duty: Response to Section III Questionnaire* at 18 and Ex. 13 (Jan. 10, 2020), P.R. Doc. 40 ("*Yama Initial Questionnaire Resp.*") (list of customers and addresses).  The list contained the names of a large number of U.S. retailers.  In response to the Department's directive that Yama "discuss in detail the role your company plays in assisting your customers in obtaining buyer credits" under the EBCP, Yama stated that it "did not provide any assistance to its customers in obtaining buyer credits."  *Id*. at 18.  Yama further stated that it "contacted all of its U.S. customers listed in Exhibit 13 and confirmed that no customer obtained buyer credits from China Ex-IM Bank during the POR."  *Id*. at 19.  Yama added that, in response to a request it sent to all customers, "certain U.S. customers provided written declaration certifying that they did not use buyer credits from Ex-IM Bank during the POR."  *Id*.  Yama submitted for the

record the customer certifications it received from approximately 28% of the customers

on its customer list.  *Id*. at Exs. 14-1 and 14-2.

        The Chinese government made statements paralleling those of Yama.  *Narrow*

*Woven Ribbons with Woven Selvedge from the People's Republic of China, Case No. C-570-953:*

*Initial Questionnaire Response* at 34 (Jan. 10, 2020), P.R. Doc. 17–39 ("*GOC Initial*

*Questionnaire Resp*.") ("The GOC determined that none of the customers of Yama used

this program through a process in which Yama provided its customer list to the GOC.

The EX-IM Bank then searched its records to confirm that these customers did not

receive credits under the Export Buyer's Credit program.").

        Other record evidence further detracts from a conclusion that Yama benefited

from the EBCP.  The "Administrative Measures of Export Buyer's Credit of EBCP,"

provided in original and translated form as Exhibit D-2 to the GOC's response to the

Department's Initial Questionnaire and Exhibit D-4 to the GOC's response to the

Department's First Supplemental Questionnaire (the "Administrative Measures"),

states in Article 3: "Except for the government special approval, export buyer's credit is

mainly used for supporting the export of capital goods, (such as Chinese

electromechanical products, complete sets of large scale equipment) and High-tech

products and services."  *GOC Initial Questionnaire Resp*. at Ex. D-2 and *Narrow Woven*

*Ribbons with Woven Selvedge from the People's Republic of China, Case No. C-570-953: First*

*Supplemental Questionnaire Response* at Ex. D-4 (Apr. 17, 2020), P.R. Doc. 140 ("*GOC First*

*Suppl. Questionnaire Resp.*") ("*Administrative Measures*").  Although not precluding the

possibility that woven ribbon exports would receive an EBCP benefit, Article 3 indicates

that exports such as Yama's are not the focus of the program.  The same document

provides evidence that the providing of credits under the EBCP, which is intended to

promote exports, does not occur without the participation of the exporter.  *Id.* at

Article 4.

### 2. The Government of China's Responses to the Department's Initial and First Supplemental Questionnaires

The record does not contain evidence that the GOC failed to respond to any

requests for information or documentation about the EBCP in its response to the Initial

Questionnaire.  The questionnaire contained seven questions the GOC was required to

answer "regarding Export Buyer's Credits provided to all U.S. customers *of the*

*mandatory company respondents* [sic] (including all responding crossowned affiliated

companies) during the POR."  *GOC Initial Questionnaire Resp.* at 32.  Commerce wrote

the questionnaire so as to direct the GOC to skip the seven questions unless the GOC

was reporting that EBCP credits were provided to customers of Yama (the sole

"mandatory company respondent").  The GOC reported that none of Yama's U.S.

customers used the EBCP, and hence the questions were not applicable.  The GOC

responded "Not applicable" to four of the questions but responded voluntarily to the

other three questions and attached documents identified in two of them.

The GOC's response to the First Supplemental Questionnaire contains evidence to support the Department's finding that the GOC failed to cooperate by not acting to the best of its ability to respond to certain of the Department's requests for information. In response to the request for "the 2013 revisions to the Administrative Measures of Export Buyer's Credits of the Ex-Im Bank of China," the GOC responded that "[t]he GOC does not maintain the requested document, as the Export Buyer's Credit Program is a commercial, financial product offered by the bank." *GOC First Suppl. Questionnaire Resp.* at 20.  The answer provided by the GOC, read literally, is nonsensical.  If interpreted to mean that only banks, and not a government entity (such as the EX-IM Bank) maintain the document, the GOC's answer begs the question of why the government, the apparent originator of the document, could not locate a copy anywhere.

In the First Supplemental Questionnaire, Commerce also requested "a list of all partner/correspondent banks involved in disbursement of funds under the Export Buyer's Credit Program," to which the GOC responded that "[s]ince none of the customers of the mandatory respondent obtained Export Buyer's Credits during the POR, the GOC understands that this question is not applicable." *Id*.  The GOC's "understanding" was correct as to the Department's request for this list in the Initial Questionnaire but was incorrect as to the same request in the First Supplemental

Questionnaire.  The second iteration of the request was not specific to Yama or its

customers.

### 3.  The Department's Invalid Finding that It Requested Information It Considered Essential to Its Verifying the "Non-Use" of the EBCP by Yama's Customers

Commerce permissibly found inadequate the GOC's responses to the request for

the 2013 revisions to the Administrative Measures and the list of what it termed

"partner/correspondent banks."  Commerce also found, but impermissibly, that the

GOC failed to provide certain other requested information that it considered essential to

its verifying the "non-use" of the EBCP by Yama's customers.  As shown by the

questionnaires it sent to the GOC, Commerce did not request that other information but

proceeded as if it had.

Commerce found that "the GOC's refusal to provide the 2013 revisions, *as well as*

*other requested information, such as key information and documentation pertaining to the*

*application and approval process,* and partner/correspondent banks, impeded Commerce's

ability to conduct its investigation of this program and to verify the claims of non-use

by Yama's customers."  *Final I&D Mem*. at 37 (emphasis added).  The GOC provided

"information and documentation pertaining to the application and approval process"

when it submitted the Administrative Measures and the "Detailed Implementation

Rules Governing Export Buyer's Credit of the Export-Import Bank of China," (the

"EBCP Implementation Rules"), which the GOC provided, in original and translated

form, as Exhibit D-3 to its response to the Initial Questionnaire and as Exhibit D-5 to its

response to the First Supplemental Questionnaire.  *GOC Initial Questionnaire Resp*. at Ex.

D-3 and *GOC Suppl. Questionnaire Resp*. at Ex. D-5 ("*EBCP Implementation Rules*").

Commerce found, further, that even had the GOC provided the "list of

correspondent banks," it still could not determine whether loans obtained by a U.S.

customer of Yama were "loans originating from, facilitated by, or guaranteed by the

China EX-IM Bank."  *Final I&D Mem*. at 38.  Commerce reached this finding even

though it made no attempt to conduct a verification by examining the record of bank

loans of any U.S. customer of Yama, concluding that it would have been futile to do so.

*Id*. at 39.  Commerce stated that in order to differentiate ordinary bank loans, such as a

loan from the private bank HSBC, from government-benefited loans under the EBCP:

> Commerce would need to know what underlying documentation to look for
> in order to determine whether particular subledger entries for HSBC might
> actually be China EX-IM Bank financing: specific applications,
> correspondence, abbreviations, account numbers, or other indicia of China
> EX-IM Bank involvement.  As explained above, the GOC failed to provide
> Commerce with any of this information.

*Id*. at 38–39.  The reference "[a]s explained above" apparently pertains to the allegation

of "the GOC's failure to provide other requested information, such as a sample

application, and other documents making up the 'paper trail' of a direct or indirect

export credit from the China EX-IM Bank, discussed above."  *Id*. at 38.  The Initial

Questionnaire requested that the GOC submit "a sample buyer's credit application

along with the application's approval and the agreement between the respondent's

customer and the bank, which establish the terms of the assistance provided under the

facility," but this request was one of the seven requests applicable only if the GOC was

reporting that Export Buyer's Credits were provided to U.S. customers of the

mandatory respondent.  *GOC Initial Questionnaire Resp.* at 33.  As noted above, that

request was inapplicable, the GOC, like Yama, having reported that no U.S. customer of

Yama was provided an Export Buyer's Credit.

Commerce did not repeat in its First Supplemental Questionnaire its request for

"a sample buyer's credit application along with the application's approval and the

agreement between the respondent's customer and the bank, which establish the terms

of the assistance provided under the facility."  Other than the inapplicable request in the

Initial Questionnaire, the questionnaires Commerce relies upon made no request for

documents comprising a "paper trail" and do not request "specific applications,

correspondence, abbreviations, account numbers, or other indicia of China EX-IM Bank

involvement."  In short, Commerce concluded that it could not verify the "non-use" of

the EBCP by Yama's customers because it lacked this additional, unrequested

information.  As a result, the Department's decision to infer adversely a benefit to Yama

from the EBCP was critically flawed, Commerce having based that adverse inference on

its reliance on "missing" information from the GOC that it never requested.  According

to the record evidence, the information Commerce requested of the GOC but did not

receive was limited to the list of correspondent banks and the 2013 revisions to the

Administrative Measures.

In defense of the Department's drawing an adverse inference that Yama

benefited from the EBCP, defendant argues that "[i]n its supplemental response, the

government [of China] . . . failed to explain with supporting documentation the steps it

had taken to determine that none of Yama's customers had used the EBC program

during the review period, which Commerce specifically requested."  Def.'s Br. 14 (citing

the *GOC First Suppl. Questionnaire Resp.* at 17, which requested "documentation from

the Ex-Im Bank of China to support the GOC's claims that it searched it [sic] records

and confirmed that Yama's customers did not receive credits under this program

during the POR").  This argument is unsupported by, and is instead refuted by, the

record evidence.

The GOC provided an explanation of the steps taken to determine that no

customer on Yama's list obtained credits under the EBCP.  *GOC First Suppl.*

*Questionnaire Resp*. at 17–20.  The "supporting documentation" part of the question was

satisfied by the GOC's submitting (a second time) the Administrative Measures and the

EBCP Implementation Rules.  Both clarify that the borrower may be an importer or a

private bank, but these documents, read together and in the entirety, are record

evidence supporting a finding that in either event the EX-IM Bank necessarily would

have in its records required documentation submitted by, and to, the exporter.  *See*, *e.g.*,

*Administrative Measures* at Article 14 (requiring submission of the "commercial contract

draft or letter of intent" and "the credit materials and related supporting document of

the borrower, guarantor, importer, exporter, and financial statement of the borrower

and guarantor"); *EBCP Implementation Rules* at I(3) (providing for issuance of a letter to

the exporter "to enable the export enterprise to engage in further commercial

negotiations"), III(1) ("After the loan agreement has been signed and officially taken

effect, the Export-Import Bank of China shall notify the export enterprise in writing.").

Further, the EX-IM Bank's procedures require that the EX-IM Bank have recourse in the

event of default and that the exporter obtain export credit insurance.  *See, e.g.*, *EBCP*

*Implementation Rules* at I(4); *Administrative Measures* at Article 20 (specifying that the

EX-IM Bank has the "right to recourse against borrower, loan guarantor or export credit

guarantor according to loan agreement.").

   The GOC's response to the First Supplemental Questionnaire, the Administrative

Measures, and the EBCP Implementation Rules are sufficient to refute any finding or

inference that Yama or any of its customers could have benefited from the EBC program

without Yama's participation and, further, without any record of that participation

being recorded in the EBCP's required recordkeeping.  Defendant's argument might be

read to imply that some further "documentation" of the record search should have been

provided, but it is puzzling whether, or how, the EX-IM Bank could have provided

additional "supporting documentation" about a record search that it reported as having

undertaken when it also reported that search as having uncovered no pertinent

documents, i.e., none identifying Yama or any of the companies on Yama's customer list

as participants in the program.  *See GOC First Suppl. Questionnaire Response* at 17 ("The

GOC also checked with the China Ex-Im Bank and confirmed that none of the U.S.

customers of the mandatory respondent used the Export Buyer's Credits during the

POR"); *see also EBCP Implementation Rules* at V (requiring retention of complete project

files).  It is not clear how defendant expects the EX-IM Bank to have further "explained

with supporting documentation" the EX-IM Bank's determination that EBCP

"documentation" pertaining to Yama or its customers did not exist.

Defendant argues, also, that "the EBC program involves a complicated loan

disbursement structure, the parameters of which the Chinese government has yet to

identify, despite repeated requests, and Commerce required certain information from

the government to understand the program so that it could verify the accuracy of

non-use claims."  Def.'s Br. 25 (citing *Final I&D Mem.* at 37–41).  This argument also

disregards record evidence.  The EBCP Implementation Rules provide procedures that

describe the "parameters" under which the EX-IM Bank operates the program through

a settlement bank.  *See EBCP Implementation Rules* at III ("Usage of the loan"),

IV ("Repayment of the loan").  Nothing in those "parameters" supports a conclusion or

inference that Yama could have benefited from the EBCP without being aware of it or

without its participation having been documented in the required EBCP recordkeeping.

### 4.  The Department's Determination of an EBCP Benefit to Yama Was Not Supported by the Existing Administrative Record

The court rejects the Department's basing its adverse inference of a benefit to Yama on the GOC's failure to provide a list of correspondent banks.  The absence from the record of that list did not affect the Department's ability to determine, or to conduct a verification on, whether Yama benefited from the EBCP.

According to the Department's own findings and reasoning, that list would not have enabled Commerce to determine whether a loan from a private bank to a U.S. customer of Yama was a loan originating from the EX-IM Bank under the EBCP unless Commerce also was provided the "paper trail" information it insisted it needed.  *Final I&D Mem*. at 38 ("This same 'paper trail' would be necessary even if the GOC provided the list of correspondent banks."), 40 ("In short, because the GOC failed to provide Commerce with information necessary to identify a paper trail of a direct or indirect export credit from the China EX-IM Bank, we would not know what to look for behind each loan in attempting to identify which loan was provided by the EX-IM Bank via a correspondent bank under the EBC program.").  In other words, Commerce found that the list of correspondent banks would have been of no use to Commerce absent other specific information, which Commerce failed to request from the GOC.  Therefore, if the list of correspondent banks—although being withheld information within the meaning of 19 U.S.C. § 1677e(a)(2)(A)—had been present on the record, Commerce would not have used this information in determining whether Yama had been provided an EBCP

benefit.  For the same reason, the GOC, in failing to provide that list, cannot correctly be

said to have significantly impeded the proceeding for purposes of 19 U.S.C.

§ 1677e(a)(2)(C).  For these reasons, and because Commerce disregarded "relevant

information" that "exists elsewhere on the record," *Changzhou Trina*, 42 CIT at __, 352

F. Supp. 3d at 1325 (citation omitted), the absence of that information from the record

did not permit Commerce to draw an adverse inference that Yama received an EBCP

benefit.

Moreover, Commerce made no attempt during the review to verify the statement

by Yama, or that of any individual U.S. customer of Yama, that the EBCP was not used.

Even without the list of correspondent banks it sought from the GOC, Commerce could

have attempted to verify the negative response of at least some customers and, for

example, could have made inquiries to the financial institutions as to the nature of any

loans those customers used to buy Yama's subject merchandise.  Commerce illogically

reasoned that unless it could verify the non-EBCP origin of all the loans of all the

customers, it could not so verify any loan of any customer.  In that respect, the

Department's presumption that no verification was possible amounts, on the record

evidence, to unsupported speculation.  On that evidence, it was impermissible for

Commerce to punish Yama simply because Yama happened to sell its subject

merchandise to a relatively large number of U.S. customers during the POR.

The GOC's failure to provide the 2013 amendments to the Administrative

Measures is also insufficient, either alone or in combination with the failure to provide

the list of correspondent banks, to support an adverse inference of a benefit to Yama

from the EBCP.  The GOC submitted the Administrative Measures and the EBCP

Implementation Rules in response to the GOC's request for the current procedures

governing the EBCP.  Commerce incorporated a finding from a previous review, the

"Silica Fabric Investigation," that the 2013 revisions "provide internal guidance for how

this program is administrated by the EX-IM Bank."  *Final I&D Mem.* at 34 (citing *Issues*

*and Decision Memorandum for the Final Determination in the Countervailing Duty*

*Investigation of Certain Amorphous Silica Fabric from the People's Republic of China* at 12

(Int'l Trade Admin. Jan 25, 2017)).  If this finding is presumed correct, i.e., that the 2013

revisions are "internal guidance," then it would be inconsistent to presume also that

they effected substantive, external modifications to the Administrative Measures under

which it could be inferred that Yama benefited from the EBCP.  Commerce engaged in

speculation that the 2013 document related, in some undefined way, to the issue of

whether Yama received an EBCP benefit.  Commerce alluded to a finding from the

Silica Fabric Investigation that the 2013 document "may have eliminated the

USD 2 million contract minimum associated with this lending program."  *Id.* at 34.  In

this proceeding, Commerce inquired as to whether the $2 million threshold was in

effect, and the GOC responded that it was.  *GOC First Suppl. Questionnaire Resp.* at 18

(stating that "for a business contract to be supported by the Export Buyer's Credits, the

contract amount must be more than 2 million U.S. dollars.").

In summary, the record does not support the Department's conclusion that the

information that Commerce requested and that the GOC failed to provide prevented

Commerce from determining that Yama did not benefit from the EBCP.  While lacking

the list of correspondent banks and the 2013 revisions, Commerce had before it a large

body of evidence, provided by Yama as well as by the GOC, supporting a finding that

Yama did not do so.  Commerce impermissibly ignored this "relevant information" that

"exists elsewhere on the record," *Changzhou Trina*, 42 CIT at __, 352 F. Supp. 3d at 1325

(citation omitted), on its finding—itself unsupported by substantial record evidence—

that the two items of requested but missing information prevented it from finding

"non-use" or verifying information that the record contained.

For the reasons the court has discussed, the administrative record does not

contain substantial evidence to support a finding that Yama benefited from the EBCP.

Nor does it contain substantial evidence to support the Department's finding that the

record did not allow Commerce to *determine* whether a benefit to Yama occurred or its

finding that it could not conduct any verification of Yama's or its customers' "non-use"

of that program.

The Department's determination as to the EBCP was a final agency decision that

has been subjected to judicial review and found to be unsupported by substantial

evidence on the administrative record the agency collected and assembled during the

CVD review proceeding.  That determination, therefore, must be remanded for

reconsideration.

The remaining question is whether Commerce may reopen the record.

Ordinarily, an agency remains free to reopen the record unless the court rules

otherwise.  *NTN Bearing Corp. of Am. v. United States*, 25 CIT 118, 124, 132 F. Supp. 2d

1102, 1107 (2001), *aff'd*, 295 F.3d 1263 (Fed. Cir. 2002) ("As long as the Court does not

forbid Commerce from considering new information, it remains within Commerce's

discretion to request and evaluate new data.").  In some cases a deficiency in the record

can be remedied in a way that is expeditious and fair, but this is not the situation here.

Rather, the record as it exists cannot support an imposition of countervailing duties for

the EBCP for multiple reasons.  Moreover, repeating the entire review as to the EBCP

would be highly prejudicial and unfair, in terms of both time and expense, for the

plaintiff, Yama, who was a fully cooperative respondent.  *See, e.g., Essar Steel Ltd. v.*

*United States*, 678 F.3d 1268, 1277 (Fed. Cir. 2012) ("To allow constant reopening and

supplementation of the record would lead to inefficiency and delay in finality.").

Because Commerce, in including a rate for the EBCP, disregarded critical record

evidence (including, in particular, the Administrative Measures and EBCP

Implementation Rules), because of the need to ensure fairness to both parties, and in the

interest of finality, the court will not exercise its discretion so as to authorize Commerce

to reopen the record upon remand.  Commerce must reconsider its EBCP determination on the basis of the existing record and reach a new determination that is in accordance with this Opinion and Order.

### E.  Provision of Synthetic Yarn and Caustic Soda for Less-Than-Adequate Remuneration

When an "authority," which the Tariff Act defines as a "government of a country or any public entity within the territory of the country," 19 U.S.C. § 1677(5)(B), confers a benefit upon a person by providing goods "for less than adequate remuneration," *id*. § 1677(5)(E)(iv), a countervailable subsidy may be found if the "specificity" requirement set forth in the statute, *id*. §§ 1677(5)(A), (5A), is satisfied.

In the eighth review of the Order, Commerce stated that "we continue to find that, in the synthetic yarn and caustic soda markets: (1) Chinese prices are significantly distorted by the involvement of the GOC; and (2) privately-owned input suppliers of synthetic yarn and caustic soda are 'authorities' within the meaning of section 771(5)(B) of the Act [19 U.S.C. § 1677(5)(B)]." *Final I&D Mem*. at 14.  Commerce stated, further, that "[w]e have also reexamined the specificity of both the synthetic yarn and caustic soda for LTAR and now find that provision of these inputs is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act [19 U.S.C. § 1677(5A)(D)(iii)(I)]." *Id*.

Concluding that the Chinese government did not provide certain requested information and failed to cooperate by not acting to the best of its ability to respond to its information requests, Commerce used facts otherwise available and drew adverse

inferences that: (1) Yama's suppliers of synthetic yarn and caustic soda were "authorities," *id*. at 16–19, and that the provision of these inputs was "specific," *id*. at 19–22.  Adopting without change the LTAR determinations it made in the Preliminary Results, Commerce calculated a 27.74% subsidy rate for synthetic yarn, *id*. at 3, 23, and a subsidy rate of 0.27% for caustic soda, *id*. at 3.

In contesting the LTAR determinations for the two inputs, Yama claimed that the record did not support a finding that the markets for them were distorted by either the GOC or the Chinese Communist Party, Pl.'s Br. 40, and that the record also failed to support the Department's treating its suppliers as authorities, *id*. at 44–46.  While arguing that the issue of specificity was, therefore, moot, Yama argued in the alternative that the provision of synthetic yarn and caustic soda was not "specific" because "synthetic yarn and caustic soda have a wide range of uses, including, but not limited [to], use in the narrow woven ribbon industry."  *Id*. at 46 (citations omitted).

Further to the issue of specificity, Yama argued that "[t]here is no evidence on the record to even remotely suggest that any LTAR subsidy is specific either as a matter of law or fact" and that "Commerce did not place anything on the record to suggest otherwise."  *Id*. at 47.  Defendant stated, in response, that "Yama is correct that Commerce did not place information on the record to support its *de facto* specificity finding."  Def.'s Br. 46.  Defendant explained that "in determining that the subsidy is *de facto* specific, Commerce relied on information from the petitioner's new subsidy

allegation in the 2015 segment of this administrative review" but "inadvertently did not

place the 2015 New Subsidy Allegation information on the record of this review." *Id*.

(citations omitted).  Noting that interested parties did not have the opportunity to

comment on that information as specified in 19 U.S.C. § 1677m(g), defendant requested

that the court "remand this issue to Commerce so that Commerce may place the

information on the record of the review and allow parties the opportunity to comment,

and if necessary, reconsider its *de facto* specificity determination." *Id*. (citing *SKF USA

Inc. v. United States*, 254 F.3d 1022, 1027–31 (Fed. Cir. 2001)).  Defendant requests that

the court "grant our motion for voluntary remand for the *de facto* specificity issue, deny

plaintiff's motion in all other respects, and sustain Commerce's final results." *Id*. at 47.

Plaintiff opposes defendant's motion for a remand on the grounds that the LTAR

issue is "moot," that the material sought to be added (characterized by plaintiff as the

"Public Bodies Memorandum") is speculation, not evidence, adding nothing to the

discussion of this issue, and that the interest of finality dictates against allowing

supplementation of the record.  Pl.'s Reply 12–13.

The court does not agree with plaintiff's argument that it should preclude

supplementation of the record in the limited way that defendant proposes.  Defendant

having pointed out that Commerce considered the information it seeks to add to the

record but inadvertently omitted it when assembling that record, the court views as

reasonable the request to reopen the record for the sole purpose defendant identifies.  If

the information was used in the agency's decision-making process, then the addition to

the record of that information should have been accomplished in the ordinary course,

and the apparent procedural error should be corrected.  Plaintiff may raise its objections

to the relevance and probativity of the new information once that information has been

placed on the record and provided to it.

Beyond the request to reopen and supplement the record, defendant's request for

a remand is unsatisfactory in two respects.  First, if the court allows Commerce to

supplement the record and to reconsider its determination on specificity as to the

provision of synthetic yarn and caustic soda, the court at the same time cannot, as

defendant urges, "sustain Commerce's final results."  Second, the court declines to

adopt defendant's piecemeal approach to the litigation of the LTAR issues, under which

defendant would have Commerce consider only the specificity question and have the

court "deny plaintiff's motion in all other respects."

The court will allow Commerce to add to the record the information from the

petitioner's new subsidy allegation in the 2015 segment of this administrative review,

upon which, according to defendant's statement to the court, Commerce relied in

making its specificity determinations as to synthetic yarn and caustic soda.  Commerce

shall allow plaintiff to submit comments to it that address this new information.  To

avoid a piecemeal approach, Commerce shall reconsider its LTAR determinations for

these two inputs, in the entirety, based on the supplemented record and the comments

plaintiff submits.  Plaintiff then will have the opportunity to comment on the

redetermination upon remand that Commerce submits to the court.

### III.  CONCLUSION AND ORDER

A remand of the Final Results to Commerce is required in this case for

reconsideration of the Department's determination as to the EBCP and to allow a

limited supplementation of the record with respect to the Department's LTAR

determinations.

Upon consideration of all papers and proceedings had herein, and upon due

deliberation, it is hereby

**ORDERED** that Yama Ribbons and Bows Co., Ltd.'s Rule 56.2 Motion for
Judgment on the Agency Record (Feb. 4, 2022), ECF Nos 27 (Conf.), 28 (Public) be, and
hereby is, granted in part; it is further

**ORDERED** that Commerce shall submit to the court a redetermination upon
remand ("Remand Redetermination") that reconsiders, based on the existing record,
the Department's determination on the EBCP program and reaches a new
determination that is in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce shall supplement the administrative record with the
"2015 New Subsidy Allegation information" that, according to defendant's statement
to the court, Commerce inadvertently failed to place on the record of the
administrative review, shall provide that information to plaintiff upon doing so, and
shall allow plaintiff to submit to Commerce comments on this new information; it is
further

**ORDERED** that in the Remand Redetermination, Commerce shall reconsider its
LTAR determinations for synthetic yarn and caustic soda in the entirety, based on the
supplemented administrative record; it is further

**ORDERED** that Commerce shall submit the Remand Redetermination to the court within 60 days of the date of this Opinion and Order; it is further

**ORDERED** that plaintiff shall have 30 days from the date of submission of the Remand Redetermination to submit to the court comments thereon; and it is further

**ORDERED** that defendant shall have 15 days from the submission of plaintiff's comments on the Remand Redetermination to submit to the court a response to those comments.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: August 25, 2023
          New York, New York