C-570-953
Remand
Slip Op. 23-127
POR: 1/1/2018 – 12/31/2018
**Public Document**
E&C/OIX: TKS

***Yama Ribbons and Bows Co. v. United States*,**
**Court No. 21-00402, Slip Op. 23-127 (CIT August 25, 2023)**
**Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final remand results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (the Court) in *Yama Ribbons and Bows Co. v. United States*, Court No. 21-00402, Slip Op.

23-127 (CIT August 25, 2023) (*Yama Ribbons*).  This action arises out of the final results in

*Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China:  Final*

*Results of Countervailing Duty Administrative Review; 2018*, 86 FR 40462 (July 28, 2021) (*Final*

*Results*), and accompanying Issues and Decision Memorandum (IDM).  The Court remanded

Commerce to:  (1) reconsider, based on the existing record, its determination regarding the

Export Buyer's Credit program (EBCP) and reach a new determination in accordance with the

Court's opinion and order; (2) supplement the administrative record with the 2015 New Subsidy

Allegation (2015 NSA), which was filed in the 2015 administrative review of this proceeding

and upon which Commerce relied in making its specificity determinations for the provision of

synthetic yarn and caustic soda for less than adequate remuneration (LTAR); (3) provide Yama

Ribbons and Bows Co., Ltd. (Yama) an opportunity to comment on the 2015 NSA; and (4)

reconsider its determinations for synthetic yarn and caustic soda in the entirety, based on the supplemented record.

As discussed below, consistent with *Yama Ribbons*, on remand, Commerce has reconsidered its decision to apply adverse facts available (AFA) in evaluating use of the EBCP and determines, under respectful protest,[1] that the EBCP was not used by Yama. Consequently, on remand, Commerce revised Yama's overall subsidy rate to exclude the 10.54 percent AFA subsidy rate assigned to the EBCP.

Separately, on remand, Commerce has reconsidered its determinations with respect to the provision of synthetic yarn and caustic soda for LTAR programs in light of the supplemented administrative record (*i.e.*, inclusion of the 2015 NSA and Yama's comments on the 2015 NSA). Commerce continues to find that:  (1) the provision of synthetic yarn and caustic soda for LTAR programs are specific; and (2) Yama benefited from these programs during the period of review (POR), January 1, 2018, through December 31, 2018.  Consequently, there is no change to the subsidy rates (*i.e.*, 27.74 percent and 0.27 percent, respectively) calculated for the synthetic yarn and caustic soda for LTAR programs in the *Final Results*.

## II.     BACKGROUND

### A.  Export Buyer's Credit Program

On July 28, 2021, Commerce published its *Final Results*.[2]  In the *Final Results*, we used AFA in determining the countervailability of the EBCP because the Government of the People's Republic of China (China) (GOC) failed to provide requested information necessary for Commerce to fully analyze this program and failed to cooperate by not acting to the best of its

---

[1] *See Viraj Group, Ltd. v. United States*, 343 F. 3d 1371, 1376 (Fed. Cir. 2003) (*Viraj*).
[2] *See Final Results* IDM.

ability in response to our information requests.[3]  Specifically, as AFA, we determined that the

EBCP met the financial contribution and specificity requirements of the Tariff Act of 1930, as

amended (the Act).[4]  Further, we determined that without the necessary information that we

requested from the GOC, the information Yama provided is incomplete for purposes of finding

non-use.[5]  Therefore, we determined as AFA that Yama used the EBCP and, consistent with our

countervailing duty (CVD) AFA hierarchy, we selected the highest calculated rate for a similar

program as the AFA rate for this program (*i.e.*, 10.54 percent), in accordance with section 776(d)

of the Act and our established practice.[6]

**B.  The Provision of Synthetic Yarn and Caustic Soda for LTAR Programs**

With regard to the provision of synthetic yarn and caustic soda for LTAR programs, we

lacked record information from the GOC to determine whether:  (1) the prices from transactions

involving Chinese buyers and sellers were significantly distorted by the involvement of the

GOC; and (2) the private companies which supplied Yama with synthetic yarn and caustic soda

were "authorities" within the meaning of section 771(5)(B) of the Act.[7]

As a result, we determined as AFA that all of Yama's synthetic yarn and caustic soda

suppliers were "authorities."[8]  Moreover, because we determined as AFA that the prices from

transactions involving Chinese buyers and sellers were significantly distorted by the involvement

of the GOC, we determined that prices from Yama's suppliers were not usable as tier one

benchmarks because they were prices charged by the providers of the goods at issue.  As a result,

---

[3] *Id.* at Comment 3; *see also Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review; 2018*, 86 FR 7264 (January 27, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[4] *Id.*
[5] *Id*.
[6] *See Final Results* IDM at Comment 3.
[7] *Id.* at Comment 1; *see also Preliminary Results* PDM at 6-9.
[8] *Id*.

as AFA, we selected benchmarks for measuring the adequacy of the remuneration for synthetic yarn and caustic soda in accordance with 19 CFR 351.511(a)(2)(ii) (*i.e.*, under tier two).[9]

Regarding financial contribution for these programs, because the GOC failed to respond to Commerce's requests for information concerning Yama's input suppliers, as AFA, we determined that Yama's input suppliers are "authorities" and that received financial contributions from these suppliers in the form of the provision of a good, pursuant to section 771(5)(D)(iii) of the Act.[10]  Finally, to determine specificity, Commerce requested that the GOC provide:  (1) a list of industries in China that purchase synthetic yarn and caustic soda; (2) the amounts (volume and value) purchased by the industry in which the mandatory respondent company operates, as well as the totals purchased by every other industry; and (3) identify the classification scheme the government normally relies on to define industries, and classify companies within an industry.[11]  Given that the GOC failed to provide the requested information,[12] as AFA, we determined that the GOC's provision of these inputs is specific within the meaning of section 771(5A)(D) of the Act.[13]  Accordingly, we determined that these programs confer countervailable subsidies.

## III.  COURT'S OPINION AND REMAND ORDER

Yama challenged Commerce's findings that:  (1) Yama used and benefited from the EBCP; (2) the record supported either a finding of market distortion for synthetic yarn and caustic soda, or that Yama's input suppliers were "authorities" in the *Final Results*; and (3) there

---

[9] *See Final Results* IDM at Comment 1; *see also Preliminary Results* PDM at 21-22.
[10] *See Final Results* IDM at Comment 1; *see also Preliminary Results* PDM at 28-31.
[11] *See Final Results* IDM at Comment 1.
[12] *Id*.
[13] We relied on information in the 2015 NSA demonstrating that the industries in China using synthetic yarn and caustic are limited in number (*i.e.*, synthetic yarn is used solely by the textile industry and caustic soda is used by only by six industries).  *See Final Results* IDM at Comment 1; *see also Preliminary Results* PDM at 28 and 29.  We note that Commerce inadvertently failed to place the 2015 NSA on the administrative record of the underlying proceeding.

is no basis on the record that any input LTAR subsidy is specific.[14]  On August 25, 2023, the Court remanded the *Final Results* to Commerce.

### A. Export Buyers' Credit Program

Yama challenged Commerce's findings that it used and benefited from the EBCP, based on AFA.  The Court held that the administrative record does not contain substantial evidence to support Commerce's finding that the GOC's failure to provide certain requested information about the EBCP prevented Commerce from either determining, or verifying, that Yama did not benefit from the EBCP.[15]  The Court elaborated that Commerce ignored relevant information, provided by both Yama and the GOC, that Yama did not use the EBCP.[16]  Accordingly, the Court remanded Commerce to reconsider its EBCP determination and reach a new determination on the basis of the existing record.[17]

### B. The Provision of Synthetic Yarn and Caustic Soda for LTAR

Yama challenged three aspects of Commerce's final results with respect to the provision of synthetic yarn and caustic soda for LTAR subsidies.  Specifically, Yama claimed that the record did not support:  (1) finding that the markets for these inputs were distorted by either the GOC or the Chinese Communist Party (CCP); (2) treating Yama's input suppliers as authorities; or (3) Commerce's specificity determination with respect to these inputs (noting that Commerce placed no evidence on the record to show that any input LTAR subsidy is specific).[18]

Commerce acknowledged that it had inadvertently omitted placing the 2015 NSA on the record on which it relied to make its specificity determinations for the provision of synthetic yarn

---

[14] *See Yama Ribbons* at 4.
[15] *Id.* at 12-25.
[16] *Id.* at 25.
[17] *Id*. at 26-27.
[18] *Id*.

and caustic soda for LTAR programs and requested leave from the Court to place this information on the record and allow parties to comment.[19]  While the Court denied Commerce's request for a voluntary remand to review the *Final Results* related to the provision of synthetic yarn and caustic soda for LTAR programs on the basis of a supplemented record, the Court ordered Commerce, on remand, to supplement the record with the 2015 NSA.  Additionally, the Court remanded Commerce to reconsider its provision of synthetic yarn and caustic soda for LTAR determinations in their entirety, based on the supplemented record and Yama's comments.[20]

## IV.   REMAND PROCEEDING

On September 7, 2023, consistent with *Yama Ribbons*, Commerce placed the 2015 NSA on the remand record and provided interested parties the opportunity to comment on this information.[21]  We only received comments from Yama,[22] which we address below.

## V.   ANALYSIS

### A.  Legal Framework:  Use of Facts Otherwise Available and Adverse Inferences

Sections 776(a)(1) and (2) of the Act provide that Commerce, subject to section 782(d) of the Act, shall apply "facts otherwise available" if necessary information is not on the record or an interested party or any other person:  (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; (C)

---

[19] *Id.* at 29.
[20] *Id.* at 30-31.
[21] *See* Memorandum, "Supplementing the Record with Inadvertently Omitted Information and Providing an Opportunity to Comment," dated September 7, 2023, attached 2015 NSA.
[22] *See* Yama's Letter, "Comments on Newly Placed Information on the Record Pursuant to Remand," dated September 14, 2023 (Yama's NSA Comments).

significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

Section 776(b) of the Act further provides that Commerce may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  Commerce's practice when selecting an adverse rate from among the possible sources of information is to ensure that the result is sufficiently adverse "so as to effectuate the statutory purposes of the adverse facts available rule to induce respondents to provide Commerce with complete and accurate information in a timely manner."[23]  Commerce's practice also ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[24]

## B.  Export Buyer's Credit Program

In *Yama Ribbons*, the Court rejected and remanded Commerce's *Final Results* with respect to the EBCP,[25] holding:

> …the administrative record does not contain substantial evidence to support a finding that Yama benefited from the EBCP.  Nor does it contain substantial evidence to support {Commerce's} finding that the record did not allow Commerce to *determine* whether a benefit to Yama occurred or its finding that it could not conduct any verification of Yama's or its customers' "non-use" of that program.[26]

The Court further held that, in the interest of fairness and finality, on remand, Commerce would be precluded from reopening the record.[27]  Given the Court's holding that "the record as it exists cannot support an imposition of countervailing duties for the EBCP,"[28] Commerce has no

---

[23] *See Notice of Final Determination of Sales at Less than Fair Value:  Static Random-Access Memory Semiconductors from Taiwan*, 63 FR 8909, 8932 (February 23, 1998).
[24] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, Vol. 1 (1994), at 870.
[25] *See Yama Ribbons* at 8-26.
[26] *Id.* at 25.
[27] *Id.* at 26-27.
[28] *Id.* at 26 ("the record as it exists cannot support an imposition of countervailing duties for the EBCP ...").

recourse but to find that Yama did not use the EBCP during the POR.  Consequently, we do so under respectful protest.[29]

**C. The Provision of Synthetic Yarn and Caustic Soda for LTAR**

**1.   2015 NSA Information**

As noted above, consistent with *Yama Ribbons*, we placed the 2015 NSA on the record and received comments on this information from Yama.  In its comments, Yama argues that the 2015 NSA does not constitute substantial evidence on the record to support Commerce's finding of countervailable subsidies on purchases of synthetic yarn and caustic soda for LTAR. Moreover, Yama argues that the 2015 NSA does not meet the requirements of the statute for an alleged subsidy to be countervailed based on the following missing information:[30]

- the name of government authority and legislation granting the subsidy, which means that the alleged subsidies cannot be specific as a matter of law;

- a list of specific industries named by the Chinese government agency or legislation which "expressly limits access to the subsidy";

- a list of "objective criteria" imposed by a specific Chinese agency or legislation; and

- any discussion of (1) the "extent of diversification of economic activities within the jurisdiction" of the Chinse government agency implementing the specific LTAR subsidy, or (2) "length of time during which the subsidy program has been in operation."[31]

According to Yama, because no specific Chinese authorities or legislation are cited in the 2015 NSA, there is no evidence on the record complying with the statutory requirement that any alleged subsidy is "specific as a matter of fact."  Yama states that the 2015 NSA contains no

---

[29] *See Viraj*, 343 F.3d at 1371.
[30] *See* Yama's NSA Comments at 2.
[31] *Id.* at 3.

information of any Chinese government agency or legislation which exercises discretion in the decision to grant the subsidy favoring an enterprise or industry over others. Thus, Yama contends there is no evidence either in the 2015 NSA or elsewhere to support Commerce's finding that the provision of synthetic yarn and caustic soda for LTAR programs are countervailable.[32]

**Commerce's Position:**

We disagree with Yama that the 2015 NSA does not support Commerce's finding that the provision of synthetic yarn and caustic soda for LTAR are countervailable subsidies. As an initial matter, we agree with Yama that the provision of synthetic yarn and caustic soda for LTAR are not *de jure* specific. However, we find that the information in the 2015 NSA supports a finding that the provision of these inputs for LTAR is *de facto* specific. Section 351.511 of Commerce's regulations directly addresses Commerce's examination with respect to the provision of goods and services for LTAR. Thus, for the LTAR subsidies at issue, consistent with the regulation, a countervailable subsidy exists when an authority provides a good for LTAR and when the provision of that subsidy is specific.[33] Moreover, an authority can provide a subsidy by providing a good at LTAR to an enterprise, industry, or group thereof, notwithstanding whether the government intended to subsidize the recipient or set up a program to do so. The only questions under sections 771(5)(A) and (B) of the Act are whether the authority provided the respondent with a subsidy, whether the subsidy is specific, and whether a benefit is thereby conferred. The evidence sought is whether the synthetic yarn and caustic soda producers are authorities under the law, whether the prices of the inputs purchased are made at prices that are at LTAR, and whether the subsidy provided is limited to an enterprise, industry, or

---

[32] *Id*.
[33] *See* 19 CFR 351.511.

group thereof.  This is the evidence Commerce sought to obtain from the GOC to make its

determination.  Consequently, as detailed below, in the absence of the requested information

from the GOC regarding the *de facto* specificity of the provision of synthetic yarn and caustic

soda for LTAR subsidies in this review, as AFA, we relied on the 2015 NSA information in our

determination.

## 2. Commerce's Findings on the Provision of Synthetic Yarn and Caustic Soda for LTAR

Based on our reexamination of the provision of synthetic yarn and caustic soda for LTAR

subsidies, we continue to find that these programs conferred countervailable subsidies to Yama

during the POR, for the reasons discussed below.

### a.   Market Distortion

To determine whether the GOC is the predominant provider of synthetic yarn and caustic

soda in China and whether its presence in the market distorts all transaction prices for synthetic

yarn and caustic soda, as discussed in the *Final Results*, we requested certain information from

the GOC.[34]  In response, for each of these inputs, the GOC provided:  (1) the total number of

enterprises, as well as the total production volume for synthetic yarn and caustic soda for the

POR; (2) the percentage of domestic consumption accounted for by domestic production; and (3)

the total volume and value of imports during the POR.[35]

Commerce issued a supplemental questionnaire requesting further information regarding

market distortion for the two inputs, including that the GOC provide a list of the number of

producers in which it maintains an ownership or management interest.[36]  In response, the GOC

stated that it was not able to provide the percentages of total volume and value of domestic

---

[34] *See Final Results* IDM at Comment 1; *see also Preliminary Results* PDM at 7.
[35] *Id.*
[36] *See* Commerce's Letter, "Second Supplemental Questionnaire," dated July 24, 2020.

production, as Commerce requested, because it does not maintain:  (1) a list of companies in which the government maintains a majority ownership or a controlling management interest; or (2) data regarding companies in which the government maintains some, but not a majority, ownership interest.[37]  Consequently, the GOC failed to identify, and provide GOC ownership information for, the companies comprising the synthetic yarn and caustic soda industries.

Nevertheless, in the *Final Results*, the GOC argued that the markets for these inputs are not distorted because only a minority of the producers of these inputs are companies in which the government maintains a majority ownership and there were no export tariffs or other restraints on these inputs during the POR.[38]  However, given that the GOC's supplemental questionnaire response indicates that the government does not maintain this type of information, the record is devoid of evidence – regarding the companies producing synthetic yarn and caustic soda in which the government maintains any ownership interest (majority or otherwise) – to support the GOC's claim.  Furthermore, the fact that the GOC does not impose export tariffs or other restraints on these inputs does not mean that the market for them is not distorted by the GOC's presence.  Other factors (such as the presence of GOC-owned companies in the market, information which the GOC did not provide) would also indicate that the GOC's presence in the market is distortive.

In a previous segment of the proceeding, Commerce verified that the GOC maintains two databases at the State Administration of Industry and Commerce:  one is the business registration database, showing the most up-to-date company information; a second system, "ARCHIVE," houses electronic copies of documents such as business licenses, annual reports, capital

---

[37] *Id.*
[38] *See Final Results* IDM at 15.

verification reports, *etc*.[39]  Therefore, we find that the GOC has an electronic system available to it to gather the industry-specific information Commerce requested, including the GOC's minority ownership interests in companies producing synthetic yarn and caustic soda, but elected not to provide Commerce this information.

Thus, because Commerce continues to find that the GOC withheld necessary information that was requested of (and is available to) it, and the record lacks such information, Commerce continues to rely on facts available in these final results of redetermination.[40]  Moreover, because the GOC failed to cooperate by not acting to the best of its ability to comply with our request for information,[41] we find that an adverse inference is warranted in the application of facts available. In drawing an adverse inference, we continue to find that Chinese prices from transactions involving Chinese buyers and sellers are significantly distorted by the involvement of the GOC.[42]

       b.      <u>Input Suppliers are "Authorities"</u>

Consistent with the *Final Results*, we continue to find that each of the private companies which supplied Yama with synthetic yarn and caustic soda is an "authority" within the meaning of section 771(5)(B) of the Act.  To determine whether producers of synthetic yarn and caustic soda are "authorities" within the meaning of section 771(5)(B) of the Act, Commerce requested that the GOC provide information about the involvement of the CCP in each of the private companies that produced the input products that Yama purchased during the POR.[43]

---

[39] *See Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China:  Preliminary Results of Countervailing Duty Administrative Review; 2016*, 83 FR 50891 (October 10, 2018), and accompanying PDM at 8 (citing, *e.g.*, *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2015*, 83 FR 11177 (March 14, 2018) (*Ribbons from China 2015*), and accompanying IDM at 6-7).
[40] *See* section 776(a)(2)(A) of the Act.
[41] *See* section 776(b) of the Act.
[42] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65377 (November 25, 1998).
[43] *See* Commerce's Letters, "Countervailing Duty Questionnaire," dated November 19, 2019 (IQ); "First Supplemental Questionnaire," dated April 3, 2020 (FSQ); and "Second Supplemental Questionnaire," dated July 24, 2020 (SSQ).

Specifically, to the extent that the owners, managers, or directors of a producer are CCP officials or otherwise influenced by certain entities, Commerce requested information regarding the means by which the GOC may exercise control over company operations and other CCP-related information.[44]   Commerce has previously explained its understanding of the CCP's involvement in China's economic and political structure,[45] including why it considers the information regarding the CCP's involvement in China's economic and political structure to be relevant.

The GOC provided information regarding the ownership structure and basic registration information for each of Yama's privately-owned input suppliers.[46]   In order to evaluate whether the privately-owned input suppliers are "authorities" with the meaning of section 771(B) of the Act, we asked the GOC to provide information about the involvement of the CCP in each of these companies, including whether individuals in management positions are CCP members.[47] In response, the GOC provided a long narrative explanation of the role of the CCP, but when asked to identify any owners, members of the board of directors, or managers of the input suppliers who were government or CCP officials during the POR, the GOC explained that there is "no central informational database to search for the requested information."[48]   Therefore, the GOC stated that Commerce should obtain this information directly from Yama's privately-owned input suppliers.[49]   In *Citric Acid from China 2012*, we found that the GOC was able to obtain the information requested independently from the companies involved, and that

---

[44] *Id.*

[45] *See, e.g.*, *Citric Acid and Certain Citrate Salts: Final Results of Countervailing Duty Administrative Review; 2012*, 79 FR 78799 (December 31, 2014) (*Citric Acid from China 2012*), and accompanying IDM at Comment 5; *see also* Additional Documents Memorandum, which includes the Public Bodies Memorandum and its attachment, the CCP Memorandum.

[46] *See* GOC's Letters, "Initial Questionnaire Response," dated January 10, 2020 (GOC's IQR), at 15, 23, and Exhibits C-2 and C-8; and "Second Supplemental Questionnaire Response, dated August 14, 2020, at 9-10, and Exhibit C-29.

[47] *See* IQ; FSQ; and SSQ.

[48] *See* GOC's IQR at Exhibit C-1 at 17.

[49] *Id*. at 18.

statements from companies, rather than from the GOC or CCP themselves, were not sufficient.[50] Therefore, we continue to find that the GOC failed to provide the information requested of (and available to) it for Yama's privately-owned input suppliers.

We understand that the CCP exerts significant control over economic activities in China.[51]  Thus, Commerce continues to find, as it has in prior CVD proceedings,[52] that the information requested regarding the role of CCP officials and CCP committees in the management and operations of Yama's privately-owned input suppliers is necessary to our determination of whether these producers are "authorities" within the meaning of section 771(5)(B) of the Act.

Nevertheless, in the *Final Results*, Yama argued that it and the GOC provided information showing that:  (1) the synthetic yarn and caustic soda LTAR programs were not used by any of Yama's suppliers during the POR; (2) all the synthetic yarn and caustic soda suppliers were privately-owned companies, not state-owned enterprises (SOE); (3) the suppliers' senior managers did not hold positions in any level of the GOC and are not members of the CCP; (4) the suppliers' operations are independent from government control; and (5) that it is illegal for any organization outside a company, including the CCP and its affiliates, to make business decisions for any company.[53]  As discussed in the *Final Results*, Yama's declaration that its input suppliers did not use the synthetic yarn and caustic soda for LTAR programs is not meaningful to our analysis of these programs; rather, Commerce must examine whether these input suppliers are "authorities" with the meaning of section 771(5)(B) of the Act and, if so, whether they

---

[50] *See Citric Acid from China 2012* IDM at Comment 5.
[51] *See* Additional Documents Memorandum, which includes the Public Bodies Memorandum and its attachment, the CCP Memorandum.
[52] *See, e.g.*, *Citric Acid from China 2012*.
[53] *See Final Results* IDM at Comment 1.

supplied synthetic yarn and caustic soda to Yama for LTAR during the POR.  The fact that

Yama's input suppliers are privately-owned companies is not dispositive to our determination

regarding whether they are "authorities" because of the potential for the GOC or CCP's

involvement in these companies.  Further, while Yama provided certifications that the senior

managers of certain of its input suppliers are not GOC officials or members of the CCP,[54] Yama

failed to provide this information for *all* of its input suppliers, and it did not provide such

information for the individual owners or board members of any of these companies.  Regardless,

it is the GOC which is in the best position to answer questions about individuals who hold

positions in the GOC or are members of the CCP.  Therefore, because we do not have complete

information for Yama's input suppliers regarding the senior managers, individual owners, or

board members who may hold positions in the GOC or are members of the CCP, Commerce

cannot rely on the partial information that Yama provided.  As a result, for the reasons discussed

above, we cannot conclude that Yama's input suppliers are independent from government

control.  In addition, for the reasons discussed below, we also disagree that it is illegal for

organizations outside of a company, including the CCP to make decisions on its behalf.

Specifically, we disagree with the GOC's claim that the presence of the CCP, or primary

party organizations, in private companies does not represent a "significant" CCP presence

relevant to whether an otherwise private company is a government authority (or that the CCP can

exert control over private companies through primary party organizations).  The GOC's

arguments ignore a significant body of past findings, record evidence and expert third-party

sources relied upon in the Public Bodies Memorandum and the attached CCP Memorandum.

The full analysis in the context of China is presented in the Public Bodies Memorandum and its

---

[54] *See* Yama's Letter, "Response to Section III Questionnaire," dated January 10, 2020, at 12, 15, and Exhibits 8-2 and 10-2.

attached CCP Memorandum, and is summarized here.  Commerce notes that the means of

government control or influence as it relates to the standard of an "authority" in the context of

CVD proceedings may extend beyond ownership – and, therefore, may extend to private

enterprises.  Accordingly, Commerce first considered what entities comprised the "government"

(for purposes of this analysis) in China in order to assess the various means of control that it may

or may not exercise over enterprises.  In this regard, Commerce considers information regarding

the CCP's involvement in China's economic and political structure to be relevant because public

information demonstrates that the CCP exerts significant control over activities in China such

that the CCP can properly be considered part of the government structure in China for purposes

of this analysis.[55]  The GOC's arguments neither rebut this finding nor the definition of

"government" relied upon in the CCP Memorandum.  Commerce explained in the Public Bodies

Memorandum that it found that the government in China includes both the CCP and the state

apparatus.  Commerce then explored the variety of means by which the GOC and CCP may

exercise control over enterprises.  Commerce has noted that publicly available information

indicates that Chinese law requires the establishment of CCP organizations, *i.e.*, primary

organizations of party, in all companies, whether state, private, domestic, or foreign-invested that

have three or more party members and that such organizations may wield a controlling influence

in the company's affairs.[56]

        We also disagree with the GOC that, because the CCP Constitution states that primary

party organizations "exercise oversight over all Party members, including the chief

administrators who are Party members, but do not direct the work of their units," this means that

---

[55] *See* Additional Documents Memorandum at CCP Memorandum (page 33) (stating that "available information and record evidence indicates that the CCP meets the definition of the term 'government' for the limited purpose of applying the U.S. CVD law to China").
[56] *See* Additional Documents Memorandum at Public Bodies Memorandum (pages 35-36 and sources cited therein).

the CCP cannot project direct authority over the operation of the company.  As discussed in the

Public Bodies Memorandum:

> In accordance with the CPP Constitution, all organizations, including private commercial enterprises, are required to establish "primary organizations of the party" (or "Party committees") if the firm employs at least three party members.[57]

This section of the report also cites expert, third-party sources, noting that:

> The party has cells in most big companies—in the private as well as the stateowned sector – complete with their own offices and files on employees.  It controls the appointment of captains of industry and, in the SOEs, even corporate dogsbodies. It holds meetings that shadow formal board meetings and often trump their decisions, particularly on staff appointments. It often gets involved in business planning and works with management to control pay.[58]

Further, the Public Bodies Memorandum notes that, according to the Xinhua News Agency,

there were a total of "178,000 party organs in private firms in 2006, a rise of 79.8 percent over

2002."[59]  The GOC fails to acknowledge or address that Primary Party Organizations are present

in private enterprises in growing numbers and therefore have an influence on the business

decision within these entities.  These Primary Party Organizations may be imbued with

significant power according to expert, third-party sources.[60]  Notably, the GOC has simply failed

to respond to Commerce's questions and explain the purpose of CCP committees, which might

shed light on the purpose, meaning, and role of these committees in private enterprises as well as

state-invested enterprises.

Therefore, we continue to find that the GOC withheld necessary information that was

requested of it and that Commerce must rely on facts available in conducting our analysis of

---

[57] *See* Additional Documents Memorandum at Public Bodies Memorandum (page 35)).
[58] *Id*. at 36 (citing "A Choice of Models," The Economist (January 2012)).
[59] *Id*. (citing *China Today*, "Brief Introduction of the Communist Party of China," current as of April 2012, at https://www.chinatoday.com/org/cpc/).
[60] *See, e.g*., Public Bodies Memorandum at 4.

Yama's privately-owned input suppliers.[61]  As a result of the incomplete responses to

Commerce's supplemental questionnaires, we find that the GOC failed to cooperate by not acting

to the best of its ability to comply with our requests for information.  Consequently, we

determine that the GOC withheld information and that an adverse inference is warranted in the

application of facts available.[62]  As AFA, we find that CCP officials are present in each of

Yama's privately-owned input suppliers as individual owners, managers, and members of the

boards of directors, and that this gives the CCP, as the government, meaningful control over the

companies and their resources.  As explained in the Public Bodies Memorandum, an entity with

significant CCP presence on its board or in management or in party committees may be

controlled such that it possesses, exercises, or is vested with governmental authority.[63]  Thus, we

continue to find that privately-owned input suppliers of synthetic yarn and caustic soda provided

a financial contribution and that supplied Yama are "authorities" within the meaning of section

771(5)(B) of the Act.

     c.    Specificity

Throughout the history of this proceeding, we have found the provision of synthetic yarn

and caustic soda for LTAR programs to be countervailable based on AFA due to the GOC's

failure to provide requested information.[64]  Because the countervailability of these programs was

based on AFA, we asked the GOC to provide necessary information regarding these programs in

this review.[65]  Specifically, we requested that the GOC:  (1) provide a list of industries in China

---

[61] *See* section 776(a)(2)(A) of the Act.
[62] *See* section 776(b) of the Act.
[63] *See* Additional Documents Memorandum at Public Bodies Memorandum (pages 33-36 and 38).
[64] *See Ribbons from China 2015* IDM; *see also Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2016*, 84 FR 11052 (March 25, 2019); and *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2017*, 84 FR 10653 (February 25, 2020)).
[65] *See* IQ; and FSQ.

that purchase synthetic yarn and caustic soda; (2) provide the amounts (volume and value) purchase by the industry in which the mandatory respondent company operates, as well as the totals purchased by every other industry; and (3) identify the classification scheme the government normally relies on to define industries and classify companies. However, the GOC failed to provide the requested information. Therefore, we find that the information on the record is incomplete regarding whether these subsidies are specific within the meaning of section 771(5A) of the Act.

Accordingly, because the GOC failed to provide information necessary for Commerce to fully analyze these subsidies, and as a result, the information is not available on the record of this review, Commerce is continuing to rely on facts otherwise available for these final results of redetermination.[66] Moreover, as a result of the incomplete responses to Commerce's questionnaires,[67] we find that the GOC failed to cooperate by not acting to the best of its ability in providing requested information.[68]

Therefore, as AFA in the absence of the requested information from the GOC in this review regarding the *de facto* specificity of these programs, we relied on the information we used to initiate an investigation of the provision of synthetic yarn and caustic soda for LTAR programs in this proceeding.[69] Specifically, regarding the provision of synthetic yarn for LTAR program, in the 2015 NSA, the petitioner[70] provided information demonstrating that synthetic yarn is used solely by the textiles industry in China.[71] In past cases, Commerce has found that when use of an input was limited to eight industries, the industries were limited in number in

---

[66] *See* section 776(a)(1) of the Act.
[67] *See* GOC's IQR at 19 and 27; *see also* GOC's Letter, "First Supplemental Questionnaire Response, dated April 17, 2020, at 5-7.
[68] *See* section 776(b) of the Act.
[69] *See* 2015 NSA.
[70] The petitioner is Berwick Offray LLC.
[71] *Id*. at Exhibit II-P.

China and, thus, the subsidy was *de facto* specific.[72]  Consequently, we find that the use of synthetic yarn by one industry (the textiles industry) is limited in number and, as a result, the provision of synthetic yarn for LTAR program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act.

Similarly, regarding the provision of caustic soda for LTAR program, in the 2015 NSA, the petitioner provided information demonstrating that caustic soda is used by only a limited number of industries (*i.e.*, chemicals, pulp and paper, aluminum, food, water treatment, and textiles) in China.[73]  As noted above, Commerce has found that when eight industries used an input in China, these industries were limited in number and, thus, the subsidy was *de facto* specific.[74]  Consequently, we continue to apply AFA and find that the use of caustic soda by six industries is limited in number and, as a result, the provision of caustic soda for LTAR program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act.

Therefore, we continue to find that, in the synthetic yarn and caustic soda markets:  (1) Chinese prices are significantly distorted by the involvement of the GOC; and (2) privately-owned input suppliers of synthetic yarn and caustic soda are "authorities" within the meaning of section 771(5)(B) of the Act.  We have also reexamined the specificity of both the synthetic yarn and caustic soda for LTAR subsidies and continue to find that provision of these inputs is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act.  As a result, we continue to find that the provision of synthetic yarn and caustic soda for LTAR programs conferred countervailable subsidies to Yama during the POR.

---

[72] *See, e.g.*, *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 73 FR 31966 (June 5, 2008) (*CWP from China*), and accompanying IDM at Comment 7.
[73] *See* 2015 NSA at Exhibit III-H.
[74] *See CWP from China* IDM at Comment 7.

## VI.    INTERESTED PARTY COMMENTS

On October 2, 2023, Commerce released the draft results of redetermination to all interested parties, and invited parties to comment.[75]  We received no comments on the draft results of redetermination.

## VII.    FINAL RESULTS OF REDETERMINATION

Consistent with the instructions of the Court, we have continued to use the same approach in the final results of redetermination.  As a result of our redetermination, we are excluding the EBCP from the subsidy programs included in Yama's overall subsidy rate for the POR.  However, Commerce continues to include the provision of synthetic yarn and caustic soda for LTAR subsidy rates (*i.e.*, 27.74 percent and 0.27 percent, respectively) in Yama's overall subsidy rate.  Accordingly, the resulting overall subsidy rate for Yama is 31.66 percent.  Because Yama's recalculated overall subsidy rate is different from the overall subsidy rate in the *Final Results*, we intend to issue a *Timken Notice*[76] with the amended final results, should the Court sustain these final results of redetermination.

10/24/2023

X _____

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[75] *See* Draft Results of Redetermination Pursuant to Court Remand, *Yama Ribbons and Bows Co., v. United States*, Court No. 21-00402, Slip. Op. 23-127 (CIT August 25, 2023), dated October 2, 2023.
[76] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990).