Slip Op. 24-92

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| YAMA RIBBONS AND BOWS CO., LTD., | |
| Plaintiff, | |
| v. | **Before:  Timothy C. Stanceu, Judge** |
| UNITED STATES, | **Court No. 21-00402** |
| Defendant. | |

OPINION

[Sustaining an agency decision issued in response to court order in litigation contesting a countervailing duty determination on narrow woven ribbons from the People's Republic of China]

Dated: August 13, 2024

*John J. Kenkel*, International Trade Law Counselors, PLLC, of Alexandria, Virginia, for plaintiff Yama Ribbons and Bows Co., Ltd.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General and *Patricia M. McCarthy, Director*.  Of counsel on the brief was *Leslie M. Lewis*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Judge:  Plaintiff Yama Ribbons and Bows, Co., Ltd. ("Yama") contested a

determination of the International Trade Administration, U.S. Department of

Commerce ("Commerce" or the "Department") in a countervailing duty ("CVD")

proceeding.  The contested determination (the "Final Results") concluded the eighth

periodic administrative review ("eighth review") of a countervailing duty order on

narrow woven ribbons with woven selvedge from the People's Republic of China

("China" or the "PRC").

Before the court is the Department's "Remand Redetermination," issued in

response to the court's opinion and order in *Yama Ribbons and Bows Co. v. United States*,

47 CIT __, 653 F. Supp. 3d 1314 (2023) ("*Yama I*").  Final Results of Redetermination

Pursuant to Court Remand (Int'l Trade Admin. Oct. 24, 2023), ECF No. 47 ("*Remand

Redetermination*").  Yama opposes the Remand Redetermination, raising several

objections.  The court sustains the Remand Redetermination.

## I. Background

Background is provided in the court's previous opinion and order and is

summarized and supplemented herein.  *Yama I*, 47 CIT __, 653 F. Supp. 3d 1314 (2023) at

1316—1318.

### A. The Contested Decision

The Final Results are published as *Narrow Woven Ribbons with Woven Selvedge

From the People's Republic of China: Final Results of Countervailing Duty Administrative

Review;* 2018, 86 Fed. Reg. 40,462 (Int'l Trade Admin. July 28, 2021) P.R. Doc. 176 ("Final

Results").[1]  Commerce incorporated by reference an accompanying "Issues and

---

[1] Documents in the Joint Appendix (June. 17, 2022), ECF Nos. 42 (conf.), 43
(public), are cited herein as "P.R. Doc. __."  Documents in the Remand and Joint
(continued . . .)

Decision Memorandum." *Issues and Decision Memorandum for the Final Results of 2018 Countervailing Duty Administrative Review: Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China* (Int'l Trade Admin. July 22, 2021), P.R. Doc. 174 ("*Final I&D Mem.*"). The Final Results pertained to entries made during a "period of review" ("POR") of January 1, 2018, through December 31, 2018. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 61,011, 61,018 (Int'l Trade Admin. Nov. 12, 2019). In the Final Results, Commerce determined that Yama benefited from 24 governmental programs and issued a total countervailable subsidy rate of 42.20%. *Final Results*, 86 Fed. Reg. at 40,462.

## B. The Court's Previous Opinion and Order

In *Yama I,* the court ruled on Yama's USCIT Rule 56.2 motion for judgment on the agency record, in which Yama contested the Department's inclusion of the following three subsidy rates: (1) a rate of 10.54% for the finding that Yama was benefiting from the Export Buyer's Credit Program ("EBCP") administered by the Export-Import Bank of China ("Ex-Im Bank"), a program that provides loans to customers at preferential rates for purchasing Chinese exported goods; (2) a 27.74% rate for the provision of synthetic yarn for less than adequate remuneration ("LTAR"), and (3) a 0.27% rate for the provision of caustic soda for LTAR. Pl. Yama Ribbons and Bows Co., Ltd. Rule 56.2

---

(…continued)

Appendix (Jan. 5, 2024), ECF No. 52, are cited herein as "P.R.R. Doc. __." All citations to record documents are to the public versions.

Mot. for J. Upon the Agency R. (Feb. 4, 2022), ECF Nos. 27 (Conf.), 28 (Public); Mem. of

Law in Supp. of Pl. Yama Ribbons and Bows Co., Ltd's 56.2 Mot. for J. Upon the

Agency R. (Feb. 4, 2022), ECF No. 27-1 (Conf.), 28-1 (Public) ("Pl.'s Br.").

      In *Yama I*, the court remanded the Final Results to Commerce with directions to

reconsider the determination to apply the 10.54% subsidy rate for the EBCP.  *Yama I*,

47 CIT at __, 611 F. Supp. 3d at 1326—1327.  On the LTAR subsidy determinations for

synthetic yarn and caustic soda, the court permitted Commerce, at defendant's request,

to supplement the administrative record with information consisting of a "New Subsidy

Allegation" ("2015 NSA") submitted by the petitioner during the 2015 administrative

review of the Order.  This was information, previously omitted from the record, that

Commerce considered in the eighth review and that was pertinent to whether there

existed the "specificity" required by section 771(5A)(D) of the Tariff Act of 1930 ("Tariff

Act"), 19 U.S.C. § 1677(5A)(D), for a countervailable subsidy.[2]  *Id*., 47 CIT at __, 611

F. Supp. 3d at 1328.  Over Yama's objection, the court issued a remand order that

directed as follows:

---

[2] All citations to the United States Code herein are to the 2018 edition.  All citations to the Code of Federal Regulations herein are to the 2018 edition.

Commerce shall allow plaintiff to submit comments to it that address this new information. To avoid a piecemeal approach, Commerce shall reconsider its LTAR determinations for these two inputs, in the entirety, based on the supplemented record and the comments plaintiff submits. Plaintiff then will have the opportunity to comment on the redetermination upon remand that Commerce submits to the court.

*Id.*

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

Section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), grants this Court subject matter jurisdiction to review actions commenced under section 516A of the Tariff Act, 19 U.S.C. § 1516a, including actions contesting a final determination that Commerce issues to conclude an administrative review of a countervailing duty order. *Id.* § 1516a(a)(2)(B)(iii).

In reviewing a final determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id.* § 1516a(b)(1). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

### B. The Remand Redetermination Issued in Response to *Yama I*

In the Remand Redetermination, Commerce reconsidered its assigning Yama a countervailing duty subsidy rate for the EBCP. Commerce determined, under protest,

that Yama did not benefit from the program and consequently revised the total subsidy

rate for Yama by excluding the 10.54% rate for the EBCP. *Remand Redetermination* at 2.

Commerce also reconsidered its positions on the provision of synthetic yarn and caustic

soda for LTAR based on the supplemented administrative record and Yama's

responsive comments. Commerce maintained its previous positions on these two

inputs and, therefore, did not change the subsidy rates of 27.74% and 0.27% for

synthetic yarn and caustic soda, respectively. *Id*. As a result, Commerce determined a

new total subsidy rate of 31.66%, i.e., 42.20% less 10.54%. *Id*. at 21.

Yama opposes the Department's retention of subsidies for the synthetic yarn and

caustic soda inputs. Pl.'s Comments in Opposition to the Results of the Remand

Redetermination (Nov. 24, 2023), ECF No. 49 ("Pl.'s Comments"). Defendant advocates

the court's sustaining the Remand Redetermination. Def.'s Corrected Response to

Comments on Remand Redetermination (Dec. 11, 2023), ECF No. 51 ("Def.'s Resp.).

## C. Use of Facts Otherwise Available and Adverse Inferences when the Exporting Country Government Fails to Cooperate in a CVD Proceeding

In the Final Results, Commerce invoked its authority to use "the facts otherwise

available" under section 776(a) of the Tariff Act, 19 U.S.C. § 1677e(a), and "adverse

inferences" under section 776(b) of the Tariff Act, 19 U.S.C. § 1677e(b), with respect to

both the EBCP and the provision of synthetic yarn and caustic soda. When using both

the "facts otherwise available" and the "adverse inference" provisions, Commerce

describes its action by using the term "adverse facts available" ("AFA"). Commerce

may resort to facts otherwise available when "an interested party or any other person" withholds requested information, 19 U.S.C. § 1677e(a)(2)(A), or "significantly impedes a proceeding," *id*. § 1677e(a)(2)(C), or when the information offered "cannot be verified as provided in section 1677m(i) of this title [19 U.S.C. § 1677m(i)]," *id*. § 1677e(a)(2)(D). Moreover, if Commerce finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply" with a request for information, Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." *Id*. § 1677e(b)(1)(A). In some instances, Commerce may use an inference adverse to the interests of a cooperating party in the proceeding if the government of the exporting country fails to cooperate by not acting to the best of its ability in responding to a request for information on an alleged countervailable subsidy. *See Yama I*, 47 CIT at __, 653 F. Supp. 3d at 1318.

### D. The Export Buyer's Credit Program

In the Final Results, Commerce determined that the Export Buyer's Credit Program "provides medium and long-term loans at preferential, low interest rates" and "is administered by a government entity, the Export Import Bank of China." *Id*., 47 CIT at __, 611 F. Supp. 3d at 1319 (citing *Final I&D Mem*. at 30). In *Yama I*, the court considered whether Commerce acted lawfully in assigning Yama a countervailable subsidy rate of 10.54% for the EBCP and, in particular, whether Commerce permissibly

invoked its authorities under the "facts otherwise available" and "adverse inference" provisions of section 776 of the Tariff Act, 19 U.S.C. § 1677e.

The court noted in *Yama I* that Commerce did not make any "affirmative finding under 19 U.S.C. § 1677(5) that Yama was conferred a 'benefit' as a result of participation in the EBCP by one or more of its customers." *Id.,* 47 CIT at __, 611 F. Supp. 3d at 1319. Instead, Commerce imposed a countervailing duty upon "a 'double negative,' i.e., a conclusion that the record does *not* support a 'finding' that Yama did *not* benefit from the EBCP." *Id.* The court concluded that there was insufficient record evidence that any Yama customer participated in the EBCP during the POR and, moreover, that there was record evidence to the contrary. *Id.*

In the Final Results, Commerce invoked its right to use the "facts otherwise available" under 19 U.S.C. § 1677e(a) and "adverse inferences" under 19 U.S.C. § 1677e(b), finding that the Chinese government failed to provide Commerce with the information it needed to analyze the EBCP and "did not act to the best of its ability" in responding to the Department's inquiries. *Yama I,* 47 CIT at __, 653 F. Supp. 3d at 1319. Commerce did not find that Yama itself withheld information or failed to cooperate to the best of its ability in responding to the Department's requests for information. *Yama I,* 47 CIT at __, 653 F. Supp. 3d at 1320.

Commerce reasoned that "information about the operation of the EBCP it considered to be necessary but missing from the record 'prevents complete and effective

verification of the customers' certifications of non-use.'" *Id.*, 47 CIT at __, 611

F. Supp. 3d at 1319 (citing *Final I&D Mem.* at 41).  The court ruled to the contrary,

stating in *Yama I* that "the record does not support the Department's conclusion that the

information that Commerce requested and that the GOC [Government of China] failed

to provide prevented Commerce from determining that Yama did not benefit from the

EBCP." *Id.*, 47 CIT at __, 611 F. Supp. 3d at 1326.  The court remanded the Final Results,

ordering Commerce to submit a Remand Redetermination "that reconsiders, based on

the existing record, the Department's determination on the EBCP program and reaches

a new determination that is in accordance with this Opinion and Order." *Id.*, 47 CIT

at __, 611 F. Supp. 3d at 1329.

   In the Remand Redetermination, Commerce stated that it "reconsidered its

decision to apply adverse facts available (AFA) in evaluating use of the EBCP and

determines, under respectful protest, that the EBCP was not used by Yama" and

"revised Yama's overall subsidy rate to exclude the 10.54 percent AFA subsidy rate

assigned to the EBCP."  *Remand Redetermination* at 2.  The court sustains the

Department's new determination as to the EBCP, which is uncontested and supported

by substantial evidence on the record.

### E.  Inclusion of Subsidy Rates for Yama's Purchases of Synthetic Yarn and Caustic Soda for "Less than Adequate Remuneration"

   Under the Tariff Act, a countervailable subsidy may exist where an "authority,"

which is defined in 19 U.S.C. § 1677(5)(B) as a "government of a country or any public

entity within the territory of the country," provides a good "for less than adequate

remuneration," *id*. § 1677(5)(E)(iv), "and a benefit is thereby conferred," *id*. § 1677(5)(B).

Before a countervailing duty may be imposed to address a domestic subsidy, the

"specificity" requirement set forth in § 1677(5A)(D) must be satisfied.

For the Final Results of the eighth review, Commerce used facts otherwise

available and an adverse inference to determine that Yama's input suppliers are

"authorities" within the meaning of section 771(5)(B) of the Act. *Final I&D Mem.* at 16.

Then, in examining the level of government ownership or control in the synthetic yarn

and caustic soda sectors of the Chinese marketplace, Commerce, relying again on facts

otherwise available and an adverse inference, determined that the markets for both of

these inputs were distorted by government influence and control. *Id.,* at 14. Deciding

for this reason that it could not use Chinese market prices to determine a "benchmark"

price for each input, Commerce used data on world market prices to conclude that these

goods were sold for less than adequate remuneration. *See Decision Memorandum for*

*Preliminary Results of 2018 Countervailing Duty Administrative Review: Narrow Woven*

*Ribbons with Woven Selvedge from the People's Republic of China* at 21—22 (Int'l Trade

Admin. Jan. 19, 2021), P.R. Doc. 162 ("*Preliminary I&D Mem.*"). Finally, Commerce used

facts otherwise available and an adverse inference to conclude that the provision of

these inputs for LTAR was *de facto* specific. *Final I&D Mem*. at 19—20. Based on these

various determinations, Commerce calculated a 27.74% subsidy rate for synthetic yarn and a 0.27% subsidy rate for caustic soda.  *Id.* at 3.

In its Rule 56.2 motion, Yama challenges the department's LTAR determinations on three grounds.  Yama maintains that Commerce erred in using facts otherwise available and an adverse inference to conclude that Yama's privately owned suppliers are "authorities" within the meaning of the Tariff Act.  Pl.'s Br. 44.  Similarly, Yama further contends that Commerce impermissibly found that the Chinese market for these two inputs was distorted by the presence of government ownership or control in the industry sectors producing synthetic yarn and caustic soda.  *Id.* at 40.  Finally, Yama contends that Commerce erred in concluding that the alleged subsidies were *de facto* specific.  *Id.* at 47.

In the Remand Redetermination, Commerce, upon considering the record as supplemented by the 2015 New Subsidy Allegation and Yama's comments on this new information, reached the same findings it had reached in the Final Results as to the subsidies it alleged pertaining to the provision of synthetic yarn and caustic soda. Yama, incorporating its Rule 56.2 motion by reference, renewed its objections to the subsidy rates for these two inputs.[3]

---

[3] Plaintiff did not submit new substantive comments opposing the retained subsidies for synthetic yarn and caustic soda, instead explaining that it "stands by its opening and reply briefs, as well as the comments it submitted to the Department on September 14, 2023, pursuant to remand."  Pl. Yama Ribbons and Bows., Ltd.'s (continued . . .)

### 1.  The Department's Adverse Inferences that Yama's Suppliers of Synthetic Yarn and Caustic Soda Were "Authorities"

To determine whether any of the private companies that supply Yama with synthetic yarn or caustic soda was an "authority" within the meaning of section 771(5)(B) of the Tariff Act, 19 U.S.C. § 1677(5)(B), Commerce asked the Chinese government, as to these companies, whether "any individual owners, members of the board of directors, or senior managers . . . were government or CCP [Chinese Communist Party] officials." *2018 Countervailing Duty Administrative Review of Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China: Countervailing Duty Questionnaire* at II-27 (Nov. 20, 2019), P.R. Doc. 162 ("*GOC Initial Questionnaire*").  In response, the government of China informed Commerce that "[t]here is no central informational database to search for the requested information" and instructed them to "collect this information through the respondent, via its suppliers directly." *Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China, Case No. C-570-953: Initial Questionnaire Response* at Ex. C-1, 17—18 (Jan. 10, 2020), P.R. Doc. 17–39 ("*GOC*

_____

(…continued)
Comments on Defendant's Final Results of Redetermination Pursuant to Court Remand (Nov. 24, 2023), ECF No. 49 at 2.  Defendant argues that plaintiff waived its objections to these retained subsidies by failing to contest the Remand Redetermination on the merits.  Def.'s Corrected Response to Comments on Remand Redetermination (Dec. 11, 2023), ECF No. 51 at 6.  The court disagrees that waiver has occurred.  The court did not rule previously on the merits of the claims contesting these subsidies as presented in plaintiff's briefs in support of its Rule 56.2 motion for judgment on the agency record.  Plaintiff preserved those claims and the grounds it asserted therefor when it incorporated its previous submissions by reference.

*Initial Questionnaire Resp.*"). !Commerce asked the Chinese government to trace the

ownership of specific supply companies "back to the ultimate individual or state

owners," receiving as a response that "the GOC [Government of China] does not have

access to the company registration information." *Narrow Woven Ribbons with Woven*

*Selvedge from the People's Republic of China, Case No. C-570-953*: *First Supplemental*

*Questionnaire Response* at 7 (Apr. 17, 2020), P.R. Doc. 140 ("*GOC First Suppl. Questionnaire*

*Resp.*"). In the final questionnaire, Commerce again asked the government of China for

"ownership structure and registration information" on Yama's suppliers of synthetic

yarn. *2018 Countervailing Duty Administrative Review of Narrow Woven Ribbons with*

*Woven Selvedge from the People's Republic of China: Second Supplemental Questionnaire* at 9

(July 24, 2020), P.R. Doc. 144 ("*GOC Second Suppl. Questionnaire"*). In response, the

Chinese government provided "Exhibit C-29" to the Chinese government's Second

Supplemental Questionnaire Response, which included information about the

shareholders and partnership structure of these companies. *Narrow Woven Ribbons with*

*Woven Selvedge from the People's Republic of China, Case No. C-570-953: Second*

*Supplemental Questionnaire Response* at Ex. C-29 (Aug. 14, 2020), P.R. Doc. 149 ("*GOC*

*Second Suppl. Questionnaire Resp."*).

The Department's original question sought information on the ownership

structure of Yama's input suppliers and the involvement of the government or the

Chinese Communist Party in senior management and board membership. While

Exhibit C-29 addressed the issue of ownership, it left unanswered whether any

government or Chinese Communist Party members were involved with Yama's input

suppliers as board members or in senior management roles.  Commerce invoked its

authority to use facts otherwise available and an adverse inference, pursuant to

19 U.S.C. § 1677e(a) and (b), explaining that the government of China "failed to

cooperate by not acting to the best of its ability to comply with our requests for

information [and]… withheld information." *Final I&D Mem.* at 17.

Yama challenges the Department's use of facts otherwise available with an

adverse inference in designating the input suppliers as authorities.  Yama maintains that

the Chinese government provided sufficient responses to the questionnaires and that

where it did not submit the requested information "either (1) it did not have such

information to submit, or (2) the information would violate confidentiality provisions of

Chinese law regarding private persons in China."  Pl.'s Br. 38—39.

The Tariff Act, in 19 U.S.C. § 1677e(b), requires an interested party to act to the

best of its ability in responding to an information request from Commerce.  Even if, as

the Chinese government reported, "[t]here is no central informational database to

search for the requested information," *GOC Initial Questionnaire Resp*. at Ex. C-1, 17,

Commerce permissibly found that the government failed to act to the best of its ability

when it responded that Commerce should seek the information from Yama and its

suppliers.  Commerce reasonably could infer that the Chinese government was in at

least as good a position to obtain the information on the government's role in owning and managing the input suppliers as was Yama.  Yama maintains that "[t]he GOC cannot be forced to give that which it does not possess," Pl.'s Br. 39, but it does not refute the record evidence that the government of China made no serious effort to obtain the information Commerce requested.

Yama objects to the use of adverse inferences based only on the alleged failure of the government of China to act to the best of its ability.  Pl.'s Br. 38—39.  This argument is unconvincing.  The Tariff Act defines an interested party to include "the government of a country in which such merchandise is produced or manufactured or from which such merchandise is exported."  19 U.S.C. § 1677(9)(B).  When hindered in its inquiries by an uncooperative exporting government in a countervailing duty proceeding, Commerce is not necessarily precluded from invoking 19 U.S.C. § 1677e(b) by the prospect of a collateral adverse effect upon a cooperating party.  *See Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1372–73 (Fed. Cir. 2014).  Commerce should avoid such adverse effect if the necessary information is present elsewhere on the record, *see Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, __, 352 F. Supp. 3d 1316, 1325 (2018), but that was not the case here.

Finally, Yama argues that "the facts on the record . . . make clear that the GOC [Government of China] and the CCP are prohibited by law from interfering in the ordinary business operations and management of a company," maintaining that there is

nothing "on the record suggesting that CCP's involvement in a private company is

sufficient to transform the company into a government authority." Pl.'s Br. 45. This

argument misses the point. Commerce did not find as a fact that Yama's suppliers were

controlled by the government and instead used, permissibly under the circumstances,

an adverse inference that these suppliers were subject to government control and,

therefore, authorities. As defendant explained, "the GOC's noncooperation resulted in

a gap of record information, which is necessary for Commerce's determination that

Yama's input suppliers are independent from government control, and which could not

be overcome by Yama's partial information." Def.'s Resp. at 9. Commerce acted within

its authority in concluding that "[a]s AFA, we find that CCP officials are present in each

of Yama's privately-owned input suppliers as individual owners, managers, and

members of the boards of directors, and that this gives the CCP, as the government,

meaningful control over the companies and their resources." *Final I&D Mem*. at 17. On

the substantial record evidence of the noncooperation of the Chinese government, the

Department's determination that Yama's input suppliers were authorities must be

sustained.

## 2. The Adverse Inferences that the Markets for Synthetic Yarn and Caustic Soda Were Significantly Distorted by Government Involvement

The Tariff Act directs Commerce to determine "the adequacy of remuneration . . .

in relation to prevailing market conditions for the good or service being provided . . . in

the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E)(iv).

Addressing the statutory reference to "prevailing market conditions" in the subject

country, the Department's regulation directs the Commerce Secretary to consider, first,

a "tier-one" analysis, under which "[t]he Secretary will normally seek to measure the

adequacy of remuneration by comparing the government price to a market-determined

price for the good or service resulting from actual transactions in the country in

question." 19 C.F.R. § 351.511(a)(2)(i). The regulation provides, further, that "[i]f there

is no useable market-determined price with which to make the comparison, . . . the

Secretary will seek to measure the adequacy of remuneration by comparing the

government price to a world market price where it is reasonable to conclude that such

price would be available to purchasers in the country in question." *Id*.

§ 351.511(a)(2)(ii). As discussed below, Yama contests the Department's resort to

§ 351.511(a)(2)(ii), i.e., its resort to a "tier-two" analysis.

     In the preamble accompanying the 1998 promulgation of the regulation,

Commerce discussed the issue of when it would consider "market-determined" prices

to be available and usable for a tier-one analysis in the presence of "government

distortion of the market," explaining as follows:

> We normally do not intend to adjust such prices to account for
> government distortion of the market. While we recognize that
> government involvement in a market may have some impact on the price
> of the good or service in that market, such distortion will normally be
> minimal unless the government provider constitutes a majority or, in
> certain circumstances, a substantial portion of the market. Where it is
> reasonable to conclude that actual transaction prices are significantly

> distorted as a result of the government's involvement in the market, we
> will resort to the next alternative in the hierarchy.

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Nov. 25, 1998).

In the eighth review, Commerce used facts otherwise available and adverse

inferences, pursuant to 19 U.S.C. § 1677e, to determine that the markets for synthetic

yarn and caustic soda were significantly distorted by involvement of the Chinese

government in those markets and, accordingly, that a tier-one analysis under 19 C.F.R.

§ 351.511(a)(2)(i) was not feasible. *Final I&D Mem*. at 14. Commerce resorted "to the

next alternative in the hierarchy," i.e., a "world price" analysis under tier two,

§ 351.511(a)(2)(ii). Explaining that it received no "benchmark" data from any interested

party from which to determine a world price for each of these products, Commerce

"relied on the 2017 average world market price" from the 2017 administrative review of

the Order, i.e., the previous review, to determine world prices for the inputs, which it

adjusted for inflation. *Preliminary I&D Mem.* at 21—22. Comparing these prices to the

prices Yama paid for its inputs, Commerce calculated subsidy rates of 27.74% and 0.27%

for Yama's purchases of synthetic yarn and caustic soda, respectively.

Yama contests the determinations Commerce reached under 19 U.S.C. § 1677e

that the domestic markets in China for synthetic yarn and caustic soda were "distorted"

by government involvement. Pl.'s Br. 40—44. Yama argues, first, that the record

evidence refutes this determination and, second, that the adverse inferences of

significant market distortion in the two markets were unlawful because the Chinese

government did not fail to cooperate in responding to the Department's inquiries.

In support of its factual contention, Yama points to record evidence from the

government of China's questionnaire responses that only a small percentage of

synthetic yarn producers are majority-government-owned and that these companies

produce even a smaller percentage of the total production, arguing that this level of

government ownership and production cannot control prices in the marketplace.  *Id*.

at 41.  Yama makes a similar argument with respect to caustic soda producers.  *Id*.  Yama

argues, further, that "the GOC stated that prices of these two raw materials are dictated

by the market, not the government" and that "[t]here are no price controls.  Nor . . . any

export controls, export licensing restrictions, or export tariffs."  *Id*.  Yama adds that

"[t]here are no government limitations on the use of these two raw materials" and that

"[p]roducers are free to sell to any customer, domestic or foreign."  *Id*. (citing *GOC*

*Initial Questionnaire Resp*).  In summary, Yama submits that "[t]here is not even a

scintilla of evidence, much less substantial evidence on the record, to support a finding

of distortion in these two markets."  *Id*.

Yama's argument that the record lacked substantial evidence to support a finding

of significant market distortion is unavailing.  It was apparent to Commerce that

government control could take forms other than majority ownership, such as a

significant, albeit minority, ownership share or the presence of government officials on

boards of directors or in senior management. *Remand Redetermination* at 11. Commerce

reasonably sought information on these other forms of government involvement to

determine whether it could conduct a tier-one inquiry under 19 C.F.R. § 351.511(a)(2)(i).

Commerce did not obtain the information it sought. Directing the Chinese

government to two companies in a First Supplemental Questionnaire, Commerce asked

the government to "trace the companies' ownership back to the ultimate individual or

state owners." *2018 Countervailing Duty Administrative Review of Narrow Woven Ribbons*

*with Woven Selvedge from the People's Republic of China: First Supplemental Questionnaire*

at 5 (April 2, 2020), P.R. Doc 138. The Chinese government responded that neither of

these companies "are registered in mainland China. Thus, the GOC does not have

access to the company registration information." *GOC First Suppl. Questionnaire Resp.* at

7. In a Second Supplemental Questionnaire, Commerce, again referring to producers in

the market sectors of synthetic yarn and caustic soda, asked the government of China

for "a list of the companies" in which the Chinese Government maintains a majority

ownership or controlling management interest "either directly or through other

Government entities" as well as "a list of the companies" where the government's

interest "is less than 50 percent." *GOC Second Suppl. Questionnaire* at 8. The Chinese

government informed Commerce that it does not "maintain the information requested."

*GOC Second Suppl. Questionnaire Resp.* at 11.

The Tariff Act allows Commerce to use an adverse inference "in selecting from among the facts otherwise available" when "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b).  Because the Chinese government made no meaningful effort to obtain the requested information, which was directly relevant to the issue of significant market distortion by government involvement, Commerce justifiably used adverse inferences that significant market distortion affected the two market sectors.  While Commerce should avoid an inference adverse to a cooperating party (such as Yama) based on non-cooperation by the government of the exporting country where the necessary information is present elsewhere on the record, *see Changzhou Trina*, 42 CIT __, __, 352 F. Supp. 3d 1316, 1325 (2018), the specific information Commerce sought was not on the record of the eighth review.  Yama points to the record evidence on the limited government majority ownership of companies in the industry sectors, but this evidence, while relevant, was not sufficient to establish that government involvement did not distort the domestic markets for these products.  The court concludes, therefore, that Commerce permissibly invoked its "adverse inference" authority under 19 U.S.C. § 1677e(b) to determine that the synthetic yarn and caustic soda markets in China were significantly distorted by government involvement.  That determination sufficed to support a decision to resort to a tier-two analysis under 19 C.F.R. § 351.511(a)(2)(ii), under which Commerce based its subsidy rates on world price information placed on

the record from the previous review.  While contesting the Department's decision to

conduct a tier-two analysis, Yama did not contest the suitability of this world price

information for use as benchmarks in its determinations that Yama obtained synthetic

yarn and caustic soda at prices that were less than adequate remuneration.

Finally, citing the Chinese "Company Law" and the CCP Constitution, Yama

argues that even if Chinese government officials were involved in the private

companies, they would be legally prohibited from dictating "how each company is

run."  Pl.'s Br. 42.  Yama does not address the consequence of the Chinese government's

failure to cooperate, which Commerce reasonably found to have precluded it from

making further inquiries on the issue of government involvement in the markets for

synthetic yarn and caustic soda and, therefore, also precluded a tier-one analysis.

### 3.  The Department's "Specificity" Determinations in the Remand Redetermination

Commerce may determine a subsidy to be *de facto* specific if "[t]he actual

recipients of the subsidy, whether considered on an enterprise or industry basis, are

limited in number."  19 U.S.C. § 1677(5A)(D)(iii)(I).[4]  In the eighth review, Commerce

---

[4] The provision reads as follows in the entirety:

Where there are reasons to believe that a subsidy may be specific as a matter of
fact, the subsidy is specific if one or more of the following factors exist:

> (I)     The actual recipients of the subsidy, whether considered on
> an enterprise or industry basis, are limited in number.

(continued . . .)

determined that the LTAR subsidies it found for synthetic yarn and caustic soda were *de facto* specific according to this provision. *Remand Redetermination* at 20. In response to the court's order in *Yama I*, Commerce placed the 2015 New Subsidy Allegation on the record and reexamined the issue of specificity as to both inputs. *Id*. On remand, Commerce, again using facts otherwise available and adverse inferences, determined that "provision of these inputs is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act." *Id*.

According to the Remand Redetermination, the petitioner, in the 2015 New Subsidy Allegation, "provided information demonstrating that synthetic yarn is used solely by the textiles industry in China." *Remand Redetermination* at 19 (*Citing 2015 New Subsidy Allegation* Part 1F (Feb. 7, 2017) Exhibit II P "How Yarn is Made" P.R.R. Doc 7, (explaining that "[y]arn is used to make textiles . . . .")).

---

(II)    An enterprise or industry is a predominant user of the subsidy.
(III)    An enterprise or industry receives a disproportionately large amount of the subsidy.
(IV)    The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

In evaluating the factors set forth in subclauses (I), (II), (III), and (IV), the administering authority shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation.

19 U.S.C. § 1677(5A)(D)(iii)

During the eighth review, Commerce requested that the Chinese government:

"[p]rovide a list of the industries in China that purchase synthetic yarn directly. . .

Please clearly identify the industry in which the companies under review are classified."

*GOC Initial Questionnaire* at II-7.  The Chinese government responded that "synthetic

yarn has a wide range of uses, including but not limited to use in the narrow ribbon

industry." *GOC Initial Questionnaire Response* at 19.  In the First Supplemental

Questionnaire, Commerce again asked the Chinese Government to provide a list of the

industries in China that purchase synthetic yarn and caustic soda, and the government

replied, "synthetic yarn and caustic soda have a wide range of uses, including, but not

limited to, use in the narrow woven ribbon industry." *GOC First Suppl. Questionnaire

Resp.* at 7.

        The responses of the government of China did not contradict the evidence in the

New Subsidy Allegation that the sole user of synthetic yarn is the textile industry.

Yama argues that the textile "industry" consists of multiple industries, including "the

ribbons industry, the thread industry, the unfinished textile industry, finished textile

industry, shirt industry, etc."  Pl.'s Br. 47.  While the "textiles industry" in China

undoubtedly can be considered to be comprised of multiple industries, as Yama argues,

the specificity provision of the Tariff Act instructs that "any reference to an enterprise or

industry is a reference to a foreign enterprise or foreign industry and *includes a group of

such enterprises or industries*." *Id.* § 1677(5A)(D)(iii) (emphasis added).  Under that

standard, the record evidence suffices to support the Department's determination that the subsidy for the sale of synthetic yarn at less than adequate remuneration is "specific" as required by 19 U.S.C. § 1677(5A)(D)(iii)(I).

The 2015 New Subsidy Allegation asserted that caustic soda is used by a total of six industries. *Remand Redetermination* at 20 (*See New Subsidy Allegation Part 1G* (Feb. 7, 2017) *Exhibit III-H "GPS Safety Summary Sodium Hydroxide"* P.R.R. Doc 8, listing six industries that use caustic soda). The questionnaire response of the government of China referred generally to "a wide range of uses" without specifying industries in addition to those identified in the 2015 New Subsidy Allegation. *GOC Initial Questionnaire Response* at 27 ("As a general matter, caustic soda has a wide range of uses, including but not limited to use in the narrow ribbon industries."). Commerce reasonably concluded from the uncontradicted evidence in the New Subsidy Allegation that a limited number of industries, in this case six, used caustic soda and permissibly determined that the subsidy for caustic soda was *de facto* specific within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(I).

### 4. Yama's Contention of the Absence of a "Program"

Yama contests the specificity findings on which Commerce relied for its LTAR subsidies on synthetic yarn and caustic soda, on the ground that evidence does not demonstrate the existence of a government "program" to provide either of these inputs at less than adequate remuneration. Pl.'s Br. 48 ("Commerce states that the Statute does

not require a 'program' but merely a subsidy . . . This is not accurate.").  Plaintiff bases

its argument on 19 U.S.C. § 1677(5A)(D)(iii) ("In evaluating the factors set forth in

subclauses (I), (II), (III), and (IV), the administering authority shall take into account the

extent of diversification of economic activities within the jurisdiction of the authority

providing the subsidy, and the length of time during which *the subsidy program* has been

in operation.") (emphasis added).  The court is not persuaded by this argument.

As discussed previously, Commerce used world price information to conclude

that Yama purchased synthetic yarn and caustic soda for prices at less than adequate

remuneration.  As also mentioned, Yama contested, unsuccessfully, the decision to

conduct a tier-two analysis but did not contest the suitability of this information for use

as world price benchmarks in determining that Yama obtained both inputs for less than

adequate remuneration.  Moreover, the record allowed Commerce to use facts

otherwise available and adverse inferences to determine that Yama's suppliers were

"authorities" and that the overall Chinese market for these inputs was significantly

distorted by government involvement.  From these determinations, Commerce

permissibly used an adverse inference to determine that the Chinese government had

significant involvement in Yama's suppliers and in the entire sectors of the Chinese

domestic market for these two products.  It was reasonable, therefore, for Commerce to

consider this inferred government involvement as constituting "programs" within the

meaning of 19 U.S.C. § 1677(5A)(D)(iii).  *See Yama Ribbons and Bows Co., Ltd. v. United States*, 46 CIT ___, 606 F. Supp. 3d 1345, 1359 (2022).

### III. CONCLUSION

The court sustains the Department's decision in the Remand Redetermination not to impose countervailing duties upon Yama with respect to the Export Buyer's Credit Program.

The court concludes that the Remand Redetermination remedied the deficiencies the court identified in *Yama I* with respect to synthetic yarn and caustic soda and reached results supported by substantial record evidence.  The Department's inclusions of subsidy rates for the provision of synthetic yarn and caustic soda for less than adequate remuneration, therefore, were supported by substantial evidence and in accordance with law.

 The court will enter judgment sustaining the Remand Redetermination.

 /s/ Timothy C. Stanceu
Timothy C. Stanceu, Judge

Dated: August 13, 2024
New York, New York